**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF KENTUCKY**
**AT LEXINGTON**

*ELECTRONICALLY FILED*

| | | |
|---|---|---|
| **C-VILLE FABRICATING, INC. DBA** | ) | |
| **TARTER INDUSTRIES** | ) | |
| | ) | |
| **AND** | ) | |
| | ) | |
| **ANNA LOU TARTER SMITH,** | ) | |
| **INDIVIDUALLY AND ON BEHALF** | ) | |
| **OF C-VILLE** | ) | **Case No. _____** |
| **FABRICATING, INC., DBA TARTER** | ) | |
| **INDUSTRIES, TARTER** | ) | |
| **MANAGEMENT COMPANY, INC.,** | ) | |
| **TARTER GATE COMPANY, LLC,** | ) | |
| **AND TARTER TUBE, LLC** | ) | |
| | ) | **COMPLAINT** |
| **AND** | ) | |
| | ) | |
| **LUANN COFFEY, INDIVIDUALLY** | ) | |
| **AND ON BEHALF OF C-VILLE** | ) | |
| **FABRICATING, INC., DBA TARTER** | ) | |
| **INDUSTRIES, TARTER** | ) | |
| **MANAGEMENT COMPANY, INC.,** | ) | |
| **TARTER GATE COMPANY, LLC,** | ) | |
| **AND TARTER TUBE, LLC** | ) | |
| | ) | |
| **AND** | ) | |
| | ) | |
| **DOUGLAS TARTER, INDIVIDUALLY** | ) | |
| **AND ON BEHALF OF C-VILLE** | ) | |
| **FABRICATING, INC., DBA TARTER** | ) | |
| **INDUSTRIES, TARTER** | ) | |
| **MANAGEMENT COMPANY, INC.,** | ) | |
| **TARTER GATE COMPANY, LLC,** | ) | |
| **AND TARTER TUBE, LLC** | ) | |
| | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |

| | |
|---|---|
| **JOSHUA DONALD TARTER** | ) |
| **910 IRVINE ROAD** | ) |
| **DANVILLE, KY 40422-8900** | ) |
| | ) |
| **AND** | ) |
| | ) |
| **THOMAS LEWIS GREGORY** | ) |
| **95 GLEN VIEW DRIVE** | ) |
| **CAMPBELLSVILLE, KY 42718-7459** | ) |
| | ) |
| **AND** | ) |
| | ) |
| **HONG KONG** | ) |
| **QMC INDUSTRY COMPANY, LTD.** | ) |
| **ROOM 2105, JFZ1125 TREND** | ) |
| **CENTRE, 29-31 CHEUNG LEE** | ) |
| **STREET, CHAI WAN, HONG KONG** | ) |
| | ) |
| | ) |
| | ) |
| **Defendants.** | ) |
| | ) |

Plaintiffs, by counsel, state as follows for their Complaint against Defendants Joshua Donald Tarter ("Josh"), Thomas Lewis Gregory ("Gregory"), and Hong Kong QMC Industry Company, Ltd. ("QMC"; collectively, "Defendants"):

## INTRODUCTION

1.      Josh and Gregory exploited their positions as senior executives at C-Ville Fabricating, Inc., d/b/a Tarter Industries ("Tarter Industries"), Tarter Management Company, Inc. ("Tarter Management"), Tarter Gate Company, LLC ("Tarter Gate"), Tarter Tube, LLC ("Tarter Tube"; collectively "Tarter Companies") to orchestrate a long-running criminal conspiracy that damaged the Tarter Companies.

2.      Over the course of seven years, Josh and Gregory looted millions of dollars from the Tarter Companies by overcharging for products they supplied to the Tarter Companies, fraudulently obtaining compensation for themselves while actually working against the interests

2

of their employer, and embezzling Tarter Companies' trade secrets.  Josh and Gregory executed this brazen conspiracy by creating several foreign companies that they used to siphon off Tarter Companies' profits through numerous racketeering schemes.

3.     Evidence currently available to Plaintiffs shows that Josh and Gregory stole tens of millions of dollars from the Tarter Companies through their racketeering activities – yet the discovery process will undoubtedly reveal that the true impact of their unlawful scheme is greater. The magnitude of Defendants' theft is obvious upon review of the costing quotes recently obtained by the Tarter Companies using legitimate and competitive pricing practices.  As of November 2017, the Tarter Companies received quotes directly from suppliers, rather than through the intermediary QMC.  One of these quotes – for the exact same products QMC sold to the Tarter Companies - indicates an annual savings of over $3,500,000.  Put differently, Josh and Gregory used their positions with the Tarter Companies to overcharge the Tarter Companies by, at least, $20,000,000 over the term of the scheme from *one* supplier.  Josh and Gregory used this stolen money to fund their extravagant lifestyles.

4.     Josh and Gregory flagrantly breached their fiduciary duty of loyalty to the Tarter Companies by acting against the best interests of the companies.  As a senior manager who frequently, although incorrectly, held himself out as President of the business, Josh occupied a position of great trust and authority.  So did Gregory, who, as a senior executive that referred to himself as a Vice-President, was entrusted with overseeing quality, engineering and purchasing decisions.  Josh and Gregory betrayed this trust by establishing a multitude of foreign companies, including QMC, to facilitate their unlawful schemes against the Tarter Companies.  Josh and Gregory also manipulated their subordinates at the Tarter Companies and other related entities into

3

unwittingly aiding them in embezzling confidential business information and facilitating QMC's attempted takeover of Tarter Companies' businesses.

5.     Josh and Gregory knew their conduct was unlawful, as evidenced by their extensive efforts to conceal their fraudulent behavior from the Tarter Companies owners and employees. Rather than create a domestic company, which could readily have been investigated, Defendants incorporated multiple companies in Hong Kong with a Chinese citizen in an effort to disguise their ownership.  Defendants then established other companies to obtain products in mainland China, and established still other companies to launder their fraudulent proceeds back into the United States.  Josh and Gregory failed to disclose their ownership interests in these foreign entities, including QMC, while they steered the majority of Tarter Companies' business to their foreign companies.  When asked if he had any ownership interest in QMC, Josh repeatedly lied to his fellow owners.  This lie was also perpetrated on the United States government, when Josh falsely attested on a customs form that he had no ownership interest in QMC and the related foreign entities.  For his part in the scheme, Gregory disciplined and criticized any employees that complained about QMC's, or its related entities, poor quality, failed to require QMC, or its related entities, to correct substandard products and misled the Tarter Companies' owners and employees about his interest in QMC, and its related entities, for years.

6.     To facilitate their racketeering activities, Josh and Gregory managed and controlled an elaborate criminal enterprise beginning in 2010 that included these multiple foreign companies, in addition to QMC.  Josh and Gregory used each of these foreign companies to facilitate their racketeering activities.  Through these foreign companies, Josh and Gregory engaged in several schemes that relied on their separate and distinct positions as senior executives at the Tarter Companies to steal the businesses' profits and property, including self-dealing, embezzlement of

4

trade secrets, diversion of business opportunities, and accepting salaries from Tarter Management while actually working for the foreign entities, including QMC, in direct conflict with the Tarter Companies' interests.

7.      Since discovery of Josh and Gregory's racketeering activity in 2016, Plaintiffs have repeatedly sought the return of the stolen money, without success.  Instead, Josh and Gregory resigned as directors of QMC in September 2016, purportedly giving full control of the entity to a Chinese national in a further attempt to hide their conduct and to keep relevant documents overseas, and inaccessible to Plaintiffs.  Gregory also incorporated his own business, built upon trade secrets he misappropriated from the Tarter Companies, in a continued attempt to capitalize on the intellectual property and money he embezzled from the Tarter Companies.

## PARTIES

8.      Plaintiff Anna Lou Tarter Smith ("Anna Lou") is a shareholder and director of Tarter Industries and Tarter Management, each of which is a Kentucky corporation.  Anna Lou is a member and manager of Tarter Gate and Tarter Tube, each of which is a Kentucky limited liability company. Ann Lou owns the single largest interest in the Tarter Companies.  She brings this action individually and on behalf of Tarter Industries, as an alternative to the direct action brought herein by Tarter Industries, Tarter Management, Tarter Gate and Tarter Tube as a derivative action pursuant to Kentucky Revised Statute ("KRS") § 271B.7-400 and KRS § 275.337.

9.      Plaintiff LuAnn Coffey ("LuAnn") is a shareholder of Tarter Industries and Tarter Management, and is a member and manager of Tarter Gate and Tarter Tube. She brings this action individually and on behalf of Tarter Industries, as an alternative to the direct action brought herein by Tarter Industries, Tarter Management, Tarter Gate and Tarter Tube as a derivative action pursuant to KRS § 271B.7-400 and KRS § 275.337.

10.     Plaintiff Douglas Tarter ("Doug") is a shareholder of Tarter Industries and Tarter Management, and is a member and manager of Tarter Gate and Tarter Tube. He brings this action individually and on behalf of Tarter Industries, as an alternative to the direct action brought herein by Tarter Industries, Tarter Management, Tarter Gate and Tarter Tube as a derivative action pursuant to KRS § 271B.7-400 and KRS § 275.337.

11.     The Tarter Companies, including Tarter Industries, are Kentucky companies with their principal place of business in Casey County, Kentucky.

12.     Defendant Josh was at all relevant times a senior manager with the Tarter Companies and became a shareholder or member of the respective Tarter Companies in 2012.  He had management responsibilities in relation to all Tarter Companies.  He resides in Boyle County, Kentucky.

13.     Defendant Gregory was a senior manager of Tarter Gate until September 14, 2016, when he resigned as a result of the misconduct complained of herein. Although Tarter Gate paid him, Gregory had management responsibilities for all of the Tarter Companies.  Upon information and belief, Gregory is a resident of Taylor County, Kentucky.

14.     QMC is a corporation incorporated under the laws of Hong Kong, China, on April 30, 2010, with its registered office at 15/F, JFZ1125, Highgrade Building, 117 Chatham Road, Tsimshatsui, Kln, Hong Kong.  The founding members of QMC are Josh, Gregory, and Xiaofeng "Eleven" Chen ("Chen"). Josh and Gregory, along with non-party Chen, each owned or had a beneficial interest in, and exercised control of QMC, and its related entities, during the relevant timeframe.

## JURISDICTION AND VENUE

15.     Pursuant to 28 U.S.C. § 1331, this Court has original jurisdiction over the subject matter of this case because all or part of the claims arise from Defendants' violations of the United

6

States Code, including the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18

U.S.C. § 1961, et. seq., and the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836.

16.     This Court has personal jurisdiction over Defendants pursuant to 18 U.S.C.

§ 1965(a) and (b).

17.     This Court has supplemental jurisdiction over the subject matter of the claims

asserted herein that arise under state law pursuant to 28 U.S.C. § 1367(a) and the doctrines of

pendent and ancillary jurisdiction, because the state law claims arise from a common nucleus of

operative facts giving rise to the federal claims alleged in this case.

18.     Venue is proper in this district pursuant to 18 U.S.C. § 1965 and 28 U.S.C. § 1391

as one or more of Defendants reside, are found, have agents, or transact their affairs within the

Eastern District of Kentucky and a substantial portions of the proceeds of the scheme to defraud

were sent to the Eastern District.

## THE LEGAL ENTITIES

A.      The Tarter Companies

19.     The Tarter Companies are a number of entities under common ownership and

control that combine with other entities to carry on the family business that evolved from the

creation of Tarter Gate, founded in 1945 in Dunnville, Kentucky.

20.     Since 1945, a number of entities have been formed to carry on the business that has

become known collectively as the Tarter Business.

21.     The Tarter Business is run through a number of separate legal entities, but they all

serve to constitute an integrated network of enterprises existing to carry out the business. Each

entity has its own governance structure, has its own books of account, and files its own tax returns

recognizing its own profits and losses.  Although the companies are separate legal entities, the

entities are commonly owned and share resources and employees.

7

22.     The Tarter Business, more specifically the Tarter Companies, has always been owned by the Tarter family and has been passed down generationally.

23.     At one point, the ownership of the Tarter Business was held by two brothers, David Tarter ("David") and Donald Tarter ("Donald"), together with their wives Anna Lou and Joy, respectively (collectively all four are referred to as the "Third Generation").  David and Anna Lou had two children, Doug and LuAnn, and are divorced.  Donald and Joy have three children, Keith Tarter ("Keith"), Josh and Nell Tarter Duggins ("Nell").

24.     As detailed below, Josh, Keith and Nell own an equal share of the Tarter Companies, comprising fifty percent (50%) of the ownership. Their cousins Doug and LuAnn each own 12.5% of the Tarter Companies and their aunt, Anna Lou, owns 25%, with the exception of the division of ownership for Tarter Management as it is slightly different.  Regardless of the more detailed divisions, Donald's side of the family owns 50% of the Tarter Companies and David's side of the family owns the remaining 50%.

25.     The Tarter Companies, like many family and closely held businesses, have not strictly adhered to the practice of holding annual shareholders and directors meetings.  The owners discharged their management responsibilities along generally understood lines, often without regard to office or title.

B.     Tarter Industries

26.     Tarter Industries was incorporated on or about May 18, 1993 with the Third Generation as shareholders.

27.     According to Tarter Industries' Articles of Incorporation "[t]he Board of Directors shall have the power to make by-laws consistent with the laws of the Commonwealth of Kentucky. . . ."  A copy of Tarter Industries' Articles of Incorporation and By-Laws are attached collectively as Exhibit A-1.

8

28.     Pursuant to Tarter Industries' By-Laws, the Board of Directors has "general supervision, management, and control of the affairs and business" of Tarter Industries.

29.     Those same By-Laws state that the Board of Directors is made up of four (4) persons.

30.     Pursuant to these By-Laws, "[t]he Directors shall be elected annually by the Stockholders, at their annual meeting, and shall hold office for one year or until his respective successor is elected. . . ."

31.     A director for Tarter Industries serves until he or she is replaced by a successor, resigns in a writing delivered to the corporate Secretary, or dies.

32.     Tarter Industries' Board of Directors are to hold an annual meeting, but to the extent a special meeting is necessary, special meetings are called by the corporate Secretary upon the direction of the President or pursuant to the written request of a majority of the Tarter Industries' Directors.

33.     A majority of the existing Tarter Industries' Directors constitutes a quorum for the transaction of any business at any Board of Directors meeting.

34.     Upon an appropriate request, the Tarter Industries' Secretary must issue a written notice that identifies the time, place and purpose of such meeting and the notice shall be provided five (5) days in advance.

35.     On or about May 20, 1993, at the first annual meeting of the Shareholders, the Third Generation, voted unanimously for the Third Generation to serve as the Directors of Tarter Industries.  A copy of the Tarter Industries 1993 Shareholders' Meeting Minutes is attached as Exhibit A-2.

36.     That same day, at the first meeting of the Board of Directors for Tarter Industries, the Third Generation unanimously elected David as President, Donald as Vice President, Joy as Treasurer, and Anna Lou as Secretary. A copy of the Tarter Industries 1993 Board of Directors' Meeting Minutes is attached as Exhibit A-3.

37.     Tarter Industries held annual Shareholders and Board of Directors meetings memorialized with written minutes for the next four years.

38.     Upon information and belief, on or about March 18, 1997, at the last known annual meeting of the Shareholders, Tarter Industries' Shareholders again unanimously voted the Third Generation to serve as Directors.  A copy of the Tarter Industries 1997 Shareholders' Meeting Minutes is attached as Exhibit A-4.

39.     That same day and directly after the annual Shareholders meeting, the Tarter Industries' Board of Directors annual meeting occurred and the Third Generation, as the Board of Directors for Tarter Industries, unanimously elected David as the President, Donald as the Vice President, Joy as the Treasurer, and Anna Lou as the Secretary.  A copy of the Tarter Industries 1993 Board of Directors' Meeting Minutes is attached as Exhibit A-5.

40.     Subsequently, on December 31, 2012, the Third Generation, as "all of the Shareholders and all of the Directors" of Tarter Industries, approved a resolution ("2012 Resolution") that Tarter Industries waived its right of first refusal and allowed David, Donald and Joy to transfer their shares in Tarter Industries to Nell, Keith, Josh, Doug and LuAnn (collectively, "Fourth Generation").  A copy of the 2012 Resolution is attached as Exhibit A-6.

41.     On or about December 31, 2012, all shares owned by David, Donald, and Joy were then transferred to the Fourth Generation through the issuance of new certificates.  Copies of the

2012 Shares Certificates are collectively attached as Exhibit A-7. Although the Fourth Generation became owners, they were never elected as officers or directors of Tarter Industries.

42.     Pursuant to the By-Laws, David, as President, and Anna Lou, as Secretary, executed the Tarter Industries stock certificates issued to the Fourth Generation on December 31, 2012.

43.     From that point forward, Anna Lou, Doug and LuAnn collectively owned fifty percent (50%) and Keith, Josh, and Nell collectively owned fifty percent (50%) of Tarter Industries.

44.     The Third Generation still constitutes Tarter Industries' Board of Directors with David as President, Donald as Vice President, Joy as Treasurer, and Anna Lou as Secretary. Any document indicating otherwise, including Annual Reports, correspondence, or internal memoranda, is erroneous.

C.    <u>Tarter Management</u>

45.     Tarter Management was incorporated on or about August 12, 1980 with Anna Lou and Joy as the two shareholders.

46.     According to Tarter Management's Articles of Incorporation "[t]he Board of Directors shall have the power to make by-laws consistent with the laws of the Commonwealth of Kentucky" and the By-Laws similarly provide that the Board "shall have the general supervision, management and control of the affairs and business of the corporation."  Copies of the Tarter Management Articles of Incorporation and By-Laws are attached collectively as Exhibit B-1.

47.     Pursuant to Tarter Management's By-Laws, "[t]he Directors shall be elected annually by the stockholders, at their annual meeting, and shall hold office for one year or until their respective successor is elected. . . ."

48.     Tarter Management's Directors serve until he or she is replaced by a successor, resigns in a writing delivered to the corporate Secretary, or dies.

49.     Pursuant to these same Articles of Incorporation, the Board of Directors consists of two (2) persons.

50.     Tarter Management's Board of Directors are to hold annual meetings, but to the extent a special meeting is necessary, special meetings are held upon a call by the corporate Secretary at the direction of the President or written request of a majority of the Board of Directors.

51.     Upon an appropriate request, Tarter Management's Secretary shall issue a written notice that identifies the time, place and purpose of such meeting and shall provide five (5) days' notice.

52.     A majority of the Tarter Management Directors shall constitute a quorum for the transaction of any business at any Board of Directors meeting.

53.     On or about September 23, 1980, at the first meeting of Tarter Management's Shareholders, Joy and Anna Lou voted unanimously for themselves to serve as the Directors of Tarter Management and issued 250 shares to each of them.  A copy of the 1980 Tarter Management Shareholders' Meeting Minutes is attached as Exhibit B-2.

54.     Then immediately thereafter, at the first meeting of the Board of Directors for Tarter Management, Joy and Anna Lou unanimously elected Anna Lou as President and Joy as Secretary-Treasurer.  A copy of the 1980 Tarter Management Board of Directors' Meeting Minutes is attached as Exhibit B-3.

55.     Tarter Management appears to have held annual Shareholders and Board of Directors meetings for the next seventeen years.

12

56.     At the last vote of Tarter Management's Shareholders on or about April, 1997, Joy and Anna Lou again unanimously elected themselves to serve as Directors. A copy of the 1997 Tarter Management Shareholders' Meeting Minutes is attached as Exhibit B-4.

57.     At the annual Tarter Management Board of Directors meeting occurring directly after, Joy and Anna Lou unanimously elected Anna Lou as President and Joy as Secretary-Treasurer.  A copy of the 1997 Tarter Management Board of Directors' Meeting Minutes is attached as Exhibit B-5.

58.     On or about July 28, 1998, Anna Lou divided her shares such that David then owned 125 of the shares and Anna Lou retained 125 shares.  A copy of the 1998 Certificate of Shares is attached as Exhibit B-6.

59.     Subsequently, on December 31, 2012, Anna Lou and Joy as Shareholders and Directors and David as a Shareholder, approved a resolution that Tarter Management waived its right of first refusal and allowed David and Joy to transfer their shares in Tarter Management to the Fourth Generation ("2012 Tarter Management Resolution").  A copy of the 2012 Tarter Management Resolution is attached as Exhibit B-7. Although they became owners, no individuals in the Fourth Generation were ever elected as officers or directors of Tarter Management.

60.     On or about December 31, 2012, all shares owned by David and Joy were transferred to the Fourth Generation through the issuance of new stock certificates. Copies of the 2012 Tarter Management share certificates are attached collectively as Exhibit B-8.

61.     Anna Lou, as President, and Joy, as Secretary, executed the Tarter Management stock certificates issued to the Fourth Generation on December 31, 2012.

62.     After the transfer, Anna Lou retained 125 shares, David split his shares evenly between Doug, 62.5 shares, and LuAnn, 62.5 shares, and Joy split her 250 shares between Keith, 83.3 shares, Josh, 83.3 shares, and Nell, 83.4 shares.

63.     From that point forward, Anna Lou, Doug and LuAnn collectively owned fifty percent (50%) and Keith, Josh, and Nell collectively owned fifty percent (50%) of Tarter Management.

64.      Tarter Management's By-Laws have never been amended to allow for a different number of directors and a vote was never held that would alter the status of Joy and Anna Lou as the two Tarter Management directors.

65.     Consequently, the officers of Tarter Management are as follows – Anna Lou is President and Joy is Secretary-Treasurer. Any document indicating otherwise, including Annual Reports, correspondence, or internal memoranda, is erroneous.

D.     Tarter Gate

66.     Tarter Gate is a limited liability company created pursuant to the Kentucky Limited Liability Act, KRS Chap. 275, *et seq*.  A copy of the Operating Agreement of Tarter Gate Company, LLC ("TGC Operating Agreement") is attached as Exhibit C-1.  It is the surviving entity of a merger between Tarter Gate Company, Inc., and TAGC, LLC which occurred on April 29, 1999.

67.     Pursuant to the TGC Operating Agreement, the Managers have the general supervision, management and control of Tarter Gate.

68.     The Tarter Gate Managers are to hold annual meetings, but to the extent a special meeting is necessary, "[t]he Secretary shall call a special meeting of the Managers when directed by the President, or upon written request of a majority of the Managers."

69.     Any notice of a special meeting of the Tarter Gate Managers shall include the time, place and purpose of such meeting and shall provide for five days' notice.

70.     At the time of Tarter Gate's creation, Vivian K. Tarter held 34 units, Donald held 20.5 units, David held 10.25 units, and Anna Lou held 10.25 units for a total of 75 units.

71.     Pursuant to an Amendment of the Operating Agreement of Tarter Gate, LLC dated December 31, 2012 and Second Amendment to Operating Agreement of Tarter Gate Company, LLC (collectively, "Tarter Gate Amendments"), the membership interests in Tarter Gate were subsequently transferred so that Anna Lou held 10.25 units, Keith held 12.507 units, Josh held 12.497 units, Nell held 12.496 units, Doug held 13.625 units, and LuAnn held 13.625 units for a total of 75 units.  Copies of the Tarter Gate Amendments are attached collectively as Exhibit C-2.

72.     From that point forward, Anna Lou, Doug and LuAnn collectively owned fifty percent (50%) and Keith, Josh, and Nell collectively owned fifty percent (50%) of Tarter Gate.

73.     According to those same Tarter Gate Amendments, the transfer of the units was also "a transfer of management rights in the Company."

74.     On or about January 2, 2014, Tarter Gate held an annual meeting of member/managers whereby after a unanimous vote, Josh was elected as the President, LuAnn was elected as the Vice President, and Anna Lou was elected as the Secretary/Treasurer.  The Fourth Generation and Anna Lou each executed the Tarter Gate meeting minutes as "Member/Managers".  A copy of the 2014 Tarter Gate Meeting Minutes is attached as Exhibit C-3.

E.     Tarter Tube

75.     Tarter Tube is a limited liability company created pursuant to the Kentucky Limited Liability Act, KRS Chap. 275, *et seq*.  A copy of the Operating Agreement of Tarter Tube, LLC ("TT Operating Agreement") is attached as Exhibit D-1. Tarter Tube is the surviving entity of a merger between Tarter Tube, Inc., and TATB, LLC.

15

76.     Pursuant to the TT Operating Agreement, the Managers have the general supervision, management and control of the affairs and business of Tarter Tube.

77.     The Tarter Tube Managers are to hold annual meetings, but to the extent a special meeting is necessary, "[t]he Secretary shall call a special meeting of the Managers when directed by the President, or upon written request of a majority of the Managers."

78.     Any notice of a special meeting of the Tarter Tube Managers shall include the time, place and purpose of such meeting and shall provide for five days' notice.

79.     At the time of Tarter Tube's creation, Donald held 100 units, David held 50 units, Anna Lou held 50 units, and the Estate of R.F. Tarter held 75 units for a total of 275 units.

80.     Pursuant to an Amendment to Operating Agreement of Tarter Tube, LLC dated December 31, 2012 ("Tarter Tube Amendment"), the units in Tarter Tube were transferred such that Anna Lou held 68.75 units, Keith held 45.83 units, Josh held 45.83 units, Nell held 45.84 units, Doug held 34.375 units, and LuAnn held 34.375 units for a total of 125 units. A copy of the Tarter Tube Amendment is attached as Exhibit D-2.

81.     From that point forward, Anna Lou, Doug and LuAnn collectively owned fifty percent (50%) and Keith, Josh, and Nell collectively owned fifty percent (50%) of Tarter Tube.

82.     According to that same Tarter Tube Amendment, the transfer of the units was also "a transfer of management rights in the Company."

**STANDING**

83.     The individual Plaintiffs, Anna Lou, Doug and LuAnn (collectively, the "Individual Plaintiffs"), collectively own fifty per cent of the ownership interests in the Tarter Companies. Anna Lou owns the single largest stake in the Tarter Companies. This action seeks to recover damages on behalf of the corporate Plaintiffs for which the Defendants are legally liable. The

16

Individual Plaintiffs have done everything possible to call special meetings of the decision makers of the Tarter Companies to authorize litigating the claims herein made. Those efforts are described in detail below.

84.     To the extent that the respective entities have not authorized a direct action, Individual Plaintiffs' efforts have been stymied because Josh, Keith, Nell, Joy and Donald are opposed to litigating the claims, even though they acknowledge Defendants' wrongdoing.  Josh, Keith, Nell, Joy and Donald have each expressed their hostility to holding Defendants accountable through litigation on multiple occasions, including outright refusals to discuss the wrongdoing. Further demand is futile, as demonstrated herein.

85.     In September 2016, after Individual Plaintiffs discovered Defendants' scheme, Josh refused to disclose the details of his involvement with QMC, or to return the money that rightfully belonged to the Tarter Companies.

86.     No later than October 2016, every director, member or owner of the Tarter Companies knew of the conspiracy described herein, knew it was wrongful, knew that Individual Plaintiffs had demanded full disclosure from Josh, and knew that he had failed to make such legally required disclosures.

87.     Individual Plaintiffs attempted to address the matters giving rise to this Complaint for nearly a year before resorting to litigation.  They did so by making repeated demands for information and compensation to the Tarter Companies.

88.     More specifically, on June 20, 2017, Individual Plaintiffs demanded that Josh fully disclose his relationship with QMC (as it was then known) and repay the Tarter Companies the gains from the conspiracy described herein. Individual Plaintiffs made this demand in person to Josh in the presence of other Tarter Companies' owners.

17

89.    Josh refused to disclose information concerning the details of the conspiracy and Keith and Nell did not join Individual Plaintiffs, and never responded to the demand for information.

90.    By electronic message on June 22, 2017, Individual Plaintiffs reiterated their demand that Josh make a complete disclosure of all matters related to QMC and return all profits of QMC to the Tarter Companies.

91.    Josh has at all times refused to make full disclosure of the misconduct outlined herein and Donald, Joy, Nell, and Keith made no effort to seek such disclosures or otherwise protect the interests of the Tarter Companies.

92.    Donald, Joy, Keith, Nell and Josh have a close familial relationship. This close relationship motivates, at least in part, their refusal to participate in holding Josh accountable for his misconduct, and their willingness for Plaintiffs to absorb the losses caused thereby.

93.    Having spent most of a year attempting to obtain information from Josh that he was legally obligated to provide, and having received no assistance in that endeavor from Keith or Nell, Individual Plaintiffs determined that litigation was the only alternative to absorbing a multi-million dollar loss caused by the wrongful conduct described herein.

94.    Individual Plaintiffs also concluded that seeking assistance from Donald, Joy, Keith, or Nell, in supporting direct actions against Josh and his co-conspirators would be futile.

95.    Consequently, Individual Plaintiffs filed a derivative action against Josh, Gregory, and QMC in Eastern District of Lexington, *Anna Lu Tarter Smith, et al. v. Joshua Donald Tarter, et al.*, Civil Action No. 17-cv-334-DCR ("Initial Complaint").

96.    Subsequently, in September 2017, Keith and Josh engaged in correspondence about "our side" referring to the siblings of Keith, Nell, and Josh, as opposed to Individual Plaintiffs.

97.     All owners understood that there was a significant division between Individual Plaintiffs on the one hand, and Josh, Keith, and Nell, as siblings, and Donald and Joy, as their parents on the other.

98.     Based on this acknowledged division between the two sides of the family, the owners executed an Interim Management Agreement that placed the day-to-day management of the Tarter Businesses in the hands of JJ Tarter ("JJ"), Doug's wife, and Keith acting jointly ("Interim Agreement").

99.     The basis for the Interim Agreement was the practical understanding that there needed to be a manner for the Tarter Business to function while the litigation continued and, therefore, one person from each side of the family was selected to exercise day-to-day management authority of the Tarter Business.

100.    There is, in fact, a sharp division of opinion concerning the proper method of dealing with the conspiracy outlined herein between Donald, Joy, Nell, Keith, and Josh, on the one hand, and David, Anna Lou, LuAnn and Doug on the other.

101.    Nevertheless, the Court dismissed the Initial Complaint without prejudice on the basis that the Initial Complaint failed to adequately allege derivative standing and the Individual Plaintiffs did not plead any direct injury.[1]

102.    Subsequent events have demonstrated that Individual Plaintiffs' judgment about Nell, Keith, Donald, and Joy's aversion to the Initial Complaint and litigation was correct and, on numerous occasions, each has expressed his, or her, opposition to litigating the claims made herein.

103.    For example:

---

[1] By including this fact, Plaintiffs reserve all rights related to that Opinion and Order, Record No. 26.

      a.     Keith reprimands Individual Plaintiffs for attempting to hold Josh accountable for the misconduct described herein because, according to Keith on multiple occasions, the latest of which was February 6, 2018, Josh has threatened to take actions to damage the Tarter Businesses if the litigation continues. Keith expressed his opposition to litigation, citing Josh's threats, at the Tarter Companies' offices in Casey County, Ky.

      b.     Donald has expressed opposition to the litigation, even though he has also said, "I know he [Josh] has done some things."

      c.     Shortly after the Court dismissed the Initial Complaint without prejudice, Individual Plaintiffs approached both Keith and Nell seeking support to litigate the claims. Even though both Keith and Nell have acknowledged that Josh's conduct was wrongful, both declined to support litigation.  Nell flatly refused, and Keith would not answer. This conversation occurred at the Tarter Business headquarters in Casey County, Kentucky in January 2018.

      d.     At a family meeting on or about February 6, 2018, Keith expressed strong opposition to litigating the claims made herein, stating that, "the lawsuit needs to go away."

      e.     That same day, Keith informed LuAnn that he agreed that what Josh did was improper but that Josh should only be expected to "pay back what he can".

      f.     On a separate occasion in February 2018, at Tarter Companies' headquarters, Joy said to LuAnn and JJ, referring to the litigation, "we need to forget this."

104.    As recently as March 14, 2018, in Casey County, Ky., Keith continued to indicate his disdain for this litigation and his desire to end the litigation with or without proper recompense from Josh.

105.    Generally, Keith, Nell, Joy and Donald have retained their voting block and not wavered from their refusal to participate in litigation over these matters.

106. Keith, Nell, Joy and Donald view the litigation as potentially taking the control and decision making power from their "side" and placing it in the hands of the other "side" such that Keith, Nell, Joy and Donald would be materially impaired and potentially lose certain financial benefits they continue to reap due to the fifty-fifty stalemate.

A.   Derivative and Direct Standing for Tarter Industries

107. In order for the corporate entity, Tarter Industries, to file litigation, a request for a call to hold a special meeting must be made by the appropriate person, or persons, to the Board of Directors to vote on said litigation.  Then, the Board of Directors must hold a special meeting at which time a majority of a quorum of the Board of Directors would have to vote in favor of initiating litigation on behalf of the entity.

108. Based on the corporate records of Tarter Industries, David is the President and he and the remaining Members of the Third Generation are the Directors. Anna Lou is the Secretary. The corporate By-laws set out the exclusive means which a person can become President of Tarter Industries. David was elected President and has never vacated the office in the manner prescribed by the By-laws. Josh has never been elected President of Tarter Industries.

109. Accordingly, on February 7, 2018, David requested that Anna Lou issue a call for a special meeting of Tarter Industries to demand that Tarter Industries commence legal action and Anna Lou did concurrently issue a Notice of Special Meeting for Tarter Industries ("Notice for Tarter Industries").

110. The Notice for Tarter Industries included the purpose of the Special Meeting along with the time, 10 a.m., the date, February 22, 2018, and the location, 10739 S. US-27, Dunnville, Kentucky 42528.

111. The purpose of the special meeting, as stated in the notice, was to approve the filling of litigation against Defendants for certain claims including, but not limited to, the claims

21

previously asserted in the Initial Complaint based on the facts and evidence set forth therein as well as the facts and evidence previously provided to the shareholders and/or Directors.

112.    Out of an abundance of caution, the Notice of Tarter Industries also included a request for a special meeting by David and Individual Plaintiffs and invited either Josh, Keith, Nell, Joy or Donald, or Keith and JJ, to agree to call a special meeting in the following ways:

a.      If Josh, Keith, Nell, Joy or Donald believed that the individuals in the Third Generation are the directors, the Notice requested that Joy or Donald agree to join David and Anna Lou's request that the Secretary, Anna Lou, issue a notice calling for a special meeting;

b.      If any interested party contended  that the transfer of shares on December 31, 2012 also transferred the seats on the Board of Directors for Tarter Industries such that the Fourth Generation and Anna Lou are the directors, the Notice requested that Josh, Keith, or Nell agree to join Doug, Lu Ann and Anna Lou's request that the Secretary, Anna Lou, issue a  notice calling for a special meeting;

c.      If Josh, Keith, Nell, Joy or Donald believed that the individuals in the Fourth Generation and Anna Lou are the directors and that Josh is the President, in accordance with the inaccurate Annual Reports, the Notice demanded that Josh request that the Secretary, Anna Lou, issue a notice calling for a special meeting; and,

d.      If Josh, Keith, Nell, Joy or Donald believed that the individuals in the Fourth Generation were the directors and the Interim Agreement somehow placed JJ and Keith in the position of co-Presidents, the Notice requested that Keith and JJ request that the Secretary, Anna Lou, issue a notice calling for a special meeting.

113.    The Notice for Tarter Industries stated that Josh, Keith, Nell, Joy and Donald should respond to the request for their agreement to call a special meeting by February 9, 2018.

22

114.    If Individual Plaintiffs received no communication from Nell, Josh, Keith, Joy, or Donald by February 9, 2018, Individual Plaintiff stated they would consider this failure to respond as a refusal to hold a special meeting and initiate litigation.

115.    Individual Plaintiffs and David sent out the Notice for Tarter Industries via US Mail and electronic mail.

116.    Anna Lou also hand-delivered a copy of the Notice for Tarter Industries to Nell and placed hardcopies on Keith, Josh, Joy, and Donald's desks.

117.    After receiving the Notice for Tarter Industries, Nell informed Individual Plaintiffs that there was some confusion regarding whether the meeting was at 10 a.m. or p.m.

118.    Not wanting any confusion regarding the time of the special meeting, Individual Plaintiffs and David sent a second notice in the same manner as the Notice for Tarter Industries that indicated that the time of the requested meeting was definitively 10 a.m.

119.    Immediately after receiving the Notice for Tarter Industries, Keith responded and asked what the purpose was of the Notice for Tarter Industries.

120.    Aside from these comments by Nell and Keith, none of the other Individual Plaintiffs or David received any communication from Joy, Donald, Josh, Keith, or Nell on the matter.

121.    Therefore, pursuant to the Notice for Tarter Industries and David's authority as the last elected President of Tarter Industries, on February 22, 2018, at 10:00 a.m. at 10739 S. US-127, Dunnville, Kentucky 42528, David called to order Tarter Industries' special Board of Directors meeting.  A copy of the meeting minutes is attached as Exhibit E.

122.    Attendance was called and it was noted that David, Anna Lou and Joy were present as three of the four directors and this constituted a quorum pursuant to the By-Laws.

123.    In addition, everyone from the Fourth Generation and JJ were present.

124.    No one from present indicated that their attendance at the meeting was only for the purpose of objecting to the Notice for Tarter Industries. No objection to proper notice was made.

125.    Accordingly, Anna Lou moved to approve the filling of litigation against Defendants including, but not limited to, the claims previously asserted in the Initial Complaint based on the facts and evidence set forth therein as well as the facts and evidence previously provided to the shareholders and/or Directors.

126.    David seconded the Motion and then called for a vote at which time Anna Lou and David voted affirmatively and Joy abstained.

127.    David then indicated that the motion passed and because that was the sole purpose of the Special Meeting, closed the meeting.

128.    Accordingly, the Board of Directors of Tarter Industries authorized litigating the claims made herein as a direct corporate action against Defendants.

129.    In the alternative, and to the extent Defendants believe that the Board of Directors is composed of different persons, Individual Plaintiffs made every attempt possible to obtain a vote for direct litigation against Defendants and these attempts were ignored or met with direct opposition.

130.    Joy, Donald, Keith and Nell have continuously demonstrated that they will not exercise any independent or separate business judgment from Josh.

131.    In the alternative, this constitutes a refusal to pursue a direct action against Defendants and any further demand that the Tarter Companies pursue this litigation would be futile, and the Individual Plaintiffs are entitled to pursue this matter as a derivative action.

B.   Derivative Standing for Tarter Management

132.   In order for Tarter Management to file litigation, a request for a call to hold a special meeting must be made by the appropriate person, or persons, to the Board of Directors to vote on said litigation.  Then, the Board of Directors must hold a special meeting at which time a majority of a quorum of the Board of Directors would have to vote in favor of initiating litigation on behalf of the entity.

133.   Based on the corporate records, Anna Lou is the President and a Director of Tarter Management and Joy is the Treasurer-Secretary and a Director of Tarter Management.

134.   Accordingly, pursuant to her authority as President, on February 7, 2018, Anna Lou requested that Joy issue a call for a special meeting by February 9, 2018 to demand that Tarter Industries commence legal action ("Request for Special Meeting of Tarter Management").  Joy refused to issue the requested notice of special meeting for Tarter Management ("Notice of Special Meeting of Tarter Management").

135.   If Joy had complied with her duties as Secretary and issued the Notice of Special Meeting of Tarter Management, the February 9, 2018 Notice of Special Meeting of Tarter Management included the purpose of the Special Meeting along with the time, 10 a.m., the date, February 22, 2018, and the location, 10739 S. US-27, Dunnville, Kentucky 42528.

136.   The purpose of the special meeting was to approve the filling of litigation against Defendants for certain claims including, but not limited to, the claims previously asserted in the Initial Complaint based on the facts and evidence set forth therein as well as the facts and evidence previously provided to the shareholders and/or directors.

137.   Out of an abundance of caution, the Request for Special Meeting of Tarter Management issued on February 9, 2018 by Individual Plaintiffs also requested that either Josh, Keith, Nell, Joy, or JJ, agree to call a special meeting in the following ways:

a.      If Josh, Keith, Nell, or Joy believed that Joy and Anna Lou were the directors, the Request for Special Meeting of Tarter Management requested that Joy agree to join Ann Lou's request for a special meeting and that Joy as Secretary issue the Notice of Special Meeting of Tarter Management;

b.      If Josh, Keith, Nell, or Joy believed that the individuals in the Fourth Generation and Anna Lou were the directors, the Request for Special Meeting of Tarter Management requested that Josh, Keith, or Nell agree to join Doug, LuAnn and Anna Lou's request that the Secretary issue the Notice of Special Meeting of Tarter Management;

c.       If Josh, Keith, Nell, or Joy believed that the individuals in the Fourth Generation were the directors and that Nell was the Secretary, as erroneously indicated in the Tarter Management Annual Reports, the Request for Special Meeting of Tarter Management requested that Nell, as the Secretary issue the Notice of Special Meeting of Tarter Management; or

d.      If Josh, Keith, Nell, or Joy believed that the individuals in the Fourth Generation and Anna Lou were the directors, but the Interim Agreement placed JJ and Keith in the position of co-Presidents, the Request for Special Meeting of Tarter Management requested that Keith and JJ request that the Secretary issue the Notice of Special Meeting of Tarter Management.

138.    The Request for Special Meeting of Tarter Management also stated that Nell, Josh, Keith and Joy must respond to the request for their agreement to call a special meeting by February 9, 2018.

26

139.    If Individual Plaintiffs received no communication from Nell, Josh, Keith or Joy by February 9, 2018, Individual Plaintiffs stated that they would consider this failure to respond as a refusal to hold a special meeting and initiate litigation.

140.    The Request for Special Meeting of Tarter Management was sent via US Mail and electronic mail.

141.    Anna Lou also hand-delivered a copy of the Request for Special Meeting of Tarter Management to Nell and placed hardcopies on Keith, Josh, and Joy's desks at the Tarter Business Headquarters in Casey County, Kentucky.

142.    After receiving the Request for Special Meeting of Tarter Management, Nell informed Individual Plaintiffs that there was some confusion regarding whether the meeting was at 10 a.m. or p.m.

143.    Not wanting any confusion regarding the time of the special meeting, Individual Plaintiffs sent a second notice in the same manner as the Request for Special Meeting of Tarter Management that indicated that the time of the requested meeting was definitively 10 a.m.

144.    Immediately after receiving the Request for Special Meeting of Tarter Management, Keith responded and asked what the purpose was of the Request for Special Meeting of Tarter Management.

145.    Aside from these comments, Individual Plaintiffs received no other communication from Joy, Josh, Keith, or Nell on the matter.

146.    Accordingly, due to Joy's refusal to issue the Notice of Special Meeting of Tarter Management as required by her pursuant to the By-Laws, Anna Lou was unable to issue a proper notice of call for a special meeting.

147.     Joy, Josh, Keith and Nell also ignored the request for a call for a special meeting by a majority of the directors, which similarly prevents calling a special meeting.

148.     These, and the other actions alleged herein demonstrate that Joy, Josh, Keith and Nell are opposed to litigating the claims herein and have refused demands to do so.

149.     Joy, Keith and Nell have continuously demonstrated that they will not exercise any independent or separate business judgment from Josh.

150.     Any further efforts to seek authorization to litigate the claims made herein as direct corporate actions would be futile.

C.     Derivative Standing for LLCs

151.     In order for Tarter Tube and Tarter Gate (collectively, "LLCs") to file litigation, a request for a call to hold a special meeting must be made by the appropriate person, or persons, to the Managers for a vote on said litigation.  Then, the Managers must hold a special meeting at which time a majority of a quorum of the Managers would have to vote in favor of initiating litigation on behalf of the entity.

152.     Based on the documents in the possession of Individual Plaintiffs, the Fourth Generation and Anna Lou constitute the six Member-Managers of LLCs. Josh appears to be the President and Anna Lou the Treasurer-Secretary.

153.     Accordingly, on February 7, 2018, Individual Plaintiffs sent a request for a special meeting of the LLCs to demand that the LLCs commence legal action ("Request for Special Meeting of LLCs").  The Request for Special Meeting of LLCs included the following requests in connection with a proposed special meeting to consider direct action by Tarter Gate and Tarter Tube to litigate the claims made herein:

       a.       That Josh, Keith, or Nell join with Anna Lou, LuAnn and Doug to create a majority of the Managers and properly request that Anna Lou issue a call for a special meeting for the LLCs;

       b.       That Josh, as the last known President or the LLCs, request that Anna Lou, as Secretary-Treasurer, issue a call for a special meeting pursuant to his authority for the LLCs; or

       c.       If Josh, Keith or Nell believed that the Interim Agreement placed JJ and Keith in the position of co-Presidents, the Request demanded that Keith and JJ request that Anna Lou, as Secretary, issue a notice calling for a special meeting for the LLCs.

154.    The Request for Special Meeting of LLCs also stated that Nell, Josh and Keith must respond to the request for their agreement to call a special meeting by February 9, 2018.

155.    If Individual Plaintiffs received no communication from Nell, Josh or Keith by February 9, 2018, the Request for Special Meeting of LLCs stated that Individual Plaintiffs would consider this failure to respond as a refusal to hold a special meeting and initiate litigation.

156.    Individual Plaintiffs sent out the Request for Special Meeting of LLCs via US Mail and electronic mail.

157.    Anna Lou also hand-delivered a copy of the Request for Special Meeting of LLCs to Nell and placed hardcopies on Keith and Josh's desks.

158.    Immediately after receiving the Request for Special Meeting of LLCs, Keith responded and asked what the purpose was of the Notice for Tarter Industries.

159.    Aside from this comment by Keith, none of the other Individual Plaintiffs heard anything else from Josh, Keith, or Nell on the matter.

160.    If any of the above had taken place, Anna Lou was prepared to issue a notice for a special meeting that would have satisfied the requirements of the LLCs' operating agreements.

161.     Accordingly, due to the refusal of Josh, Keith, or Nell to request a special meeting, Individual Plaintiffs are unable to call as special meeting in the manner as required by the LLCs' operating agreements.

162.     As set forth above, Individual Plaintiffs have taken every reasonable step to obtain authorization by the Member-Managers of Tarter Gate and Tarter Tube to directly pursue the claims made herein.

163.     Those actions have been thwarted by Josh, Keith and Nell because, as they have explicitly stated, they are aligned in their opposition to litigating these claims and holding Defendants fully accountable for their wrongdoing.

164.     Keith and Nell have continuously demonstrated that they will not exercise any independent or separate business judgment from Josh.

165.     Any further effort or demand on the LLCs to initiate this litigation would be futile.

## THE TARTER COMPANIES BUSINESS

166.     Tarter Gate originally made and sold wooden gates throughout Central Kentucky. Over the years, Tarter Gate began producing steel, spot-welded and tubular gates in addition to wooden gates.

167.     The Tarter Business eventually expanded to include farm and ranch equipment and has become the largest manufacturer of farm gates and animal management equipment in North America.

168.     Generally, the Tarter Business acts as an integrated business enterprise, notwithstanding the separate legal entities, including the Tarter Companies.

169.    Although integrated in such a way that a reference to "Tarter" or "Tarter Gate" or "Tarter USA" or "Tarter Farm and Ranch" does not specifically identify one particular legal entity, the Tarter Business generally works as follows:

a.    A primary function of the Tarter Business is to sell various items for farm and ranch use. The finished products are typically assembled, in part, from various components manufactured and/or sold by third party vendors.

b.    Tarter Industries is a purchaser of component parts as it is the manufacturing company for many Tarter Business products, specifically the three-point tractor implements and animal management products.  Many of the purchases of components and parts are made by Tarter Industries and are used to make finished goods that are then sold, on the books, to other entities within the Tarter Business.  Tarter Industries also directly manufactures goods for third-party customers and some sales are direct.  In addition, Tarter Industries hires employees to work in its manufacturing facility, to create new products, to engineer or fix current products, to create new product designs and to engage in research and development.

c.    Tarter Management pays the officers and executive employees for the Tarter Business including, but not limited to, the Third Generation, the Fourth Generation, and Gregory. Even though Tarter Management pays these employees, these individuals also served as senior executives to the Tarter Business generally, including the other Tarter Companies.

d.    Tarter Gate generally serves as the manufacturer of gates, feeders and other farm and ranch related products.  It also buys products from Tarter Industries and hardware for some manufactured products.  Of these products, Tarter Gate sells products to two third-party distributers of Tarter branded farm and ranch products, neither of which are owned or controlled by the Tarter Companies.

e. Tarter Tube generally provides tubing formed in its facilities for use by multiple entities within the Tarter Business to facilitate the manufacturing of gates, corrals, feeders, etc. Tarter Tube also sells hardware to other Tarter Businesses, including the Tarter Companies.

170. The general outline set forth above is not a complete delineation of the involvement of each of the Tarter Companies in the Tarter Business and does not include a description of all of the entities involved in the Tarter Business.

171. As additional evidence of the integrated nature of the Tarter Business, the Interim Agreement covered not only the Tarter Companies, but also Green River Gate, Inc., Liberty Tank, LLC, United Warehousing Company, LLC, Liberty Tank, LLC, and Flora Jet, LLC, all of which are under common ownership.

172. Today, the Tarter Business has over one million square feet of manufacturing space in Kentucky, Indiana and Utah and employs over 1,400 people, making it the largest employer in Casey County.

173. The large majority of the employees work in manufacturing facilities and have no access to computers that contain confidential information outside of the potential that some assembly workers may have access to specs/drawings for products on the market in order to create the goods on the assembly line.

174. Only certain Tarter Business employees in management positions are able to receive or obtain confidential and proprietary information.

175. Josh and Gregory were able to manipulate their positions as senior managers in the Tarter Business, specifically the Tarter Companies, to circumvent certain confidentiality requirements whenever they chose. Specifically, and notwithstanding that other individuals with

32

access to the same confidential information were required to sign confidentiality agreements, Josh and Gregory evaded this requirement.

176.    The Tarter Business, including the Tarter Companies, limits access to confidential information by utilizing a secure, password-protected network and company servers that are only accessible to certain Tarter Companies' employees.

177.    Within that network, the Tarter Business, including the Tarter Companies, maintain a document management system that allows them to further limit access to certain drives, folders, and documents.  For example, the Tarter Business, including the Tarter Companies, set up an engineering drive whereby only certain high-level employees within the engineering department could access proprietary drawings.

178.    Because the pricing information was especially proprietary and confidential, it was not placed on the Tarter Business network, at all.  Rather the individuals in charge of pricing maintained this information on their own hard drives and only gave out such information to certain authorized Tarter Business individuals on a must have basis.

179.    This pricing information was so highly confidential that on numerous occasions even certain owners were refused access to this information.

180.    Additionally, as a matter of practice, the Tarter Business, including the Tarter Companies, maintain the confidentiality of any marketing strategies, product development, customers' and potential customers' contact information and preference information, as well as financial information including pricing, supply costs, overhead, and other information used to determine profit margins.

181.    As interim manager, Keith reiterated the confidential nature of this information when, in an email to the other owners on March 3, 2018, he stated that the Tarter Business,

including the Tarter Companies, does not "share [its] internal costing and overhead" with anyone, including its distributors, in order for them to figure out the Tarter Business margins - "Never Ever."

### RELATIONSHIP OF JOSH AND GREGORY TO THE TARTER BUSINESS

182.    Josh is a shareholder of Tarter Industries and Tarter Management and is a member and manager of Tarter Gate and Tarter Tube.

183.    Josh is erroneously listed as President of Tarter Industries on its last annual report filed with the Commonwealth of Kentucky Secretary of State.  On various other occasions, he has held himself out to be Vice-President or President of Tarter Industries, and the other Tarter Companies.

184.    At all relevant times, Josh has been a manager and senior executive of the Tarter Companies, and has held himself out as an officer or senior executive of the Tarter Companies. With this assumed authority, Josh has exercised executive authority on behalf of all the Tarter Companies.

185.    At all relevant times, Josh had access to all confidential and proprietary information of the Tarter Business, including the Tarter Companies.  This information included, without limitation, marketing and business strategies, financial data, pricing, costs, profit margins, order information, suppliers' quotes and knowledge concerning customer and potential customer relationships.

186.    At all relevant times, Josh participated in sensitive business decisions related to each of the Tarter Companies including, without limitation, the following:

      a.    Negotiating vendor agreements;

      b.    Negotiating sales agreements;

       c.      Negotiating with various entities with an eye toward purchasing ongoing business operations and substantial physical facilities;

       d.      Engaging, consulting with, and providing confidential information related to the each of the Tarter Companies to financial consultants in order to develop a reorganization of the Tarter Companies;

       e.      Engaging, consulting with and providing confidential information to financial advisors in order to perform an evaluation of the value of various ownership interests in the Tarter Companies;

       f.      Transacting business with the most valued customers of the Tarter Companies;

       g.      Spending or committing the expenditure of significant sums of Tarter Companies funds on his own assumed authority;

       h.      Representing himself as a senior officer in a wide range of business negotiations with vendors, customers and other entities having business with the Tarter Companies;

       i.      Hiring and firing key personnel of the Tarter Companies; and

       j.      Determining internal and distributors' pricing and determining the prices paid for components.

187.    At all relevant times, Josh had oversight of Manufacturing and Purchasing at the Tarter Companies.

188.    Josh's relationship to each of the Tarter Companies is one involving a high degree of trust, confidentiality and discretion.

189.    Josh owed and owes fiduciary duties to the Tarter Companies.

190.    Josh was a member and manager of the LLCs. As such, and by virtue of the operating agreements of the companies, he owed and owes fiduciary duties to the LLCs and their members.

191.    Gregory was a management employee receiving a Form W-2 for wages from Tarter Gate.

192.    Gregory's senior management duties extended, however, to the other Tarter Companies.

193.    Gregory had oversight of Engineering and Quality for the Tarter Companies, and he worked with Josh and others in confidential aspects of the business such as pricing, costing, and selecting vendors.

194.    At all times during Gregory's employment with the Tarter Companies, Gregory had access to all confidential and proprietary information of the Tarter Companies including, but not limited to, marketing and business strategies, financial data, pricing, costs, profit margins, order information, and knowledge concerning customer and potential customer relationships.

195.    On certain occasions, Gregory held himself out as Vice-President of "Tarter" and he executed contracts under the same supposed authority.

196.    At other times, Gregory held himself out as Vice-President and General Manager of Tarter Gate.

197.    At all relevant times, Gregory participated in sensitive business decisions related to each the Tarter Companies including, without limitation, the following:

    a.    Negotiating vendor agreements;

    b.    Negotiating sales agreements, including the negotiation and execution of multi-million dollar contracts;

   c. Transacting business with the most valued customers of the Tarter Companies;

   d. Spending or committing the expenditure of significant sums of Tarter Companies funds on his own assumed authority;

   e.  Representing himself as a senior officer in a wide range of business negotiations with vendors, customers and other entities having business with the Tarter Companies;

   f. Hiring and firing key personnel of the Tarter Companies; and

   g. Determining internal and distributors' pricing and determining the prices paid for components.

198. Gregory had oversight of Quality, Warranty and Engineering until September 14, 2016.

199. Tarter Industries, Tarter Gate, and Tarter Tube utilized QMC products.  Gregory's responsibilities for warranty, quality and engineering extended, at a minimum, to these companies.

200. Gregory's position with the Tarter Companies was one of trust and confidence.

201. Due to his position as an executive of the Tarter Companies, Gregory owed fiduciary duties to the Tarter Companies.

202. Josh and Gregory both held sensitive, senior positions with the Tarter Business, including the Tarter Companies, and were in a position to control the vendors selected by the Tarter Companies, as well as the prices paid to those vendors.

203. Josh and Gregory had access to confidential information including terms and conditions, products, pricing, and profit margins that informed the decisions made by the Tarter

Business, including the Tarter Companies, concerning their vendors, suppliers, and pricing. This information is confidential, proprietary and constitutes trade secrets.

204.     During the relevant time, Individual Plaintiffs did not have control over or responsibility for the selection of vendors and related pricing decisions. Rather, they reasonably relied on Josh and Gregory to honestly supervise these functions and share all necessary or material information with them.

## FACTS REGARDING FRAUDULENT SCHEME AND CONSPIRACY

205.     The Tarter Companies purchased components for use in their finished products from a wide array of suppliers. By 2009, the Tarter Companies had begun to source certain components from China because of significant cost savings available from Chinese suppliers.

206.     The Tarter Companies engaged Chen to act as their agent in China for these transactions and paid him for his services.

207.     The Tarter Companies had an opportunity to realize significant savings by utilizing Chinese suppliers for a limited number of component materials.

208.     The Chinese-sourced components purchased by the Tarter Companies were assembled in mainland China.  These products were then shipped directly from mainland China to the Tarter Companies in Kentucky.

209.     The fraudulent scheme designed to reap secret profits from Tarter Companies' business in China began in 2010 when Josh, Gregory, and Chen conspired to overcharge the Tarter Companies causing them to pay more than they should have for Chinese components.

210.     By email dated March 17, 2010, Chen advised Josh and Gregory about the profit that they could divert from the Tarter Companies.  Using a 5' tiller "as a sample to tell you something about profits," Chen explained the scheme.  In Chen's example, the tiller cost $450 to manufacture.  The broker purchased the tiller for $485, and then sold the product to Tarter for

$609.  After $58 is deducted for shipping costs, the broker grossed $66 on the tiller simply by serving as the intermediary.  This email is attached as Exhibit F.

211.    By email dated March 28, 2010, Chen further explained the scheme to his co-conspirators.  According to Chen, "I have found out the best way for our trade company is we go to build a company with a bank account in Hongkong [sic].  If we have QMC Industry in Hongkong, our trade process is like this, see attached picture."  This e-mail is attached as Exhibit G, and the picture is shown below.



212.    Chen explained the value of the scheme as follows: "The foreign exchange market in Hongkong is free, we can receive the money freely, no limit.  We also can wire transfer money from Hongkong freely.  For instance, we wire transfer money to supplier, to broker, and to you guys."

213.    Chen further explained, "[p]er this way, Tarter send[sic] the money to Hongkong, not to the broker, we can control our money safely by ourself."

214.    Chen stressed the need for secrecy.  "The broker never knows how much money Tarter send to us, that means they never knows our profits, the profits is our business secret, it is very important."  Chen advised that this potential company could have three shareholders.

215.    The scheme devised by Josh, Gregory and Chen to defraud the Tarter Companies envisions and relies upon several distinct, independent people and entities.  First, as senior executives for the Tarter Companies, Josh and Gregory are needed to direct Tarter Companies' funds to the new foreign entity and oversee the use of the QMC-sourced products throughout the Tarter Business.  Second, QMC must be established as a distinct, separate legal entity in Hong Kong so the owners can avoid paying taxes to the Chinese government.  In addition, QMC must be a separate and distinct legal entity so that the broker "does not know our profits."  Third, QMC was created to disguise Josh and Gregory's involvement from the other owners of the Tarter Companies.  Without creating the separate legal entity known as QMC, Josh and Gregory's fraud would have been discovered.  Fourth, there must be a factory supplier, as QMC does not make anything.  This supplier in mainland China is separate and distinct from Josh, Gregory, Chen and QMC.

216.    On April 30, 2010, the conspiracy formed by Chen, Gregory and Josh started with the incorporation of QMC.  The shareholders were Chen, Josh and Gregory.

217.    Upon information and belief, in addition to the formation of QMC, Josh, Gregory and Chen also created Quality Manufacturers of China, QMC Industry Co., Ltd. and Fuzhou QMC Industry, Co., Ltd. (referred to herein collectively with QMC as the "QMC Entities") to perfect the fraudulent scheme.

218.    Upon information and belief, Josh and Gregory are only owners of QMC and not the remaining QMC Entities.

219.    Josh and Gregory did not own the entities formed in mainland China, but these entities each played a role in the racketeering enterprise as otherwise described herein.

220.    For example, Fuzhou QMC Industry, Co., Ltd.'s website states that "[T]his is QMC Industries, we are professional manufacturer for farm and ranch equipment parts in China. . . . containers have been shipped out to USA per month for many years and enjoy great reputations [sic] among our customers."

221.    In furtherance of the conspiracy, Josh and Gregory maintained and used email accounts at qmcindustries.com, even though they were senior management officials of the Tarter Companies.

222.    The electronic message attached as Exhibit H is from the address anerbano@gmail.com. The message is concerning QMC business and was sent to lg@qmcindustries.com and jt@qmcindustries.com - "lg" and "jt" are Gregory and Josh.

223.    Upon information and belief, the QMC Entities manufacture nothing, and are simply pass-through entities.

224.    The QMC Entities receive orders from the Tarter Business for various components. The QMC Entities then forward those orders to suppliers in mainland China.

225.    Those suppliers manufacture the components and ship them to the Tarter Companies.

226.    None of the QMC Entities ever takes possession of the components.

227.    At various times, at least, Tarter Industries, Tarter Gate, and Tarter Tube have placed or paid for orders with the QMC Entities.

228.    The vendor indicated for these purchases was at certain times Quality Manufacturers of China or at other times QMC.

229.    The Chinese suppliers billed one of the QMC Entities the true cost of the components. The QMC Entities then substantially inflated that cost and invoiced Tarter Industries,

Tarter Gate, and Tarter Tube for the goods at the inflated prices, overcharging the Tarter entities for the purchases.

230.    Due to the different companies, Tarter Industries, Tarter Gate, and Tarter Tube had three separate supplier identifications for the QMC Entities.

231.    In furtherance of the fraudulent scheme, on certain payment invoices sent from QMC Industry Co., Ltd., Tarter Industries, Tarter Gate, and Tarter Tube were directed to remit payment to a Chinese bank account under the name "Hong Kong QMC Industry Co., Ltd."

232.    These invoices were transmitted via wire by a QMC employee from an email address listed as judy.chen@qmcindustries.net.

233.    Tarter Industries, Tarter Gate, and Tarter Tube wired payments related to these invoices to at least three of the QMC Entities, Quality Manufacturers of China, QMC Industry, and QMC Industry Co., Ltd.

234.    The "Packing Lists" sent for the orders Tarter Industries, Tarter Gate, and Tarter Tube made to QMC Industry Co., Ltd. were sent "For and on behalf of" QMC.

235.    None of the QMC Entities does anything that the Tarter Business, including the Tarter Companies, could not do for themselves, either directly or through a subsidiary.

236.    The QMC Entities, in furtherance of the scheme proposed by Chen and adopted by Josh and Gregory, simply acted as an unnecessary middleman for components sourced from mainland China, marking up the prices and overcharging Tarter Industries, Tarter Gate, and Tarter Tube.  Subsequent investigation has shown that Josh and Gregory marked up some items by as much as 85.77%, while the average markup appears to be approximately 28%.

237.    Neither Josh nor Gregory disclosed to Plaintiffs their scheme to utilize the QMC Entities to divert Tarter Companies' money to themselves.

42

238.    Josh and Gregory had a duty to immediately and fully disclose their personal interest in any transaction with the Tarter Companies. This included any interest in QMC  or the QMC Entities. This is a continuing duty.

239.    Plaintiffs were unaware that QMC was owned by Josh and Gregory and did not acquiesce to the diversion of Tarter Companies' money to Josh, Gregory or Chen through the QMC Entities.

240.    Plaintiffs were not aware that Josh and Gregory had an ongoing personal business relationship with Chen.

241.    On May 21, 2010, Tarter Industries sent the first wire to Quality Manufacturers of China in the amount of $85.50.  Subsequent wires were for $67,545 (June 9, 2010); $176,472 (August 12, 2010); $162,116 (August 13, 2010); and $249,237.50 (September 2, 2010).  A representative sample of these wire transfers, including the date, check number, payment amount, supplier identification and recipient of the funds is attached as Exhibit I.

242.    In 2010, the Tarter Companies wired $1,720,710.85 to Quality Manufacturers of China.  *See* Exhibit J.

243.    In 2011, the Tarter Companies wired $4,240,165.43 to QMC and Quality Manufacturers of China.  *Id*.

244.    In 2012, the Tarter Companies wired $6,668,763.34 to QMC and Quality Manufacturers of China.  *Id*.

245.    In 2013, the Tarter Companies wired $10,338,838.71 to QMC, Quality Manufacturers of China and QMC Industry Co., Ltd.  *Id*.

246.    In 2014, the Tarter Companies wired $14,040,451.35 to QMC, Quality Manufacturers of China and QMC Industry Co., Ltd.  *Id*.

247.    In 2015, the Tarter Companies wired $17,003,001.63 to QMC and Quality Manufacturers of China.  *Id*.

248.    In 2016, the Tarter Companies wired $11,237,539.38 to QMC and Quality Manufacturers of China.  *Id*.

249.    In 2017, the Tarter Companies wired $9,587,652.11 to Quality Manufacturers of China.  *Id*.

250.    In total, the Tarter Companies wired at least $74,857,122.80 to Quality Manufacturers of China.  *Id.*

251.    Defendants concealed the true price of the goods from the Tarter Companies, and did so in every transaction between the QMC Entities and the Tarter Business, specifically Tarter Industries, Tarter Gate and Tarter Tube.

252.    The invoices attached as Exhibit K are examples of the operation of this aspect of the fraudulent scheme. On June 7, 2010, Josh and Gregory caused Tarter Industries to order from Quality Manufacturers of China 1,580 gear boxes at a unit price of $85.50 for a total of $135,090. The QMC Entities simply placed an identical order to the manufacturer, King Gear Import and Export Company. The manufacturer billed Quality Manufacturers of China a unit price of $62, for a total of $97,960, and upon completion, shipped the order to Tarter Industries in Casey County, Kentucky. As a result, Josh, Gregory and Chen diverted $37,130 from Tarter Industries through that single transaction.

253.    Another example is shown in Exhibit L.  On November 18, 2010, Zhu Caimu of China Machinery sent an email to Chen advising him that China Machinery was raising its costs 3%.  Caimu listed the costs for specific gearbox parts.  On November 19, 2010, Quality Manufacturers of China submitted an invoice to Tarter Industries for payment for these parts.  The

QMC Entities charged Tarter Companies over $50,000 more than its purchase price from China Machinery.  As a result, Josh, Gregory and Chen diverted over $50,000 from Tarter Industries to themselves.

254.    This pattern has been replicated through hundreds of orders since 2010.

255.     Due to their positions in the Tarter Businesses, specifically Tarter Industries, Tarter Gate and Tarter Tube, Josh and Gregory had the ability to control purchasing decisions and successfully concealed their scheme from Tarter Companies' other directors, members, managers, officers and shareholders through both affirmative misrepresentations and fraudulent concealments and omissions.

256.    Notwithstanding Tarter Companies' ability to limit access to certain information pursuant to the secure server and document management system, Josh and Gregory had access to all information they requested since they were both considered part of the senior management of the Tarter Companies and both held themselves out as officers of the Tarter Companies.  In addition, Josh was an owner of the Tarter Companies, and, in some cases, a member or manager.

257.    Josh and Gregory also used their knowledge of the Tarter Companies' trade secrets, confidential business methods and information, including, without limitation, their knowledge of prices paid by the Tarter Companies to suppliers for the subject components, price quotations provided by potential suppliers of their products, and profit margins on the finished products sold by the Tarter Companies. Defendants have misappropriated and used these trade secrets for, among other things, setting the prices for the various components that QMC sources to the Tarter Companies from China.

258.    It was necessary to the success of the scheme that Josh and Gregory misuse their positions of trust in order to control the purchasing decisions of Tarter Industries, Tarter Gate and Tarter Tube and conceal the true reasons for making those decisions.

259.    Without misusing their positions of trust and authority within the Tarter Companies, which was distinct from their ownership of QMC, the scheme could not have succeeded. The misguided purchasing decisions made by Josh and Gregory were a perversion of the corporate activities of the Tarter Companies and could not have been accomplished by QMC, or the QMC Entities, acting alone.

260.    For the first eighteen months of QMC and the QMC Entities' existence, the Tarter Companies were the only customers.

261.    Beginning in December 2011, the QMC Entities began selling materials to the Tarter Companies' competitors.

262.    Between 2015 and 2017, according to U.S. customs data, Tarter Industries, Tarter Gate and Tarter Tube still provided seventy-four percent (74%) of the QMC Entities' domestic revenue.

263.    Throughout the QMC Entities' existence, and as a part of the fraudulent scheme, Josh and Gregory used the facilities, personnel and other resources of the Tarter Companies to operate QMC to their own benefit. Examples include:

a.    Tarter Gate, at the direction of Josh and Gregory, paid at least three individuals what purported to be salary, as well as housing expenses. These individuals were Chen and two others, known as Sky Yin and Roger Yan.  These individuals were never employees of the Tarter Gate or any of the Tarter Companies, but rather, upon information and belief, were associates of the QMC Entities.  From May 28, 2009 through December 12, 2012, these individuals

were paid $125,245.48 by wire transfer from Tarter Gate.  Gregory caused these wires to be made. A representative summary of the payments is attached as Exhibit M.

      b.      After Josh and Gregory organized QMC and the other QMC Entities, they made frequent trips to China to visit their business. Josh and Gregory caused Tarter Gate to pay the expenses for this travel, which rightfully should have been paid by Defendants. For example, Josh and/or Gregory traveled to China on numerous occasions, including May 2010, October 2010 and March 2014, among other times.

      c.      Josh and Gregory routinely caused the staff of Tarter Industries to provide services to the QMC Entities, including engineering and other professional services.

      d.      Josh and Gregory routinely utilized Tarter Companies' facilities, including phone, internet and computers, to accomplish the QMC Entities' work or otherwise benefit the QMC Entities.

      e.      Josh and Gregory were both full-time, executive level employees of the Tarter Companies and paid by Tarter Management.  Meanwhile, both devoted substantial amounts of their work time to the QMC Entities, rather than the Tarter Companies.

264.    Josh diverted business and manufacturing opportunities from the Tarter Companies to the QMC Entities. For example, in 2011, Josh, holding himself out as President of the Tarter Companies, entered into an agreement with the Italian company Feraboli to design and manufacture disc bars at Tarter Companies' facilities in Kentucky.  The design was completed following many months of work and collaboration between Tarter Companies' employees and the Italian engineers.  However, rather than manufacture the product at Tarter Companies' facilities in Kentucky, and honor his agreement with Feraboli, Josh decided to manufacture the product in China through the QMC Entities. In doing so, Josh diverted Tarter Companies' resources to

designing a product that he sourced through the QMC Entities, to his personal benefit and that of his co-conspirators.

265.    Gregory also diverted business and manufacturing opportunities from the Tarter Companies to the QMC Entities-sourced companies.  On November 16, 2010, Gregory, from his Tarter Companies' email, sent a QMC vendor agreement to a Tarter customer. The customer thereafter requested quotes for products from the QMC Entities.

266.    The QMC Entities frequently provided items of poor quality and/or incorrect design to the Tarter Companies.  Rather than return the defective products to the QMC Entities for correction or replacement, Gregory would direct that the products be sold, despite his knowledge that the products were defective.

267.    As a result of Gregory's fraud, customers received defective products.  Through the warranties, Tarter Industries, Tarter Tube and Tarter Gate would correct the defect for the customer.  Much of the costs of the repairs were born by the Tarter Business, not the QMC Entities as the one responsible for the defects.

268.    Specifically, Tarter Industries bought gearboxes from Omni Gear prior to Josh and Gregory switching to QMC as the supplier.  For any Omni Gear field failures, Tarter Industries insisted on filing a claim for reimbursement with Omni Gear. The QMC gearboxes failed at a higher rate than those made by Omni Gear.  Nonetheless, by 2013, Josh and Gregory decided to forgo any reimbursements for failed gearboxes from QMC.  Instead, Tarter Industries absorbed the loss.  Josh and Gregory therefore profited themselves, at the expense of Tarter Industries and the Tarter Business, by declining to hold QMC responsible for its defective gearboxes.

48

269.   In order to hide the poor quality of the QMC Entities' products, Gregory would repeatedly lie, and direct Tarter Industries, Tarter Tube, and Tarter Gate employees to lie, about the quality of the QMC Entities' products.

270.   As a specific example, the Tarter Business obtained an order from a third-party retailer for disc mower.  Gregory then ordered disc mowers from the Italian company Feraboli. Gregory ordered that the mowers be disassembled, painted, and re-assembled and sent to a retailer for inspection.  Upon information and belief, Gregory did not intend to order the mowers from Feraboli, but rather planned to have the QMC Entities provide the mowers.  Aware that the QMC Entities could not produce a mower of sufficient quality to pass inspection, Gregory attempted to deceive the third-party retailer by providing a sample from another manufacturer.

271.   Josh and Gregory repeatedly directed Tarter Industries, Tarter Tube, and Tarter Gate employees or agents to order from the QMC Entities, rather than other manufacturers, and pay for products from the QMC Entities.

272.   For example, on January 22, 2015, Josh sent an email to a Tarter employee directing him to order from QMC rather than a domestic supplier.  "They definitely need to direct import these.  If they don't have space in their plant Ken has a warehouse on standby.  Ken don't buy these again from KY.  Please do direct buy from QMC."  By directing Tarter Companies employees to order from QMC, rather than from other companies – even companies based in Kentucky – Josh and Gregory victimized legitimate manufacturers through their fraudulent scheme.  The email is attached as Exhibit N.

273.   Josh and Gregory required the Tarter Companies purchasing agents to obtain three quotes for any item that did not come from QMC or the QMC Entities.  No similar quoting process was required of the QMC Entities' products.

49

274.    The Tarter Companies' purchasing agents receive bonuses, in part, by cost savings they obtain.  By requiring the purchasing agents to buy products at inflated prices from the QMC Entities rather than directly from the manufacturers at a lower price, the purchasing agents were unable to maximize the cost savings to the Tarter Companies, and in return, received less in bonuses.  Thus, these employees were also victimized by Josh and Gregory's fraudulent scheme.

275.    Gregory directed Tarter Industries and Tarter Gate employees to email schematics of products possessed by Tarter Industries and Tarter Gate to Chen so that the schematics could be copied by the QMC Entities.  Gregory directed the true source of the schematics be deleted to hide his fraud and misappropriation of these trade secrets.

276.    Gregory utilized text and Skype to communicate with Chen in furtherance of the scheme to defraud.  For example, on August 20, 2012, Gregory and Chen exchanged text messages.  Chen advised Gregory that the QMC Entities could "revise some prices for better margin."  Gregory responded, "I do not understand that . . . Steel is decreased all yr."  Chen replied, "Im [sic] not talking about our cost.  Im talking about my prices to Ray [a Tarter purchasing officer.]"  Chen concluded, "We will discuss.  Text is no good."

277.    The QMC Entities obtained the "better margin" by overcharging the Tarter Companies for the products, for the purpose of diverting Tarter Companies' money to Josh, Gregory and Chen for their personal use.

278.    In approximately January 2013, questions began to arise concerning the ownership of the QMC Entities. The Tarter Companies' purchasing and material staff began to question why a foreign entity, previously unknown within the industry, had become the Tarter Companies' primary supplier.  The staff also began to question why the procurement process and product return

process differed significantly with the QMC Entities than other suppliers, with the QMC Entities receiving favored treatment.

279.   For example, it was standard operating procedure for the Tarter Companies to obtain multiple purchase price bids before selecting a supplier for a particular product. This was not done with the QMC Entities.  Initially, the QMC Entities were provided with the quoted prices and terms from other potential suppliers, corrupting the competitive bid process.  Later, the QMC Entities were simply selected to supply products without competitive quotes, a fact unknown until 2016.

280.   As another example, the QMC Entities received more favorable terms than other suppliers. For example, QMC is typically paid 50% of its inflated price in advance, which was contrary to the customary practice for other vendors.  This was paid because Josh told Anna Lou that paying 50% was common practice in China.  In fact, this was a lie.  Josh, acting jointly with Gregory, created these terms.  At the time he made the statement, paying 50% in advance was not standard practice in China.  Josh knew this was a false statement when he made it.

281.   As yet another example, components provided through the QMC Entities were of substantially lower quality and included many more defective products or "culls" than was typical of other suppliers. Josh and Gregory enriched themselves, at the Tarter Companies' expense, by handling defective products sourced through QMC differently from other suppliers.

282.   Standard operating procedure required substandard or defective products to be returned to the manufacturer for replacement or a refund.  This did not occur with the QMC Entities, and few refunds were requested for defective products.  Instead, the Tarter Companies bore the cost, to the pecuniary benefit of the QMC Entities, Josh, and Gregory.

283.   More specifically, in January 2013, a Tarter Companies' customer requested an alternative to the current product known as finish mowers ("Mowers"). The efforts of Josh and Gregory to enrich themselves through the scheme outlined herein started a chain of events that has caused substantial monetary and reputational damage to the Tarter Companies:

a.   Without obtaining any competitive bids, Josh and Gregory steered this business to the QMC Entities, which sourced the product to a Chinese manufacturer, thereby enriching Defendants.

b.   When the first Mowers arrived at the Tarter Companies for testing, it was apparent that the Mowers were of unacceptable quality and should have been rejected.  Rather than rejecting the defective Mowers as they would have if the supplier had not been QMC, Josh and Gregory caused them to be sold, knowing of the defects.

c.   The quality problems with the Mowers were unusually severe and customer complaints started almost immediately.  Over 200 Mowers were returned for refunds and dozens more required service, all at the expense of the Tarter Companies.  The QMC Entities should have borne the expense of these defective products, but as part of the scheme outlined herein, the Tarter Companies took the loss.

d.   Tarter Companies' engineering and quality staff expended hundreds of hours correcting the design defects in the Mowers.  This expense rightfully should have been borne by the QMC Entities.

e.   The Tarter Companies have hundreds of the Mowers in inventory.  The Tarter Companies cannot sell the Mowers because they are defective or because the reputation of this product in the market has been ruined by the prior faulty iteration of the product.

f.      Knowing that the Mowers cannot be sold at the original price, Josh is attempting to sell the Mowers at drastically reduced prices, with little success.

g.      As a part of the fraudulent scheme, Josh and Gregory caused the Tarter Companies to single source the Mowers from the QMC Entities and then bear the expense of the QMC Entities' delivery of the Mowers that should have been rejected, enriching themselves at the Tarter Companies' expense.

h.      As a part of the fraudulent scheme, Josh and Gregory concealed their ownership interest in the QMC Entities from Plaintiffs in order to preserve their ability to steer the business to the QMC Entities without competition and then to shift the expense of its failure to perform to the Tarter Companies.  But for the fraudulent concealment, the Tarter Companies would not have sustained these losses.

i.      In addition to victimizing the Tarter Companies, Josh and Gregory's fraudulent scheme victimized the distributors and retailers of these and all other defective products by requiring the retailers to process the customers' complaints and the distributors to incur the cost of shipping the defective product to the Tarter Companies for repair.  Josh and Gregory knew these entities, in addition to the Tarter Companies, would be victimized by their decision to knowingly sell defective products simply to enrich themselves.

284.    Defendants have also misappropriated the resources of the Tarter Companies to operate the QMC Entities. These resources include staff time, expense funds, engineering services, physical facilities, and phone and computer services.

285.    Josh made numerous misrepresentations of material fact, as outlined herein, in order to further Defendants' fraudulent scheme. Over the course of several years, Josh's

misrepresentations regarding his involvement with QMC included, but were not limited to, the following:

a.  In or about January 2013 in the Tarter Companies' offices in Casey County, Kentucky, Josh asserted to Anna Lou and LuAnn that he had no ownership interest in QMC.

b.  On numerous occasions in or about January and February 2013, Josh visited Anna Lou in her Tarter Companies office in Casey County, Kentucky, in order to assure her that he had no interest in QMC. Josh implored Anna Lou to believe his false representations, agreeing that it would be "morally wrong" for him to have an interest in QMC.

c.  Based upon these representations, Anna Lou believed her nephew and made no further inquiry.  Indeed, Anna Lou did not believe her nephew Josh would steal from her or his cousins.  Moreover, Anna Lou took it on faith that Josh would not steal from his own parents and siblings.  Until Josh's deception was uncovered, the Tarter Companies operated on trust between the owners.  Josh knew this and took advantage of this trust to execute his scheme to defraud.

d.  Josh never discussed QMC with Doug Tarter, and Doug never heard any conversation about QMC's ownership until 2017.

e.  In or about April 2016, at the office in Casey County, Kentucky, Josh once again misrepresented his interest in millions of dollars' worth of transactions undertaken with the Tarter Companies, stating, "I have nothing to do with QMC."

286.  In furtherance of the conspiracy, and in order to conceal its existence, Josh has made fraudulent misrepresentations to entities other than Plaintiffs.

287.  Josh perpetrated an ongoing fraud to avoid paying required tariffs and duties on QMC products. For example, Josh signed a Department of Homeland Security, U.S. Customs and

Border Protection ("USCBP") Request for Information on May 16, 2016. The USCBP Request sought information to determine the applicability of certain fees, duties, penalties, or taxes related to a product that Josh and Gregory caused Tarter Industries and/or Tarter Gate to purchase from QMC. Josh signed as "Josh Tarter, VP & General Manager, Corporate Company Official", and certified the truth of the contents of the response ("Response"), which is attached as Exhibit O.

288.    The Response signed by Josh represents that "there is no relation to the seller of the merchandise." The seller was QMC, the statement was made by Josh and the buyer was Tarter Industries and, in some cases, Tarter Gate. On information and belief, this statement is false or misleading. While Chen, Gregory and Josh used various legal entities to fulfill different roles in the conspiracy, it is clear that Josh and Gregory were related to those entities and also to Tarter Gate and Tarter Industries.

289.    The Response also states that, "We [Tarter Companies] do not own any materials, components, tools, dies, or molds that are used in the manufacturing process of the products. All engineering, development, design work are completed by QMC Industry Co." This statement is false or misleading. On information and belief, the engineering, design and development of the product came, in whole or in part, from the Tarter Companies.

290.    As part of completing this Response, certain purchasing employees asked Josh if he had an ownership interest in QMC and Josh misrepresented that he did not have any interest in QMC in furtherance of his schemes.

291.    Each of these material misrepresentations were made by Josh with knowledge of their falsity, and in furtherance of the conspiracy outlined herein.

292.    Josh intended to, and did in fact deceive Plaintiffs concerning the true nature of the ownership and control of QMC.

293.     In reasonable reliance on Josh's misrepresentations, Plaintiffs did not take action to end the fraudulent scheme outlined herein. Plaintiffs have been damaged by their reliance on Josh's fraudulent misrepresentations, which were necessary to perpetuate all of the fraudulent schemes outlined herein.

294.     Josh and Gregory had a duty to disclose to Plaintiffs and the Tarter Companies the true nature of their relationship and involvement with QMC and any other related entities.

295.     Josh and Gregory had a duty to disclose to Plaintiffs and the Tarter Companies the income and profits derived by each of them through the transactions of any entity, including QMC, in which each of them had any ownership or beneficial interest, to the extent that such transactions were in any way related to the business engaged in by the Tarter Companies.

296.     Josh and Gregory had a duty to disclose to Plaintiffs and the Tarter Companies that they made routine use of Tarter Companies' resources to further the interests of QMC and its related entities, including the QMC Entities.

297.     Josh and Gregory had a duty to disclose to Plaintiffs and the Tarter Companies that they made use of confidential trade secrets belonging to the Tarter Companies in order to further the interests of QMC and related entities, including the QMC Entities. For example, each time the QMC Entities quoted a price for a product to the Tarter Companies, it did so with knowledge of the pricing which the Tarter Companies could, or had, obtained from QMC's competitors and with knowledge of the Tarter Companies' breakeven point and profit margins.

298.     Defendants had a duty to disclose to Plaintiffs and the Tarter Companies that they caused the QMC Entities to receive more favorable terms from the Tarter Companies regarding payment terms, return or credit for defective goods, and other aspects of the transactions than other suppliers of the Tarter Companies.

299.     As fiduciaries of the Tarter Companies, Josh and Gregory had a duty to make a complete, all-encompassing, unambiguous disclosure of every aspect of their relationship to QMC and to any related entity, or other entity that did business with, sought to do business with, or was in competition with the Tarter Companies.

300.     Defendants willfully failed to disclose all of the material facts set forth in the preceding paragraphs herein, and took steps to conceal the true facts from Plaintiffs.

301.     Neither Josh nor Gregory has ever made a full disclosure to all of the shareholders, members, or officers of the Tarter Companies of the details of their involvement with QMC and any related entities, including the QMC Entities. For example, they have never disclosed any of the following:

a.     The nature and extent of QMC's involvement with the competitors of the Tarter Companies;

b.     QMC's profitability from its business with the Tarter Companies, its competitors, or otherwise;

c.     The nature and extent of their ownership interest in QMC or any related entity;

d.     The nature and extent of their managerial control of QMC or any related entity;

e.     The substance of any discussions between them or their QMC colleagues and any customers of the Tarter Companies;

f.     The extent to which the resources of the Tarter Companies have been utilized to further the interest of QMC or any related entity; and

g.     The extent to which confidential information of the Tarter Companies, including, without limitation, drawings, pricing information, business methods, customer lists, profit margins and vendor lists have been used to benefit QMC.

302.   On or about September 30, 2016, knowing that their behavior was inappropriate and in an attempt to protect themselves from their misconduct, Josh and Gregory filed documents in China giving the impression that they had divested themselves of their interest in QMC by "transferring" their respective interest to Chen.

303.   Upon information and belief, Josh and Gregory's divestment of their ownership interest in QMC was a sham, not supported by any consideration or purchase price.

304.   Shortly thereafter, documents related to Global Bright Industrial, Ltd. ("Global Bright") indicate that Chen, Josh, and Gregory retained their ownership of this entity. Global Bright had separate functions to further the purposes of the conspiracy, including serving as a conduit to move funds generated by the conspiracy from China to the co-conspirators in the United States by wire transfer.

305.   Upon information and belief, Josh and Gregory owned or were associated with other companies or entities, besides QMC, including the QMC Entities, for the purpose of continuing the scheme using a new entity.

306.   Upon information and belief, Josh and Gregory owned or were associated with other companies or entities, besides QMC, including the QMC Entities, for the purpose of wiring the fraudulently obtained QMC funds to Defendants.

307.   On January 12, 2017, using Tarter Companies' resources, Josh incorporated JDT Management Services, Inc. ("JDT Management").  Josh is the sole owner and director.

308.    On May 1, 2017, Josh submitted an JDT Managment invoice to QMC for $5,000 for "marketing services for the month of May."  The invoice is attached as Exhibit P.

309.    At no time did Josh disclose his marketing activities for QMC to the other owners of the Tarter Companies.   Upon information and belief, JDT Management is designed to launder the fraudulent proceeds of QMC to Josh.

310.    Upon information and belief, Josh and Gregory used confidential Tarter Companies' cost and price lists to the benefit of QMC, and therefore to themselves.

311.    By virtue of their positions as officers and managers of the Tarter Companies, Josh and Gregory had access to the Tarter Companies' confidential cost and price lists, as well as the information and factors that went into determining certain product prices, and engineering and product information before it was sold in the market.

312.    Defendants used this confidential, proprietary, and trade secret information in providing products to the Tarter Companies and its competitors.

313.    Defendants have willfully used and disclosed Tarter Companies' confidential, proprietary and trade secret information for their own personal benefit and the benefit of QMC. Defendants knew, or should have known, that the Tarter Companies expended significant time and resources in maintaining and developing their marketing and business strategies, inventory and pricing costs, and calculations related to profit margins.  Defendants knew, or should have known, that this information is confidential and should not be disclosed to brokers or suppliers that were negotiating prices with the Tarter Companies. As co-conspirator and QMC shareholder Chen explained, "[t]he broker never knows how much money Tarter send to us, that means they never knows our profits, the profits is our business secret, it is very important."  By using the Tarter Companies' customer, cost and pricing information for the benefit of themselves and QMC,

Defendants intentionally misappropriated the Tarter Companies' confidential and proprietary trade secret information.

314.    From May 2010 through the present, Josh and Gregory used Tarter Companies' confidential, proprietary, and trade secret information in negotiating prices between QMC, the Tarter Companies, and the Tarter Companies' competitors.

315.    By way of example, as recently as the summer of 2016, the Tarter Companies were approached by a customer to supply manure spreaders.  Josh and Gregory obtained confidential information from the Tarter Companies related to the production of this new manure spreader. Specifically, Josh and Gregory obtained information about customer preferences provided only to the Tarter Companies and an order the Tarter Companies were going to attempt to fill. Josh and Gregory also obtained the necessary information about product design and specifications as well as drawings prior to their disseminations. Josh and Gregory also had the information necessary to achieve the targeted profit margins. Outside of Josh and Gregory's' misappropriation, this information was only shared with management employees and would not have been shared with the public or suppliers. Separately, and collectively, this information constituted confidential and proprietary trade secret information. Nevertheless, Josh and Gregory took this confidential and proprietary information and immediately disclosed it to the QMC Entities, including QMC.  The QMC Entities, including QMC, then used this information to gain an insurmountable advantage over other suppliers and made the Tarter Companies' quoting process ineffective. Josh and Gregory undercut any potential for the Tarter Companies to effectively bid out the product, thereby reducing the profit margins the Tarter Companies could have otherwise obtained. As a result, the QMC Entities, including QMC, made money and the Tarter Companies were harmed.

316.    A second example relates to the Tarter Companies' development, creation and design of a Quick Attach Pallet Fork ("Pallet Fork").

a.      In May 2016, a customer approached the Tarter Companies about manufacturing a Pallet Fork and a Flail Mower and provided the Tarter Companies with a price point that it wanted to pay for the product.

b.      At Josh's request, the Tarter Companies' engineers spent significant time and effort designing and creating a unique Pallet Fork for the customer.

c.      The Tarter Companies then examined their overhead, profit margins, supply chain, and other confidential and proprietary information. This information, coupled certain pricing and the customer's requests, meant that the Tarter Companies could not hit the customer's desired price point.

d.      Josh and Gregory both had this confidential and proprietary information and were involved, in different capacities, with the design and creation of the Pallet Fork.

e.      Consequently, the Tarter Companies' Pallet Fork product was never made public and was never released to the market.

f.      In January 2017, Gregory formed a company titled Mighty Strong Products, LLC ("Mighty Strong").

g.      In July 2017, Mighty Strong began receiving products from the QMC Entities. An initial review of the products the QMC Entities sent to Mighty Strong shows that Mighty Strong is receiving farm and ranch equipment. Further review of these products shows that Mighty Strong is receiving the Pallet Fork and other products with the same part numbers as those created for their Tarter Companies' counterparts.

h.     After additional investigation, Plaintiffs discovered that Mighty Strong is selling, seeks, or sought to sell the Pallet Fork designed by Tarter Companies to the customer that initially approached the Tarter Companies.

i.     Mighty Strong would only know about the existence of the product, the customer for whom it was created, and the pricing information if Mighty Strong, Josh, Gregory, and QMC utilized the Tarter Companies' confidential and proprietary trade secret information.

317.   On July 31, 2017, LuAnn asked Josh about his knowledge of Mighty Strong.  Josh, as an owner of QMC and close associate of Gregory, knew about Mighty Strong. Josh, as an owner of QMC, has or will profit from any sales made by QMC to Mighty Strong.  Josh refused to disclose any information concerning Mighty Strong even though he had a duty to do so.

318.   More recently, on or about November 1, 2017, Chen created two new entities that appear to be associated with the QMC Entities, QMC Industries Limited and QMC International Limited.

## PLAINTIFFS' ATTEMPTS TO ELIMINATE THE QMC ENTITIES AS A SUPPLIER AND REMOVE JOSH AND GREGORY

319.   In or around January 2013, Anna Lou and LuAnn, in the presence of other owners of the Tarter Companies, asked Josh if he had any interest in QMC. Josh vigorously denied any ownership in QMC, and falsely represented that it was wholly owned by Chen. Over the next several weeks, Josh repeated these denials on numerous occasions.

320.   At another business meeting on or about April 1, 2016, Josh again denied any involvement in QMC.

321.   On or about September 1, 2016, Plaintiffs inquired further into the status of QMC. Josh's assistant, J.R., informed JJ that QMC was expanding its production of Tarter Companies'

products, and would eventually manufacture the Tarter Companies' entire farm implement line in China, rather than in Casey County, Kentucky.

322.    Stunned by Defendants' secret plan to move the manufacturing process from Kentucky to China, and determined to prevent its implementation, Plaintiffs undertook further investigation into QMC.

323.    In 2016, Plaintiffs discovered, after considerable investigation, evidence that Josh and Gregory have an ownership interest in QMC.

324.    On or about September 5, 2016, Anna Lou and LuAnn met with Josh.  When confronted with proof of his ownership interest in QMC, Josh responded, in essence, "it is what it is" and showed no remorse for his deception.  Having relied on Josh's repeated assurances that he had no interest in QMC, this was the first time Plaintiffs confirmed Defendants' deception.

325.    On or about September 6, 2016, Josh met with the Tarter Companies owners and apologized for his misconduct. Josh nonetheless declined to return any money to the Tarter Companies.   He also failed to fully disclose all facts and circumstances surrounding his involvement with QMC, or its related entities.

326.    On or about September 14, 2016, Gregory resigned from his position with the Tarter Companies after being confronted with his inappropriate behavior.

327.    In approximately November 2016, after discovering the conspiracy, the Tarter Companies renewed the practice of obtaining quotes from suppliers other than QMC. During the course of the conspiracy, Josh and Gregory misused their positions with the Tarter Companies to corrupt the procurement process. Josh and Gregory used their knowledge of quotes from other suppliers to QMC's benefit, or eliminated competitive bidding altogether.

328.    The renewed practice of obtaining multiple quotes for components demonstrated the potential for substantial savings for the Tarter Companies as well as the magnitude of Defendants' fraudulent scheme.

329.    For example, in or about February 2017, the Tarter Companies obtained a quote from Omni Gear for gearboxes. Omni Gear's quote would save the Tarter Companies nearly $1 million per year for this component alone.  Tarter Companies' engineers tested the Omni Gear product and found it to be as good, if not better, than the much more expensive product provided through the QMC Entities.

330.    Subsequent bidding revealed additional and substantial price savings for products that for years the QMC Entities were supplying to the Tarter Companies.

331.    In addition, Plaintiffs discovered that the Tarter Companies had been required to pay 50% down on all orders to the QMC Entities. No other suppliers required this amount of up-front money from purchasers.

332.    Josh and Gregory prevented the Tarter Companies from seeking the most favorable terms and conditions available for components sourced from QMC. By not seeking the best terms through a competitive bidding process, QMC charged prices exceeding the market rate, and otherwise imposed terms that financially benefitted QMC at the expense of the Tarter Companies. In so doing, Josh and Gregory fraudulently converted Tarter Companies' funds to QMC.

333.    The Tarter Companies subsequently sought to reestablish relationships with other vendors. During this process, Plaintiffs discovered that Josh and Gregory had contacted customers of the Tarter Companies and had persuaded certain representatives of those customers to resist efforts to replace QMC with other, more cost effective suppliers. This was done to force the Tarter

Companies to continue to purchase products at inflated prices from QMC, further enriching Josh and Gregory.

## HARM TO THE TARTER COMPANIES

334.    Josh and Gregory enjoy the fruits of their various schemes to defraud.  Gregory has purchased boats and is building an ocean front house near Key West, Florida. Josh has purchased luxury automobiles and a house valued at approximately $5 million dollars in Park City, Utah. Josh and/or Gregory have enjoyed trips to Italy, the Bahamas, Dubai, Key West, the Breeders Cup, the Super Bowl, New York City, Augusta National Golf Course, Mexico, Monaco and London. Josh and Gregory drove a Lamborgini and flew in a helicopter during their various visits to Italy. Josh chartered numerous private planes for his travel. Neither individual's salary at the Tarter Companies was sufficient to support this extravagant lifestyle.

335.    Josh's scheme to profit from breaching his obligations to the Tarter Companies extends beyond his interest in QMC and includes other entities which he owns or controls.

336.    As a direct and proximate result of Defendants' conduct, Plaintiffs were injured, and continue to suffer injuries, to their business and property.

337.    Defendants' actions have reduced the value of Tarter Industries, Tarter Management, Tarter Tube, and Tarter Gate due to the decrease in the profitability of the entities.

338.    Plaintiffs incurred millions of dollars of damages in the form of excessive charges and cost savings that belonged to Tarter Industries, Tarter Management, Tarter Tube, and Tarter Gate, as well as the cost of purchasing defective or substandard products from QMC.

339.    Plaintiffs were further damaged by the diversion of their personnel and other facilities and resources to support QMC's business.

340.    Upon information and belief, more specific injury to Plaintiffs include, but are not limited to the following:

a.      Tarter Industries paid the QMC Entities over $68.6 million based on improperly inflated product prices;

b.      Tarter Gate paid the QMC Entities over $3.3 million for goods based on improperly inflated product prices;

c.      Tarter Tube paid the QMC Entities over $2.5 million for goods based on improperly inflated product prices;

d.      Tarter Industries paid for labor, resources, and good utilized by the QMC Entities, the value of which has yet to be determined;

e.      Tarter Management paid the salaries of Josh and Gregory while they were engaging in actions on behalf of the QMC Entities. In addition, Tarter Management paid the cost of certain fringe benefits for Josh and Gregory at a cost to be determined. During the entire time of the conspiracy, Josh and Gregory were working against the interests of Tarter Management and the remaining Tarter Companies and were faithless servants.  Specifically, from January 6, 2011 through July 21, 2016, Tarter Management Company paid Gregory gross wages of $590,131.73. From January 6, 2011 through July 21, 2016, Tarter Management Company paid Josh gross wages of $2,503,048.21.

f.      Tarter Management paid certain expenses of Josh and Gregory that were actually incurred while they were engaged in business on behalf of the QMC Entities; and

g.      The QMC Entities harmed Tarter Industries' reputation and future profits when the parts and products the QMC Entities allegedly produced for Tarter Industries malfunctioned.

341.   The entire amount of Plaintiffs' loss is currently unknown, but includes the profits Defendants made from QMC, all related entities, and the usurpation of corporate opportunities.

## COUNT I

### RICO (18 U.S.C. § 1962(c)) – All Defendants

342.     Plaintiffs incorporate each of the preceding allegations by reference as though fully set forth herein.

343.     Defendants violated the federal RICO, 18 U.S.C. § 1962(c), by conducting the affairs of a criminal enterprise through a pattern of racketeering activity to the injury of Plaintiffs' business and property.

344.     At all relevant times, each Plaintiff was a "person" as that term is defined in 18 U.S.C. §§ 1961(3) and 1964(c).

345.     At all relevant times, each Defendant was a "person" as that term is defined in 18 U.S.C. §§ 1961(3) and 1962(c).

346.     Defendants Josh, Gregory and QMC, along with Chen, the various QMC Entities, and Global Bright are a group of persons associated together in fact for the common purpose of carrying out an ongoing criminal enterprise, as described in the foregoing paragraphs of this Complaint; namely, to defraud and steal from the Tarter Companies.  Since the incorporation of QMC in April 2010, there has been a continuous association-in-fact among Josh, Gregory, and the evolving cast of corporate entities that they created from 2010 through the present.  Defendants Josh and Gregory established these corporate entities (including QMC, QMC Industry, Quality Manufacturers of China, QMC Industry Co., Ltd., Fuzhou QMC Industry, Co., Ltd., Global Bright, and JDT Management) for the purpose of defrauding and stealing from the Tarter Companies.

347.     At all relevant times, the enterprise was engaged in, and its activities affected, interstate commerce within the meaning of RICO, 18 U.S.C. § 1962(c).  The enterprise sold component parts and some finished goods to the Tarter Companies and other businesses throughout the United States.

348.     At all relevant times, Josh and Gregory have been associated with and central to the operation of the enterprise.  Because they operated and managed the enterprise, they were integral to its success.  The criminal enterprise has generally been structured and coordinated to operate as a continuing unit to accomplish the goals of Josh and Gregory's scheme.  Josh has acted as the head of the enterprise, responsible for directing Tarter Companies' business to the enterprise and insuring Tarter Companies' continued use of QMC-sourced products.  Gregory has led the enterprises' day to day domestic logistics, including directing trade secrets be sent to the  QMC entities; directing Tarter Companies' employees to be used to the benefit of the QMC entities; concealing the QMC entities' quality issues from the other Tarter Companies' owners and customers; directing that reimbursements for defective products not be presented by Tarter Companies to the QMC entities; traveling to China as needed to further the scheme to defraud at the expense of the Tarter Companies; and interacting with Eleven Chen.  Both Josh and Gregory improperly accessed confidential Tarter pricing information to be used in their self-dealing to maximize their fraudulent profits. Chen has led the enterprises' day to day activities in China, finding various suppliers and serving as the public face of the QMC entities in order to deceive Plaintiffs about the QMC entities' true ownership.  Hong Kong QMC Industry Co. has served, in its distinct, individual corporate capacity, as a Hong Kong based entity used to disguise Josh and Gregory's ownership interests, conceal the profit margins obtained from the Tarter Companies from the mainland China suppliers, and serve as a conduit to wire Tarter Companies' money into and out of Hong Kong to avoid detection from Plaintiffs and avoid paying taxes to the Chinese government.  The other Chinese corporate entities, which upon information and belief are not owned by Josh or Gregory, were structured and used to source products from mainland China to the Tarter Companies in the United States and conceal Josh and Gregory's involvement, in

furtherance of the scheme to defraud.  These companies include QMC Industry Co., Limited, QMC Industry, Quality Manufacturers of China, QMC Industry Co., Ltd., and Fuzhou QMC Industry, Co., Ltd.  Finally, Global Bright is a separate, distinct corporate entity used by Josh and Gregory to launder their stolen proceeds back into the United States for the personal use of Josh and Gregory.

349.    The scheme to defraud could not have been successful but for Josh and Gregory's separate, distinct roles at the Tarter Companies, which allowed them to fraudulently divert the Tarter Companies' funds to QMC undetected.  In addition, but for Josh and Gregory's separate, distinct roles at the Tarter Companies, the scheme to force the Tarter Companies to absorb the cost of defective QMC products could not have occurred.

350.    Josh and Gregory agreed to and did conduct and participate in the conduct of the enterprises' affairs through a pattern of racketeering activity and for the unlawful purpose of intentionally defrauding Plaintiffs.  Specifically, from May 21, 2010, through present,  Defendants:

a.    enriched themselves by causing the Tarter Companies to pay excessive prices to QMC for components that could have been sourced at lower prices from other suppliers;

b.    enriched themselves by causing the Tarter Companies to accept inferior or defective components from the QMC Entities when such goods would have been rejected from other suppliers;

c.    enriched themselves by using the Tarter Companies' facilities, personnel and resources to operate QMC;

d.    diverted Tarter Companies' money to pay the salaries and expenses of individuals who worked on behalf of QMC entities, not Tarter Companies;

e.       perpetuated their scheme by making fraudulent misrepresentations and by fraudulently concealing the true facts from Plaintiffs;

f.       perpetuated their scheme by making fraudulent misrepresentations, and directing others to make fraudulent misrepresentations, to conceal the poor quality of QMC products;

g.       knowingly caused defective products to be sold, and caused the Tarter Companies to incur the costs of repair and/or replacement under the warranties; and

h.       intentionally misappropriated confidential and proprietary trade secret information.

351.    Josh and Gregory conducted and participated, directly or indirectly, in the conduct, management, or operation of the enterprises' affairs through repeated acts of racketeering activity amounting to a "pattern of racketeering activity" within the meaning of RICO, 18 U.S.C. § 1961(5).

352.    "Racketeering activity" is defined in 18 U.S.C. § 1961(1) to include, among other crimes, violations of 18 U.S.C. § 1343 (wire fraud), 18 U.S.C. § 1836 (DTSA as more specifically detailed in Counts III and IV below), and 18 U.S.C. § 1836 (money laundering).  Anyone "having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations or promises" is prohibited from making use of the wires "for the purpose of executing such scheme or artifice or attempting so to do" under § 1343.

A.    Pattern of Racketeering:  Wire Fraud

353.    Pursuant to and in furtherance of their fraudulent scheme, Josh and Gregory committed multiple related acts of wire fraud by causing the Tarter Companies to wire money to QMC in excess of the true cost of the products being purchased.  Josh and Gregory, by virtue of

70

their distinct and separate roles in the Tarter Companies, fraudulently stole the Tarter Companies' money by charging the Tarter Companies excessive prices. By virtue of their role as senior executives charged with negotiating prices and overseeing quality and engineering, Josh and Gregory were able to perpetuate their fraudulent scheme undetected for years. Josh and Gregory then diverted Tarter Companies' money for their personal use, utilizing Hong Kong QMC, the QMC entities, Global Bright and JDT Management. Josh and Gregory's inception of the fraudulent scheme is detailed in the email of March 28, 2010, sent via wire, and attached as Exhibit G. Exhibits K and L, detailed in paragraphs 245 and 246, are further specific examples of the use of wires in furtherance of the fraudulent scheme. Examples of additional wires in furtherance of the fraudulent scheme are set forth in Exhibit J.

354.    These wires identify the date of each fraudulent wire, the amount and content of the fraudulent wire, and the identity of the entity submitting and receiving the funds. Each wire is sent in furtherance of Josh and Gregory's scheme to defraud.

355.    Josh and Gregory caused hundreds of wires to be transferred in furtherance of their scheme to defraud. Upon information and belief, Josh and Gregory sourced many products from another Chinese manufacturer, Longlife, and simply resold the products to Plaintiffs at a higher price, diverting the excess money to themselves. By way of further specific examples:

a.    On March 17, 2011, the Tarter Companies received from Quality Manufacturers of China part 45109, a bearing assembly 1' square plated. The cost to the Tarter Companies was $29,281.50. This same product was available from another Chinese manufacturer, Longlife, for $22,439.51. The difference of $6,841.99 was diverted to Josh and Gregory, representing a mark-up of 30%.

b.     On April 21, 2016, the Tarter Companies received from Quality Manufacturers of China part 15473, a subsoiler point 1/2 x 2 5/8. The cost to the Tarter Companies was $1,418. This same product was available directly from another Chinese manufacturer, Longlife, for $970. The difference of $448 for this part was diverted to Josh and Gregory, representing a mark-up of 46%.

c.     On January 6, 2016, the Tarter Companies received from Quality Manufacturers of China part 50051, a 2 5/16 trailer ball with 1 lock washer. The cost to the Tarter Companies was $13,212.11. This same product was available directly from another Chinese Manufacturer, Longlife, for $8,011.50. The difference of $5,200.61 for this part was diverted to Josh and Gregory, representing a mark-up of 64%.

d.     On January 5, 2013, the Tarter Companies received from Quality Manufacturers of China part 61196, a 153M 4' and 5' combo PTO shaft. The cost to the Tarter Companies was $66,000. This same product was available directly from another Chinese Manufacturer, Longlife, for $48,675. The difference of $17,325 was diverted to Josh and Gregory, representing a mark-up of 35%.

e.     On August 6, 2012, the Tarter Companies received from Quality Manufacturers of China part 61197, a 154 M 6' PTO shaft. The cost to the Tarter Companies was $57,600. This same product was available directly from another Chinese Manufacturer, Longlife, for $43,320. The difference of $14,280 was diverted to Josh and Gregory, representing a mark-up of 32%.

f.     On January 1, 2017, the Tarter Companies received from Quality Manufacturers of China part 2000011, a caster fork, bushing, hub and 15" wheel assembly. The cost to the Tarter Companies was $35,100. This same product was available from another Chinese

Manufacturer, Longlife, for $26,667.  The difference of $8,433 was diverted to Josh and Gregory, representing a mark-up of 31%.

g.      On August 2, 2012, the Tarter Companies received from Quality Manufacturers of China part 01-008NH, a gear box with castle nut.  The cost to the Tarter Companies was $58,225.  This same product was available from another Chinese Manufacturer, Longlife, for $49,300.  The difference of $8,925 was diverted to Josh and Gregory, representing a mark-up of 18%.

h.      On July 5, 2015, the Tarter Companies received from Quality Manufacturers of China  part 01-482NHG, a 6' shaft exchanges.  The cost to the Tarter Companies was $142,848. This same product was available from another Chinese Manufacturer, Longlife, for $98,764.80.  The difference of $44,083.20 was diverted to Josh and Gregory, representing a mark-up of 44%.

i.      On October 26, 2015, the Tarter Companies received from Quality Manufacturers of China part 787M, a 5' and 6' PTO with slip clutch.  The cost to the Tarter Companies was $146,244.96.   This same product was available from another Chinese Manufacturer, Longlife, for $101,035.20.  The difference of $45,209.76 was diverted to Josh and Gregory, representing a mark-up of 44%.

j.      On October 31, 2011, the Tarter Companies received from Quality Manufacturers of China part F15, a 15" furrower.  The cost to the Tarter Companies was $47,315.40. This same product was available from another Chinese Manufacturer, Longlife, for $37,051.94.  The difference of $10,263.46 was diverted to Josh and Gregory, representing a mark-up of 27%.

356.     Each of the above specific examples is part of Josh, Gregory, and QMC's scheme to defraud Plaintiffs.  In each example, the scheme involved a material misrepresentation and/or concealment of a material fact, namely Josh and Gregory's ownership interest in QMC.  Josh and Gregory further misrepresented the true cost of the products, in furtherance of their scheme to defraud.  These statements include actual, direct false statements as well as half-truths and the knowing concealment of material facts.  Both Josh and Gregory had the intent to defraud.  Finally, wires were used in furtherance of the scheme.  Josh and Gregory aided and abetted each other in executing this scheme to defraud.

357.     In all instances, Josh and Gregory acted with knowledge and fraudulent intent.

358.     In committing these acts, Josh and Gregory committed wire fraud in violation of 18 U.S.C. § 1343, and their acts amount to racketeering activity under 18 U.S.C. § 1961(1).

359.     In all instances, Josh and Gregory either made affirmative misrepresentations of their ownership interests in QMC, or made material omissions of their ownership interests in QMC.  At all times, Josh and Gregory knowingly participated in the scheme to defraud; their ownership interest in QMC was a material fact unknown to Plaintiffs; Josh and Gregory acted with the intent to defraud Plaintiffs by misrepresenting and/or concealing their self-dealing; and wires were used in furtherance of the scheme.

360.     In addition to satisfying each of the elements of wire fraud individually, both Josh and Gregory aided and abetted each other in committing their scheme to defraud.

361.     Plaintiffs were deceived by the scheme to defraud.

B.     Pattern of Racketeering:  DTSA

362.     Pursuant to and in furtherance of their fraudulent scheme, Defendants committed multiple violations of the DTSA by misappropriating confidential and proprietary trade secret

74

information.  The DTSA violations are set forth more fully in Count III and incorporated by reference herein.

C.     Pattern of Racketeering:  Money Laundering

363.     Racketeering activity is further defined in 18 U.S.C. § 1961(1) to include violations of the federal money laundering statute, 18 U.S.C. § 1956.

364.     Under 18 U.S.C. § 1956(a)(1)(A)-(B), a person who knows "that the property involved in a financial transaction represents the proceeds of some form of unlawful activity" is prohibited from conducting a "financial transaction" that involves the property (i) "with the intent to promote the carrying on of specific unlawful activity" or (ii) "knowing that the transaction is designed in whole or in part . . . to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity."

365.     A "financial transaction" is broadly defined in 18 U.S.C. § 1956(c)(3)-(4) to include transactions that affect interstate or foreign commerce, or various transactions affecting interstate or foreign commerce through a financial institution, including "a deposit, withdrawal, transfer between accounts, exchange of currency, loan, extension of credit, purchase or sale of any stock, bond, certificate of deposit or other monetary instrument."

366.     The phrase "specified unlawful activity" is defined in 18 U.S.C. § 1956(c)(7) to include, among other things, "any act or activity constituting an offense listed in section 1961(1)," the RICO statute.

367.     Josh and Gregory repeatedly engaged in money laundering in violation of 18 U.S.C. § 1956(a)(1)(A) by engaging in transactions utilizing bank accounts held by QMC, Global Bright, and their personal domestic accounts.  First, Josh and Gregory caused the Tarter Companies to send funds to Hong Kong QMC or a related QMC entity in furtherance of their scheme to defraud, as detailed in Exhibit I.  Upon information and belief, QMC then transferred these funds to Global

Bright, who then transferred the funds back into Josh and Gregory's domestic accounts. Each Tarter Company dollar flowing from QMC through Global Bright back to Josh and Gregory's personal domestic account is a violation of 18 U.S.C. § 1956(a)(1)(B).

368. The acts set forth above, and detailed in Exhibits attached hereto, constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

369. Defendants have directly and indirectly conducted and participated in the conduct of the enterprise's affairs through the pattern of racketeering and activity described above, in violation of 18 U.S.C. § 1962(c).

370. As a direct and proximate result of Defendants' racketeering activities and violations of 18 U.S.C. § 1962(c), Plaintiffs have been injured in their businesses and property in that millions of dollars have been diverted from the Tarter Companies to Defendants.

371. Specifically, Tarter Industries paid the QMC Entities over $68.6 million for inflated product prices; Tarter Gate paid the QMC Entities over $3.3 million for goods based on improperly inflated product prices; Tarter Tube paid the QMC Entities over $2.5 million for goods based on improperly inflated product prices; and Tarter Management paid for labor, resources, and good utilized by the QMC Entities, the value of which has yet to be determined. Each Tarter entity is a person as defined by 18 U.S.C. § 1962(c).

372. In addition, pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover from Defendants, jointly and severally, actual damages, treble damages, their costs and reasonable attorneys' fees.

## COUNT II

### RICO Conspiracy (18 U.S.C. § 1962(d)) – Josh and Gregory

373. Plaintiffs incorporate each of the preceding allegations by reference as though fully set forth herein.

374.    As set forth above, Josh and Gregory agreed and conspired to violate 18 U.S.C. § 1962(c).  Specifically, Josh and Gregory conspired to establish QMC, the QMC Entities, and Global Bright, for the purpose of diverting Tarter Companies' money for their personal use through repeated acts of wire fraud and violations of the DTSA.

375.    Josh and Gregory have intentionally conspired and agreed to directly and indirectly conduct and participate in the conduct of the affairs of the enterprise through a pattern of racketeering activity.  Josh and Gregory knew their predicate acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further the schemes described above.  That conduct constitutes a conspiracy to violate 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d).

376.    Defendants' conspiracy is either still continuing or would have continued but for this lawsuit.

377.    As a direct and proximate result of Defendants' racketeering activities and violations of 18 U.S.C. § 1962(c), Plaintiffs have been injured in their businesses and property in that millions of dollars have been diverted from the Tarter Companies to Josh and Gregory.

378.    In addition, pursuant to 18 U.S.C. § 1964(d), Plaintiffs are entitled to recover from Josh and Gregory, jointly and severally, actual damages, treble damages, their costs and reasonable attorneys' fees.

## COUNT III

### Misappropriation of Trade Secrets under
### the DTSA (18. U.S.C. § 1836, *et seq.*) – All Defendants

379.    Plaintiffs incorporate each of the preceding allegations by reference as though fully set forth herein.

380. Josh and Gregory, in their positions with the Tarter Companies, acquired knowledge and information from the Tarter Companies including but not limited to any marketing and business strategies, product development including designs and drawings, terms and conditions, customers' and potential customers' contact information and preference information, vendor information, supplier information, financial information including pricing, supply costs, overhead, and other information used to determine profit margins ("Information").

381. That Information constitutes a "trade secret" as it (1) derives independent economic value from not being generally known to, and not readily ascertainably by proper means by, other persons who could obtain economic value from its disclosure or use, and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

382. Josh misappropriated, and continues to misappropriate, the Tarter Companies' confidential and proprietary Information related to products and services used, sold, shipped and ordered in, or intended to be used, sold shipped and/or ordered in, interstate or foreign commerce through the acquisition, use and disclosure of this information.

383. Until his employment with the Tarter Companies ended in September 2016, Gregory misappropriated the Tarter Companies' confidential and proprietary Information related to products and services used, sold, shipped and ordered in, or intended to be used, sold shipped and/or ordered in, interstate or foreign commerce through the acquisition, use and disclosure of this information.

384. At all times, the Tarter Companies have taken reasonable efforts to maintain the secrecy of this Information by: limiting access to a secure, password-protected network that is only accessible by Tarter Companies' employees; further limiting access to certain information on that password-protected network by controlling access to certain drives, files, and folders; keeping

certain information off the network entirely; having certain employees execute confidentiality agreements; and developing commonly known practices and procedures to prohibit any disclosure of this information.

385.    This confidential, proprietary, and trade secret Information derives independent economic value from not being generally known to, and not being readily ascertainable through proper means by another person who could obtain economic value from the disclosure or use of the information.

386.    Defendants knew or had reason to know that the Tarter Companies considered and treated the Information entrusted to them as confidential and secret.

387.    Based on the senior management positions Josh and Gregory occupied in the Tarter Companies, Josh has, and Gregory had, a duty to maintain the confidentiality of this trade secret Information.

388.    Due to the relationship of Josh and Gregory as owners of QMC, QMC knew, or had reason to know, that Josh and Gregory misappropriated, and continue to misappropriate, the Tarter Companies' trade secret Information related to products and services used in and intended for use in interstate commerce.

389.    Defendants each acquired the confidential, proprietary and trade secret Information by improper means, including a breach of their respective duties to maintain the secrecy of the trade secret information, when they provided certain information from the Tarter Companies to QMC, the QMC Entities, or any other related entity or utilized such information for QMC, the QMC Entities or any other related entity's benefit, both before and after May 2016.

390.    Defendants conspired to misappropriate the Tarter Companies' trade secret Information and to receive, possess, use, and benefit from those trade secrets with the knowledge that the Information should otherwise remain secret.

391.    Defendants' misappropriation of the Tarter Companies' trade secret Information was willful and malicious and the Tarter Companies are entitled to exemplary damages in an amount up to twice the actual damages awarded.

392.    As a direct result of Defendants' misappropriation, the Tarter Companies have suffered damages for actual loss in an amount to be proven at trial, including attorneys' fees and costs.

393.    As a direct result of Defendants' misappropriation, Defendants have been unjustly enriched, and the Tarter Companies are entitled to damages for such enrichment, in an amount to be proven at trial.

394.    As a direct consequence of Defendants' misappropriation, the Tarter Companies are entitled to the seizure of any misappropriated information by the U.S. Marshal.

## COUNT IV

### Aiding and Abetting Josh's Misappropriation of Trade Secrets
### Pursuant to the DTSA – Gregory and QMC

395.    Plaintiffs incorporate each of the preceding allegations by reference as though fully set forth herein.

396.    As set forth in Count III, Josh misappropriated the Tarter Companies' trade secrets in violation of the DTSA.

397.    QMC and Gregory knew of Josh's actions, his obligations, and his duties, and that the foregoing constituted a violation of the DTSA.

398.     QMC and Gregory aided, abetted, and substantially assisted Josh in misappropriating the Tarter Companies' trade secrets and did so in a manner that was oppressive, malicious and fraudulent.

399.     Defendants are liable to Plaintiffs for Josh's violations of the DTSA.

400.     Plaintiffs are entitled to recover compensatory and punitive damages from Defendants.

401.     Defendants must disgorge the gross profits made by them from QMC and any related business, including but not limited to the QMC Entities, and are jointly and severally liable to Plaintiffs for such amount.

## COUNT V

### Conspiracy to Commit the Misappropriation of Trade Secrets Pursuant to the DTSA - All Defendants

402.     Plaintiffs incorporate each of the preceding allegations by reference as though fully set forth herein.

403.     As set forth in Count III, Josh misappropriated the Tarter Companies' trade secrets in violation of the DTSA.

404.     QMC and Gregory knew of Josh's actions, his obligations, and his duties, and that the foregoing constituted a violation of the DTSA.

405.     Defendants discussed, coordinated, and conspired to commit a violation of the DTSA.

406.     QMC and Gregory acted tortiously pursuant to a common plan and substantially assisted Josh in misappropriating Tarter Companies' trade secrets and did so in a manner that was oppressive, malicious and fraudulent.

407.     Defendants are liable to Plaintiffs.

81

408.     Plaintiffs are entitled to recover compensatory and punitive damages from Defendants.

409.     Defendants must disgorge the gross profits made by them from QMC and any related business, including but not limited to the QMC Entities, and are jointly and severally liable to Plaintiffs for such amount.

## COUNT VI

### Violation of Kentucky's Uniform Trade Secrets Act ("KUTSA")
### (KRS § 365.880, *et seq.*) – All Defendants

410.     Plaintiffs incorporate each of the preceding allegations by reference as though fully set forth herein.

411.     Josh, as an owner, officer, director and/or manager of the Tarter Companies, owed the Tarter Companies a common law duty not to disclose, misappropriate, or use confidential information or trade secrets.

412.     Gregory, as an officer and/or management employee of the Tarter Companies, owed the Tarter Companies a common law duty not to disclose, misappropriate, or use confidential information or trade secrets.

413.     QMC knew or had reason to know that Josh and Gregory owed the Tarter Companies a common law duty not to disclose, misappropriate, or use confidential information or trade secrets.

414.     Defendants are obligated under Kentucky's Uniform Trade Secrets Act (KRS § 365.880, *et. seq.*, the "KUTSA") not to disclose or misappropriate the trade secret information of the Tarter Companies.

415.     The Information Defendants obtained, used and disclosed are trade secrets within the meaning of the KUTSA.

416.   At all times, the Tarter Companies have taken reasonable efforts to maintain the secrecy of their Information by: limiting access to a secure, password-protected network that is only accessible by Tarter Companies' employees; further limiting access to certain information on that password-protected network by controlling access to certain drives, files, and folders; keeping certain information off of the network entirely; having certain employees execute confidentiality agreements; and developing commonly known practices and procedures to prohibit any disclosure of this information.

417.   This confidential, proprietary, and trade secret Information derives independent economic value from not being generally known, and not being readily ascertainable, through proper means by another person who could obtain economic value from the disclosure or use of the information.

418.   Defendants all knew, or had reason to know, that the Tarter Companies considered and treated the Information entrusted to them as confidential and secret.

419.   Defendants each acquired the confidential, proprietary and trade secret Information by improper means, including a breach of their respective duties to maintain the Information's secrecy, when they transmitted, utilized and disclosed said information without the Tarter Companies' consent.

420.   Defendants' conduct constitutes misappropriation of trade secrets under the KUTSA.

421.   At the time of such improper misappropriation of Tarter Companies' trade secrets and other confidential and proprietary Information, Defendants knew or had reason to know that their knowledge was acquired under circumstances giving rise to a duty to maintain the secrecy of the information.

422.     Defendants' misappropriation of Tarter Companies' trade secrets was willful and malicious.

423.     As a direct and proximate result of Defendants' willful and malicious misappropriation, the Tarter Companies have sustained and continue to sustain irreparable harm and are entitled to recovery of the damages requested, including attorneys' fees, and all other relief this Court deems just and proper.

## COUNT VII

### Aiding and Abetting Josh's Misappropriation of Trade Secrets
### Pursuant to the KUTSA – Gregory and QMC

424.     Plaintiffs incorporate each of the preceding allegations by reference as though fully set forth herein.

425.     As set forth in Count VI, Josh misappropriated Tarter Companies' trade secrets in violation of the KUTSA.

426.     QMC and Gregory knew of Josh's actions, his obligations, and his duties, and that the foregoing constituted a violation of the KUTSA.

427.     QMC and Gregory aided, abetted, and substantially assisted Josh in misappropriating the Tarter Companies' trade secrets and did so in a manner that was oppressive, malicious and fraudulent.

428.     Defendants are liable to Plaintiffs for Josh's violations of the KUTSA.

429.     Plaintiffs are entitled to recover compensatory and punitive damages from Defendants.

430.     Defendants must disgorge the gross profits made by them from QMC and any related business, including but not limited to the QMC Entities, and are jointly and severally liable to Plaintiffs for such amount.

## COUNT VIII

### Conspiracy to Commit the Misappropriation of Trade Secrets
### Pursuant to the KUTSA - All Defendants

431.     Plaintiffs incorporate each of the preceding allegations by reference as though fully set forth herein.

432.     As set forth in Count VI, Josh misappropriated Tarter Companies' trade secrets in violation of the KUTSA.

433.     QMC and Gregory knew of Josh's actions, his obligations, and his duties, and that the foregoing constituted a violation of the KUTSA.

434.     Defendants discussed, coordinated, and conspired to commit a violation of the KUTSA.

435.      QMC and Gregory acted tortiously pursuant to a common plan and assisted Josh in misappropriating Tarter Companies' trade secrets and did so in a manner that was oppressive, malicious and fraudulent.

436.     Defendants are liable to Plaintiffs.

437.     Plaintiffs are entitled to recover compensatory and punitive damages from Defendants.

438.     Defendants must disgorge the gross profits made by them from QMC and any related business, including but not limited to the QMC Entities, and are jointly and severally liable to Plaintiffs for such amount.

## COUNT IX

### Breach of Fiduciary Duty - Josh and Gregory

439.     Plaintiffs incorporate each of the preceding allegations by reference as though fully set forth herein.

85

440.    Josh owed fiduciary duties to Plaintiffs.

441.    Gregory owed fiduciary duties to the Tarter Companies.

442.    By the conduct complained of herein, Josh and Gregory breached their fiduciary duties owed to Plaintiffs.

443.    Josh and Gregory acted with oppression, fraud and malice, and are therefore liable to Plaintiffs for punitive and compensatory damages.

444.    Josh and Gregory must disgorge the gross profits made by QMC and any related entities, including but not limited to the QMC Entities, turning over such funds to the Tarter Companies, and compensate Individual Plaintiffs for their losses cause by Josh and Gregory's breach.

## COUNT X

### Aiding and Abetting Josh's Breach of Fiduciary Duty - Gregory and QMC

445.    Plaintiffs incorporate each of the preceding allegations by reference as though fully set forth herein.

446.    QMC and Gregory knew that Josh owed fiduciary duties to Plaintiffs.

447.    By the conduct alleged herein, Josh breached his fiduciary duties owed to Plaintiffs.

448.    QMC and Gregory aided, abetted, and substantially assisted Josh in breaching fiduciary duties to Plaintiffs and did so in a manner that was oppressive, malicious and fraudulent.

449.    Defendants are liable to Plaintiffs for Josh's breach of fiduciary duties owed them.

450.    Plaintiffs are entitled to recover compensatory and punitive damages from Defendants.

451.    Defendants must disgorge the gross profits made by them from QMC and any related business, including but not limited to the QMC Entities, and compensate Individual Plaintiffs for their losses.  Defendants are jointly and severally liable to Plaintiffs for such amount.

## COUNT XI

### Fraudulent Misrepresentation – Josh

452.     Plaintiffs incorporate each of the preceding allegations by reference as though fully set forth herein.

453.     Josh made knowing, false misrepresentations of material fact to Plaintiffs, intending that Plaintiffs rely on those misrepresentations.

454.     Plaintiffs did, in fact, reasonably rely on the misrepresentations of Josh, to their detriment.

455.     Josh acted intentionally, oppressively and maliciously in the conduct complained of herein and is liable to Plaintiffs for compensatory and punitive damages.

## COUNT XII

### Fraudulent Concealment/Fraud by Omission – All Defendants

456.     Plaintiffs incorporate each of the preceding allegations by reference as though fully set forth herein.

457.     The fraudulent concealments referred to herein induced Plaintiffs to continue the business relationship with QMC, to their detriment.

458.     Every transaction referred to herein and every wire transfer of money from the Tarter Companies to QMC, and the other QMC Entities, rests on Defendants' fraudulent concealment, and constitutes a separate act of fraudulent concealment.

459.     Defendants acted intentionally, oppressively, and maliciously in the conduct complained of herein and are liable to Plaintiffs for compensatory and punitive damages.

## COUNT XIII

### Usurpation of Corporate Opportunity – Josh and Gregory

460.     Plaintiffs incorporate each of the preceding allegations by reference as though fully set forth herein.

461.     The business of QMC, and any related entities, that is, purchasing components from Chinese manufacturers for incorporation into the finished products of the Tarter Companies, represented a corporate opportunity of the Tarter Companies.

462.     Josh and Gregory used their management positions with the Tarter Companies to misappropriate this corporate opportunity for themselves.

463.     QMC aided and abetted Josh and Gregory in the wrongful diversion of this corporate opportunity.

464.     Defendants acted intentionally, maliciously and oppressively and are liable to Plaintiffs for compensatory and punitive damages.

## COUNT XIV

### Unjust Enrichment – All Defendants

465.     Plaintiffs incorporate each of the preceding allegations by reference as though fully set forth herein.

466.     By the conduct complained of herein, Defendants wrongfully received and retained the benefit of monies and other assets that rightfully belong to the Tarter Companies.

467.     Defendants were unjustly enriched by the monies and other assets of the Tarter Companies, which Defendants should not, in equity and good conscience, be permitted to retain. Defendants should account for and disgorge these assets to the Tarter Companies.

## COUNT XV

### Faithless Servant Doctrine – Josh and Gregory

445.    Plaintiffs incorporate each of the preceding allegations by reference as though fully set forth herein.

446.    From the outset of this conspiracy in 2010, and continuing to this date, Josh has willfully breached his duties to Plaintiffs.  The breach of duty has been extensive, continuous, and permeates his service to Plaintiffs.

447.    As a result of his faithless service, Josh has forfeited his right to all of his compensation received from the Tarter Companies since the inception of the conspiracy.  Plaintiffs are entitled to recover the value of Josh's compensation during the relevant time, whether such compensation was paid as salary, bonus or fringe benefits.

448.    For the outset of this conspiracy in 2010, until Gregory resigned his position with the Tarter Companies on September 14, 2016, Gregory breached his duties to Plaintiffs.  The breach of duty has been extensive, continuous, and permeates his service to Plaintiffs.

449.    As a result of his faithless service, Gregory has forfeited his right to all of his compensation received from the Tarter Companies from the inception of the conspiracy until he left his employment in 2016.  Plaintiffs are entitled to recover the value of Gregory's compensation during the relevant time, whether such compensation was paid as salary, bonus, or fringe benefits.

WHEREAS, Plaintiffs respectfully demand as follows:

A.    Judgment upon their Complaint against all Defendants, jointly and severally, as requested herein;

B.    Compensatory damages sufficient to compensate the Tarter Companies for all damages incurred by the acts and omissions complained of herein;

C. Judgment requiring Defendants to disgorge and pay over to the Tarter Companies all profits derived from the conduct complained of herein;

D. Judgment against Defendants and in favor of Plaintiffs for punitive damages in an amount to be determined at trial;

E. Treble damages and attorneys' fees as provided for by 18 U.S.C. § 1964;

F. Exemplary damages and attorney's fees as provided for in 18 U.S.C. § 1836(b)(3)(C);

G. A permanent injunction restraining Defendants from the use of the Tarter Companies' trade secrets;

H. Seizure of any misappropriated information by the U.S. Marshal as provided for in 18 U.S.C. §1836(b)(2);

I. Judgment against Defendants for prejudgment and post-judgment interest;

J. Trial by jury on all issues so triable; and

K. Judgment awarding Plaintiffs all other relief to which they appear entitled.

## DEMAND FOR JURY TRIAL

In accordance with the Federal Rules of Civil Procedure, Plaintiffs demand a trial by jury on all matters so triable.

Respectfully submitted,


*/s/ Kerry B. Harvey*
Kerry B. Harvey
Andrew Sparks
Emma R. Wolfe
Dickinson Wright PLLC
300 W. Vine Street, Ste. 1700
Lexington, Kentucky 40507
Tel:     (859) 899-8700
Fax:     (859) 899-8759
Email:  kharvey@dickinsonwright.com
         asparks@dickinsonwright.com
         ewolfe@dickinsonwright.com
COUNSEL FOR PLAINTIFFS

## VERIFICATION

The undersigned hereby verify and state that each and every factual statement set forth above are true and correct to the best of our knowledge, information, and belief, under penalty of perjury.

Pursuant to Fed. R. Civ. P. 23.1, the undersigned verify and allege (1) they were a shareholder or member at the time of the transaction complained of, or that their share or membership later devolved on it by operation of law; (2) the undersigned verify and allege the action is not a collusive one to confer jurisdiction that the court would otherwise lack; and (3) as described fully in the complaint, have made effort to obtain the desired action from the directors or comparable authority and, if necessary, from the shareholders or members; and (4) the reasons for not obtaining the action or not making the effort.


Anna Lou Tarter Smith

COMMONWEALTH OF KENTUCKY)
COUNTY OF _Casey_     )

The foregoing Verified Complaint was acknowledged before me this _5_ day of
_June_     2018, by Anna Lou Tarter Smith.

Notary Public: _____

My Commission expires: _____ 8-7-20

92

## **VERIFICATION**

The undersigned hereby verify and state that each and every factual statement set forth above are true and correct to the best of our knowledge, information, and belief, under penalty of perjury.

Pursuant to Fed. R. Civ. P. 23.1, the undersigned verify and allege (1) they were a shareholder or member at the time of the transaction complained of, or that their share or membership later devolved on it by operation of law;  (2) the undersigned verify and allege the action is not a collusive one to confer jurisdiction that the court would otherwise lack; and (3) as described fully in the complaint, have made effort to obtain the desired action from the directors or comparable authority and, if necessary, from the shareholders or members; and (4) the reasons for not obtaining the action or not making the effort.


LuAnn Coffey

STATE OF SOUTH CAROLINA
COUNTY OF Charleston

The foregoing Verified Complaint was acknowledged before me this 5th day of
June    2018, by LuAnn Coffey.

Notary Public: Cynthia Ann Parisoli

My Commission expires: Feb 1, 2021

## **VERIFICATION**

The undersigned hereby verify and state that each and every factual statement set forth above are true and correct to the best of our knowledge, information, and belief, under penalty of perjury.

Pursuant to Fed. R. Civ. P. 23.1, the undersigned verify and allege (1) they were a shareholder or member at the time of the transaction complained of, or that their share or membership later devolved on it by operation of law;  (2) the undersigned verify and allege the action is not a collusive one to confer jurisdiction that the court would otherwise lack; and (3) as described fully in the complaint, have made effort to obtain the desired action from the directors or comparable authority and, if necessary, from the shareholders or members; and (4) the reasons for not obtaining the action or not making the effort.


_____
Douglas Tarter

COMMONWEALTH OF KENTUCKY)
COUNTY OF _Casey_        )

The foregoing Verified Complaint was acknowledged before me this _5_ day of
_June_       2018, by Douglas Tarter.

Notary Public: _____

My Commission expires: _____8-7-20_____


LEXINGTON 75292-1 65949v1


94