UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION - LEXINGTON

| | |
|---|---|
| **C-VILLE FABRICATING, INC.** *dba* *Tarter Industries*, et al.,<br><br>        **Plaintiffs,**<br><br>**V.**<br><br>**JOSHUA DONALD TARTER, et al.,**<br><br>        **Defendants.** | **CIVIL ACTION NO. 5:18-cv-379-KKC**<br><br><br>**ORDER AND OPINION** |

\*\*\* \*\*\* \*\*\*

This matter is before the Court on motions to dismiss filed by Defendants Joshua Tarter [DE 11] and Thomas Gregory [DE 12]. Each Defendant attacks the Plaintiffs' Complaint on Fed R. Civ. P. 12(b)(1) and 12(b)(6) grounds. For the reasons set forth below, the Defendants' motions [DE 11; DE 12] are **GRANTED in part and DENIED in part.** The matter may proceed to discovery.

## BACKGROUND

### A.

This commercial action was originally brought by Plaintiffs Anna Lou Tarter Smith, LuAnn Coffey, and Douglas Tarter, in their individual capacities and in their derivative capacities on behalf of four of the Tarter family's business entities: Tarter Industries, Tarter Management, Tarter Gate, and Tarter Tube. *Smith v. Tarter*, 305 F. Supp. 3d 733, 736 (E.D. Ky. 2018). The Court will refer to these entities as the "Tarter Companies."

In their original complaint, the Plaintiffs alleged that Defendants Joshua Tarter, Thomas Gregory, and QMC Industry Company, Ltd., violated the Racketeer Influenced and Corrupt Organizations Act ("RICO"), the Defend Trade Secrets Act ("DTSA"), the Kentucky Uniform Trade Secrets Act ("KUTSA"), and the Kentucky common law through the operation of

1

a pass-through scheme involving source components and parts. *Id.* As will be discussed *infra*, Judge Danny Reeves of the Eastern District of Kentucky dismissed the complaint in its entirety. *Id.* at 744. He did so, however, without prejudice. *Id.*

The Tarter Companies maintain headquarters in Casey County, Kentucky. [DE 1, at 30.] Plaintiffs assert that each entity plays a distinct role in what is the largest animal management and farm gate manufacturing operation in North America. [DE 1, at 30.] For example, Tarter Industries is responsible for the manufacture and purchase of component parts, the hiring of new employees, and the research and development of new products. [DE 1, at 31.] Tarter Tube, on the other hand, specializes in the creation of tubing that assists in the manufacture of gates and other equipment. [DE 1, at 31.] It also sells hardware to the other Tarter Companies. Tarter Gate, presumably after buying components and parts from Tarter Industries and Tarter Tube, manufactures gates and other animal control equipment. These final products are then sold to two main distributors. [DE 1, at 31.] The final Tarter entity, Tarter Management, controls the compensation of the officers and executive employees of the Tarter Companies. [DE 1, at 31.]

The Tarter Companies have always been family owned and operated, with the shares of each entity passing down generationally. [DE 1, at 8.] At one point in time, the aggregate shares of the Tarter Companies were held by two brothers, David and Donald Tarter, along with their wives, Anna Lou Tarter Smith and Joy Tarter. [DE 1, at 8.] The Court will refer to these individuals as the "Third Generation" of the Tarter family. David and Anna Lou had two children, Douglas and LuAnn, and were eventually divorced. [DE 1, at 8.] Donald and Joy remain married and have three children, Keith, Joshua, and Nell. The Court will refer to the descendants of David and Donald—Douglas, LuAnn, Keith, Joshua, and Nell—as the "Fourth Generation" of the Tarter family.

Within the last ten years, three of the four members of the Third Generation (David, Donald, and Joy) transferred their interests in the Tarter Companies to members of the Fourth

Generation. [DE 1, at 8.] As with many family-held entities, this transition was far from seamless. And, it has created a tangled web of ownership and responsibility that the Court must sift through in order to address the pending motions.

Tarter Industries was incorporated under Kentucky law on May 18, 1993. [DE 1, at 3.] Members of the Third Generation divided the initial shares of the corporation. [DE 1, at 8.] David and Anna Lou each held 25% interests, while Donald Tarter and his wife, Joy Tarter, each retained 25% interests. [DE 1, at 9.] At the first annual shareholders meeting, David, Donald, Anna Lou, and Joy elected themselves to serve as Directors. [DE 1, at 9.] That very same day, the Third Generation family members, in their Director capacities, appointed themselves to various company positions. David became the President, Donald became the Vice President, Joy became the Treasurer, and Anna Lou became the Secretary of the corporation. [DE 1, at 10.] It appears that annual shareholders and Board of Directors meetings were held from 1993 to 1997. [DE 1, at 10.] However, no such meetings convened between 1997 and 2012. [DE 1, at 10.]

On December 31, 2012, David, Donald, and Joy transferred their shares of Tarter Industries. [De 1, at 11.] David transferred his shares to him and Anna Lou's two children, Douglas and LuAnn. Likewise, Donald and Joy passed along their interests in Tarter Industries to their three children, Keith, Joshua, and Nell. [DE 1, at 11.] In the aftermath of these transfers, Anna Lou, Douglas, and LuAnn held a collective 50% interest in Tarter Industries, while Keith, Joshua, and Nell together owned the other 50%. [DE 1, at 11.]

Amazingly enough, this new slate of shareholders did not elect a new Board of Directors. Nor did they formally appoint Officers. Instead, it appears that they simply assumed the Board seats and divvied up company responsibility in an informal manner. [DE 1, at 11.] From 2013 to 2017, Tarter Industries' annual filings with the Kentucky Secretary of State listed Joshua as

President, Keith as Vice President, Nell as Treasurer, and Anna Lou as the Secretary. [DE 13-3.] These annual filings, however, did not state who the Directors of the corporation were.

Tarter Management shares a similar story. Incorporated pursuant to Kentucky law, the original shares of Tarter Management were issued to David's wife at the time, Anna Lou, and Donald's wife, Joy. [DE 1, at 12.] Each retained a 50% stake. At the first shareholders meeting, Anna Lou and Joy unanimously voted themselves to serve as the Directors. They then appointed themselves to the positions of President (Anna Lou) and Secretary-Treasurer (Joy). [DE 1, at 12.] The record reveals that annual shareholders and Board meetings were held until 1997. From 1997 to 2012, however, no such meetings took place. [DE 1, at 13.] On July 28, 1998, Anna Lou divided her shares with David such that each held 25% interests in Tarter Management. [DE 1, at 13.]

On December 31, 2012, David split his interest in the corporation between him and Anna Lou's two children, Douglas and LuAnn. [DE 1, at 13.] Similarly, Joy divided her interest in Tarter Management between her and Donald's three children, Keith, Joshua, and Nell. [DE 1, at 13.] From that point on, Anna Lou, Douglas, and LuAnn together owned 50% of Tarter Management and Keith, Joshua, and Nell collectively owned the other 50%. [DE 1, at 14.] Like Tarter Industries, the newly minted shareholders of Tarter Management failed to vote on a new Board of Directors and to formally appoint Officers. Again, it appears that these positions, and their accompanying responsibilities, were implicitly assumed.

Because of the nature of the 2012 ownership transitions, the corporate structures of Tarter Industries and Tarter Management are severely muddled. While David, Donald, and Joy transferred their ownership interests to members of the Fourth Generation, they never formally resigned from their posts as Directors and Officers. Moreover, while it appears that Fourth Generation shareholders have taken on a significant portion of the day-to-day operations of the corporations and list themselves as Officers in the corporations' annual filings, they never voted

themselves in as Directors or appointed themselves to Officer positions. Thus, there is a tension between who Directors and Officers are according to the bylaws and who actually runs the day-to-day affairs of the corporations.

The other two Tarter businesses, Tarter Gate and Tarter Tube, are limited liability companies created pursuant to the Kentucky Limited Liability Act. [DE 1, at 14-15.] On December 31, 2012 the Third-Generation member/managers of both LLCs approved resolutions that transferred their ownership interests. [DE 1, at 15.] From that point on Anna Lou, Douglas, and LuAnn collectively owned 50% of Tarter Gate and Tarter Tube while Keith, Joshua, and Nell owned the other 50% of the two LLCs. [DE 1, at 15.] It is alleged that in 2014, the member/managers of Tarter Gate formally elected Josh as President, LuAnn as Vice President, and Anna Lou as the Secretary/Treasurer. [DE 1, at 15.] That said, nothing in the record suggests that a similar vote was held for Tarter Tube.

Lastly, both parties have indicated that because of the divisions within the Tarter family, the shareholders executed an interim management agreement in October of 2017 that placed the day-to-day management of the Tarter Companies in the hands of Douglas's wife, J.J., and Keith. [DE 1, at 19.] Though the Plaintiffs and the Defendants both reference the agreement, the Court has certain doubts as to its validity. After all, it was only signed by one party, Joshua Tarter. 5:17-cv-334 [DE 33-4.]

### B.

Defendant Joshua Tarter—a Fourth Generation family member—is a shareholder of the Tarter corporations (Tarter Industries and Tarter Management) and a member/manager of the Tarter LLCs (Tarter Gate and Tarter Tube). [DE 1, at 34.] Plaintiffs contend that at all relevant times, Joshua held himself out as a high-ranking executive of the Tarter Companies conglomerate. And in accordance with this assumed authority, Plaintiffs suggest that Joshua

oversaw the entire operation of the Tarter Companies. He negotiated and executed vendor and sales agreements, transacted business with valued customers, hired and fired key personnel, and developed company strategies. [DE 1, at 35.] Plaintiffs also maintain that in his implicit top brass position, Joshua Tarter had access to "confidential and proprietary information" of the Tarter Companies. This information included business strategies, order information, customer relationships, research and development, market analyses, and most importantly, information regarding component pricing and profit margins. [DE 1, at 34.]

It is alleged that Joshua Tarter's right hand man at the Tarter Companies was fellow Defendant, Thomas Gregory. [DE 1, at 36.] Gregory's official job description included general management duties for Tarter Gate LLC. Despite this description, Plaintiffs contend that Gregory's oversight extended much further. They claim that he had control over engineering and quality for the Tarter Companies and worked closely with Joshua "in confidential aspects of the business such as pricing, costing, and selecting vendors." [DE 1, at 36.] On certain occasions, Plaintiffs suggest that Gregory held himself out as Vice-President of the Tarter Companies and executed contracts in that capacity. [DE 1, at 36.]

## C.

In 2009, the Tarter Companies, like many other American manufacturers, began to source components and parts from Chinese suppliers. The reason? Cost savings. [DE 1, at 38.] The Tarter Companies employed an individual named Xiaofeng Chen to facilitate these transactions. [DE 1, at 38.] Chen would negotiate with the Chinese suppliers, who would then ship the components directly from mainland China to the Tarter Companies. [DE 1, at 38.]

Plaintiffs allege that in 2010, Joshua Tarter, Thomas Gregory, and Xiaofeng Chen, concocted a scheme to divert the component cost savings to themselves. The Complaint provides an overview of how the operation purportedly functioned. First, the three individuals incorporated QMC Industry Company, LTD in Hong Kong, making themselves the sole

shareholders. Next, Joshua Tarter and Thomas Gregory, using their implicit senior positions within the Tarter Companies, ensured that components and parts were sourced from QMC instead of from other Chinese suppliers. [DE 1, at 41.] Once QMC received orders from the Tarter Companies, it would forward the orders to Chinese suppliers. [DE 1, at 42.] The Chinese suppliers would then ship the components directly to the Tarter Companies, billing the true cost of the components to QMC in the process. QMC would turn right around and charge the Tarter Companies at an inflated rate for the components. To complete the transaction, the Tarter Companies would wire payments to QMC and its affiliates. Joshua Tarter and Thomas Gregory, using offshore accounts, would then funnel the profits to their own private bank accounts. Plaintiffs assert that the average markup on these transactions was roughly 28%. However, in some egregious instances, that markup ran as high as 85%. [DE 1, at 42.] Finally, in addition to selling components to the Tarter Companies, Plaintiffs contend that QMC also sold parts at an upcharge to competitors. [DE 1, at 46.]

Plaintiffs also submit that Defendants Joshua Tarter and Thomas Gregory used their authority within the Tarter Companies to guarantee the favorable treatment of QMC. For instance, it was standard practice for the Tarter Companies to obtain multiple bids before selecting a supplier for a component. [DE 1, at 51.] This was not the case when it came to QMC and its affiliates. [DE 1, at 51.] Moreover, the QMC entities were paid 50% of their asking price in advance, while other suppliers received nothing. Lastly, Plaintiffs allege that the Defendants caused the Tarter Companies to accept defective products, shifting the loss from QMC to the various Tarter entities in the process. [DE 1, at 51.]

This pass-through scheme allegedly persisted until 2016, resulting in the Tarter Companies wiring approximately $74,857,122.80 to QMC and its affiliates. Plaintiffs assert that during this period, Defendants Joshua Tarter and Thomas Gregory hid their interests in QMC, despite a duty to reveal the information. [De 1, at 50.] Plaintiffs further contend that in addition

to concealing his QMC interests, Joshua Tarter affirmatively lied about them on two occasions. First, in early 2013, Plaintiffs assert that Joshua Tarter repeatedly told Anna Lou that he had no interests in QMC and that it would be "morally wrong" for him to do so. [DE 1, at 54.] And second, in April of 2016, Plaintiffs claim that Joshua again misrepresented his interests in QMC, stating, "I have nothing to do with QMC." [DE 1, at 54.]

The Complaint enumerates that in late 2016, after considerable investigation, Plaintiffs discovered Defendants Joshua Tarter and Thomas Gregory's ownership interests in QMC. [DE 1, at 63.] On September 5, 2016, Anna Lou and LuAnn met with Joshua. When confronted with allegations of his ownership interest in QMC, Joshua purportedly responded "it is what it is." And on September 6, 2016, Joshua met with Tarter family members and apologized for his conduct—though he refused to return the money. [DE 1, at 63.] Finally, the Complaint alleges that on September 14, 2016, Thomas Gregory resigned after being confronted with allegations of impropriety. [DE 1, at 63.]

### C.

On August 11, 2017, Plaintiffs Anna Lou Tarter Smith, Douglas Tarter, and LuAnn Coffee filed an initial lawsuit in this Court against Defendants Joshua Tarter, Thomas Gregory, and QMC, alleging violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), the Defend Trade Secrets Act ("DTSA"), the Kentucky Uniform Trade Secrets Act ("KUTSA"), and the Kentucky common law. *Smith*, 305 F. Supp. 3d at 736.

Defendants Joshua Tarter and Thomas Gregory, in turn, moved to dismiss the action on Fed. R. Civ. P. 12(b)(1) and 12(b)(6) grounds. *Id.* As to their 12(b)(1) claims, Defendants argued that the Plaintiffs lacked standing to bring the suit in their individual capacities and also lacked the standing to bring a derivative suit on behalf of any of the Tarter Companies. *Id.* at 738. Judge Reeves agreed, concluding that an individual shareholder does not have standing to bring a direct cause of action when the only injury being asserted is diminution in the value of his

corporate shares. *Id.* at 739. Judge Reeves further rejected the Plaintiffs' argument that they possessed individual standing by way of their statuses as member/managers of the two Tarter LLCs: Tarter Gate and Tarter Tube. *Id.* at 740.

Judge Reeves also discharged the Plaintiffs' claims of derivative standing. *Id.* at 744. To achieve derivative standing, Kentucky law requires that a plaintiff first make demand on the board or in the alternative, show that demand would have been futile. *Id.* at 741. The Plaintiffs argued that their requests that Josh Tarter fully disclose his interest in QMC and to return all profits satisfied the demand requirement. *Id.* Judge Reeves determined, however, that requests for information or repayment are not synonymous with requests to commence legal action. *Id.* As such, he found that the Plaintiffs failed to satisfy the pre-suit demand requirement. *Id.*

Plaintiffs argued in the alternative that they were excused from the demand requirement because doing so would have been futile. *Id.* at 742. The general tenet of Plaintiffs' argument was that Joshua Tarter's siblings, Keith and Nell, could not exercise independent judgment because of their close relationship with their brother. *Id.* at 743. Moreover, Plaintiffs argued that Keith and Nell had an inherent interest in quashing any lawsuit against Joshua—if he was forced to tender his shares, their side of the family would no longer control 50% of the Tarter Companies. *Id.* at 743. Despite these contentions, Judge Reeves refused to invoke the futility exception, finding that the Plaintiffs had "provided no more than a conclusory allegation that the personal relationship between Joshua Tarter and his siblings would undermine the siblings' independence." *Id.* at 743-44.

In total, Judge Reeves found that the Plaintiffs had failed to establish both individual and derivative standing. As such, he dismissed the action without prejudice on 12(b)(1) grounds. He did not address the Defendants' Rule 12(b)(6) arguments.

**D.**

Since the dismissal of the original complaint, two important things have happened. First, in February of 2016, a new round of demand letters was sent to the potential combinations of Directors and member/managers for the four Tarter Companies. [DE 1, at 22.] And unlike the first alleged demands rejected by Judge Reeves, these ones explicitly requested the Boards of the corporations and the member/managers of the LLCs to vote on the specific issue of whether to sue the Defendants—Joshua Tarter, Thomas Gregory, and QMC— for their supposed misdeeds. [DE 30-1.]

Second, the Board of Tarter Industries allegedly passed a resolution authorizing the corporation to file a lawsuit against the Defendants. On February 7, 2018, David requested that Anna Lou, in her capacity as Secretary of Tarter Industries, call for a special meeting to vote on whether to commence legal action against the Defendants. [DE 1, at 21.] Anna Lou obliged and set the meeting for February 22, 2018 at 10:00 a.m. at the Tarter headquarters. The notice explicitly stated the purpose of the meeting. [DE 1, at 22.]

In addition to sending notice of the meeting to David, Donald, and Joy, Anna Lou also sent notices to Keith, Joshua, and Nell. [De 1, at 22.] Pursuant to the notice, David called the special meeting to order on February 22, 2018 at 10:00 a.m. A recording of this meeting has been submitted into the record. [DE 11-1.] The recording reveals that the meeting was called to order with David, Anna Lou, and Joy present (constituting a quorum pursuant to the bylaws). Anna Lou then moved to vote on the issue of whether to initiate a lawsuit against Joshua Tarter, Gregory, and QMC. At this point, Joy asked if Anna Lou could explain the motion to her in laymen's terms. Anna Lou refused. Instead, she read the motion out loud once more. David seconded the motion and a vote was called. David and Anna Lou voted "yea" while Joy abstained. David announced that the motion had passed and adjourned the meeting. [DE 1, at 24.] After

the meeting had closed, Donald arrived and demanded that the vote be taken again. David and Anna Lou refused, noting that the original vote had taken place on time. [DE 11-1.]

## E.

Hoping the second bite at the apple proves more successful than the first, Anna Lou Tarter Smith, LuAnn Coffey, and Douglas Tarter have filed another action in this Court against Defendants Joshua Tarter, Thomas Gregory, and QMC. They do so in their individual capacities and in their derivative capacities on behalf of the four Tarter Companies: Tarter Industries, Tarter Management, Tarter Gate, and Tarter Tube. Tarter Industries has also been joined as a direct Plaintiff in the action. As a collective, the Plaintiffs argue that the standing deficiencies of their first complaint have been cured, pointing to the newly issued demand letters and the Tarter Industries Board resolution.

## ANALYSIS

Defendants Joshua Tarter and Thomas Gregory have now moved to dismiss Plaintiffs' claims pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6). The Court will consider the 12(b)(1) motions first, as the 12(b)(6) challenges becomes moot if subject-matter jurisdiction is lacking. *See Moir v. Greater Cleveland Reg'l Transit Auth.*, 895 F.2d 266, 269 (6th Cir. 1990).

## I. Defendants' 12(b)(1) Motions

The Plaintiffs argue that they have hit the subject-matter jurisdiction trifecta— enjoying individual, direct, and derivative standing to sue the Defendants. The Defendants contest this assertion. First, they argue that the Plaintiffs lack individual standing because they have not suffered an injury separate from that of the Tarter Companies. Second, Defendants maintain that the resolution passed by Tarter Industries on February 22, 2018 does not confer direct standing because the vote was invalid. Third and finally, Defendants argue that the Plaintiffs lack derivative standing to sue on behalf of the Tarter Companies because the recently issued

demand letters are legally deficient. They also contend that the demand futility exception does not apply here.

For the reasons stated below, the Court finds that the Plaintiffs lack the standing to bring the action in their individual capacities but have successfully established (1) Tarter Industries' direct standing to sue the Defendants, and (2) derivative standing to sue on behalf of Tarter Management, Tarter Gate, and Tarter Tube.

## A.

"Standing goes to a court's subject matter jurisdiction." *Kepley v. Lanz*, 715 F.3d 969, 972 (6th Cir. 2013) (internal quotation omitted). As such, a court may dismiss a lawsuit for lack of subject-matter jurisdiction under Rule 12(b)(1) if the plaintiff lacks standing to bring the action. *See Allstate Ins. Co. Global Med. Billing, Inc.*, 520 F. App'x 409, 410–11 (6th Cir. 2013) (observing that the lack of standing is treated as an attack on subject-matter jurisdiction and is therefore considered under Rule 12(b)(1)). When a defendant challenges the plaintiff's standing to sue under Rule 12(b)(1), the burden is on the plaintiff to show that jurisdiction exists. *Lewis v. Whirlpool Corp.*, 630 F.3d 484, 487 (6th Cir. 2011); *Golden v. Gorno Bros., Inc.*, 410 F.3d 879, 881 (6th Cir. 2005).

Rule 12(b)(1) motions to dismiss come in one of two forms: a facial attack or a factual attack. *Gentek Bldg. Prods., Inc. v. Sherwin–Williams Co.*, 491 F.3d 320, 330 (6th Cir. 2007). When ruling on a facial challenge to subject-matter jurisdiction under Rule 12(b)(1), the district court must accept all material allegations of the complaint as true. *Carrier Corp. v. Outokumpu Oyj*, 673 F.3d 430, 440 (6th Cir. 2012); *Courtney v. Smith*, 297 F.3d 455, 459 (6th Cir. 2002). A factual attack, on the other hand, is an attack on the factual existence of standing. *See id.* No presumptive truthfulness attaches to the plaintiff's allegations and the court is "free to weigh the evidence and satisfy itself as to the existence of its power to hear the case." *Id.* In either

case, "the plaintiff has the burden of proving jurisdiction in order to survive the motion." *Rogers v. Stratton Indus.*, 798 F.2d 913, 915 (6th Cir. 1986).

Here, Defendants Joshua Tarter and Thomas Gregory have raised both facial and factual challenges to subject-matter jurisdiction. The facial attacks are geared towards the Plaintiffs' individual standing claims. Specifically, Defendants Joshua Tarter and Thomas Gregory assert that the Complaint, as written, fails to sufficiently allege injuries separate from those suffered by Tarter Companies.

The challenges to direct and derivative standing are more factual in nature. For one, Joshua Tarter has questioned the validity of the resolution passed by the Tarter Industries Board on February 22, 2018. He argues, amongst other things, that the vote was rushed and taken in bad faith. In support of these arguments, he has submitted an audio recording of the vote into the record. [DE 11-1.] On the other hand, Defendant Gregory has challenged the content, and even the existence of, the new round of demand letters referenced in the Plaintiffs' Complaint. [DE 12, at 11] ("Plaintiffs do not allege the content of this 'call,' nor do they attach a copy of it to their Complaint."). Because these are factual attacks, the Court may consider extrinsic evidence, including the audio recording of the Tarter Industries special meeting and the alleged demand letters, without converting the Defendants' Rule 12(b)(1) motions to dismiss into Rule 56 motions for summary judgment. Moreover, when evaluating these factual attacks, the Court does not have to treat the factual allegations related to jurisdiction as true. *See Ceballos v. United States*, No. CIV.A. 11-21-ART, 2011 WL 5855290, at *2 (E.D. Ky. Nov. 22, 2011) (observing that "there is no presumptive truthfulness" when defendants bring a factual attack on subject-matter jurisdiction).

## B.

In the original action, Judge Reeves rejected the Plaintiffs' claims of individual standing, concluding that they had not alleged any "injuries apart from the costs and loss of cost savings

allegedly incurred by the Tarter Companies." *Smith*, 305 F.Supp.3d at 739. Instead, they had only suffered diminution in the value of their corporate shares, which, according to Sixth Circuit precedent, is insufficient to confer standing. *Id.* (citing *Warren v. Mfrs. Nat. Bank of Detroit*, 759 F.2d 542, 544 (6th Cir. 1985)). Plaintiffs again seek to sue the Defendants in their individual capacities. [DE 1, at 19.] They, however, have not asserted any new facts or arguments in support of their position. With nothing additional to review, the Court adopts Judge Reeves' analysis and concludes that the Plaintiffs lack individual standing to sue the Defendants.

### C.

The Plaintiffs also assert that Tarter Industries has direct standing to sue the Defendants due to a Board resolution authorizing the entity to seek legal redress. Defendants Joshua Tarter and Thomas Gregory, via their 12(b)(1) motions, challenge the validity of this resolution. First, they argue that David Tarter did not have the authority to order the call for the special meeting because he was not, at the time, the President of Tarter Industries. Second, Defendants contend that the members of the Third Generation (David, Donald, and Joy) were not actually the Directors of Tarter Industries and therefore, could not raise the matter for a vote. Third, Defendants argue that even if the Court determines that the Board was comprised of Third Generation family members, the vote was nonetheless invalid because it was called in bad faith and because of Anna Lou's conflict. Fourth and finally, Defendants argue that the interim management agreement precluded the vote altogether.

Defendants Joshua Tarter and Thomas Gregory claim that David, Donald, and Joy abdicated their positions as Directors when they transferred their interests in Tarter Industries back in 2012. Though they are not specific as to who currently sits on the Tarter Industries Board, Defendants appear to be arguing that it consists of Anna Lou and some variation of Fourth Generation family members. The Defendants also argue that Fourth Generation members, in addition to occupying the corporation's Board seats, are also the acting Officers of

Tarter Industries. They point to the annual filings with the Kentucky Secretary of State which list Joshua Tarter as President, Keith Tarter as Vice President, Nell Tarter Douglas as Treasurer, and Anna Lou Smith as the Secretary of the corporation.

Plaintiffs, on the other hand, argue that though the members of the Fourth Generation may have informally assumed roles as Directors and Officers, they were never elected (Directors) or appointed (Officers) to these positions in accordance with the bylaws of Tarter Industries. According to the Plaintiffs, David, Donald, and Joy did not submit written resignations to the corporation's Secretary, Anna Lou. Nor were they formally replaced in their capacities as Directors or Officers. Indeed, the parties appear to concede that corporate formalities have not been observed by Tarter Industries since 1997.

After a review of the arguments, the Court finds that the Plaintiffs have sufficiently alleged that David Tarter had the authority to call for the special meeting and that, at the time of the meeting, the Board of Tarter Industries consisted of David, Donald, Joy, and Anna Lou. This conclusion is supported by the bylaws of the corporation, which controls the election of Directors and the appointment of Officers.

In the alternative, Defendants argue that the resolution is still invalid (1) because the vote was taken in bad faith, and (2) because Anna Lou should have abstained due to an inherent conflict.

At this time, the Court is unwilling to invalidate the vote taken at the February 22, 2018 special meeting. For one, the Court finds that the Plaintiffs have sufficiently alleged that the vote was taken in good faith. According to the Complaint, notices of the special meeting were sent to all interested family members. These notices were sent well in advance of the actual meeting and they explicitly noted the meeting's purpose—to approve the filing of litigation against the Defendants. [DE 30-1.] The fact that David, Anna Lou, and Joy showed up on time to the special meeting supports this conclusion. Further, the Court has reviewed the audio tape

of the meeting that was submitted into the record by Defendant Joshua Tarter. [DE 11-1.] As noted *supra*, the Court may consider the audio recording without transforming the Rule 12(b)(1) motion into the summary judgment motion due to the factual nature of Defendants Joshua Tarter and Thomas Gregory's attacks on subject-matter jurisdiction. A review of the tape reveals that the meeting was called on time and Anna Lou read the motion out loud twice to Joy before the vote was taken. Despite the contentions of the Defendants, David and Anna Lou's refusal to spell out the motion to Joy in different terms does not automatically render the vote invalid. Moreover, the fact that Donald Tarter was late, while unfortunate, does not nullify the result.

Defendant Joshua Tarter's invocation of *Whitman v. Fuqua* is unpersuasive. 549 F. Supp. 315, 323 (W.D. Pa. 1982). Though the court there did find that a resolution "hurriedly" passed by a few directors was invalid, the facts in *Whitman* are distinguishable from those here. In *Whitman*, the meeting at issue was clandestine, held hundreds of miles away from headquarters, and only two of the eight Directors attended. Here, on the other hand, ample notice of the special meeting was given, and it was held in a place that the Directors could easily attend, company headquarters. Also, the special meeting began at the time specified and was attended the entire alleged Board—though Donald did show up late.

The Defendants further allege that the February 22, 2018 vote should be invalidated due to Anna Lou's conflict of interest. Defendants assert that Anna Lou had a personal interest in the litigation because if Joshua Tarter were forced to tender his shares of the Tarter Companies, Anna Lou's side of the family would gain a controlling interest in the family business. These contentions, however, are speculative at best. Nothing in the record affirmatively establishes that Joshua Tarter would have to give up his interests in the event of a successful lawsuit. Further, there is no evidence to support the claim that if Joshua were required to give up his shares, they would automatically be retained by members of the other side of the family. Accordingly, at this stage of litigation, the Court is unwilling to conclude that Anna Lou was

required to abstain from the vote taken at the special meeting. *See Lerner ex rel. Gen. Elec. Co. v. Immelt*, 523 F. App'x 824, 827 (2d Cir. 2013) (observing that allegations of self interest must be made with specificity).

Lastly, Defendant Joshua Tarter claims that in October of 2017 the executive authority of the Tarter Companies was officially transferred to J.J. Tarter and Keith Tarter. [DE 11, at 23.] Though the interim management agreement was referenced in the Complaint, the Court has reservations as to its operative effects. This is especially true considering the fact that it was only executed by one party, Joshua Tarter.

Overall, the Plaintiffs have sufficiently alleged Tarter Industries' direct standing to sue Defendants Joshua Tarter, Thomas Gregory, and QMC.

## D.

The Plaintiffs assert derivative standing to sue on behalf of the four Tarter Companies listed in the Complaint: Tarter Industries, Tarter Management, Tarter Gate, and Tarter Tube. In support, they cite to a new round of demand letters issued to the potential combinations of Directors and member/managers for each of the four Tarter Companies in February of 2016. [DE 30-1.] Alternatively, Plaintiffs argue that even if the Court finds that the demand letters were insufficient, demand on the board would have been futile, given Joy, Keith, Nell, and Joshua Tarter's inability to exercise independent judgment on the matter.

Conversely, Defendant Joshua Tarter argues that the Plaintiffs are not the "fair and adequate" representatives of the other shareholders of the Tarter Companies. *See* Fed. R. Civ. P. 23.1(a). Pursuant to Rule 23.1(a), a derivative proceeding "may not be maintained if it appears that the plaintiff does not fairly and adequately represent the interests of the shareholders or members who are similarly situated in enforcing the right of the corporation or association." The Sixth Circuit has enumerated eight factors for courts to consider whether a plaintiff is a fair and adequate representative under Rule 23.1(a): (1) economic antagonisms between

representative and class; (2) the remedy sought by plaintiff in the derivative action; (3) indications that the named plaintiff was not the driving force behind the litigation; (4) plaintiff's unfamiliarity with the litigation; (5) other litigation pending between the plaintiff and defendants; (6) the relative magnitude of plaintiff's personal interests as compared to his interest in the derivative action itself; (7) plaintiff's vindictiveness toward the defendants; and (8) the degree of support plaintiff was receiving from the shareholders he purported to represent. *Davis v. Comed, Inc.*, 619 F.2d 588, 593–94 (6th Cir. 1980).

Citing the first *Davis* factor, economic antagonisms, Defendant Joshua Tarter argues that the Plaintiffs are not proper representatives because their main goal in pursuing the litigation is to force Joshua Tarter to tender his shares, thus giving their side of the family control of the Tarter Companies. [DE 11, at 15.] These claims are unsubstantiated. The Complaint alleges a desire to return the pilfered funds back to company coffers. And at this point in time, the Court is unwilling disregard the allegations in the Complaint and conclude that the primary purpose of the litigation is to garner control of the Tarter Companies. Accordingly, the first *Davis* factor does not weigh in favor of the defense.

Next, Defendant Joshua Tarter argues that the sixth *Davis* factor, relative magnitude of the plaintiff's personal interest as compared to his interest in the derivative action itself, weighs in favor of the defense. Like the first *Davis* factor, the argument here is that the Plaintiffs' primary motivation in litigating is not to make the Tarter businesses whole, but rather to gain control of them. Again, these claims are entirely speculative with no supporting documentation.

Defendant Joshua Tarter then argues that the Plaintiffs are improper representatives because they are vindictive, thus tipping the seventh *Davis* factor in favor the defense. In support of this argument, Joshua points to the "hyperbolic language and mischaracterizations" in the Complaint. [DE 11, at 16.] Plaintiffs, in turn, argue that seeking compensation for fraudulent activities is not vindictive and maintain that the point of the lawsuit is to return the

misappropriated funds to the Tarter Companies. At this stage of the litigation, the Court refuses to reconstrue the stated purposes of the Plaintiffs. As such, the seventh *Davis* factor does not weigh in favor of the defense.

Lastly, Joshua Tarter asserts that there is a lack of support from the other class members, namely Joy, Keith, and Nell Tarter (Joshua's mother and siblings). This is undeniable. However, even with the eighth *Davis* factor weighing in the defense's favor, the Court finds, on balance, that the Plaintiffs have adequately pleaded that they are fair and adequate representatives of the shareholders of the Tarter Companies.

Instead of attacking the Plaintiffs' adherence to Rule 23.1(a), Defendant Thomas Gregory challenges the legal sufficiency of the alleged demands made on the Tarter Companies in February of 2018. Gregory first argues that the demands were not particular enough because they were sent to those who "might be Directors" instead of those occupying those roles. This argument is unpersuasive. As articulated by the Plaintiffs, the reason the demand letters were addressed to every possible Board and member/manager variation was because there was (and still is) legitimate uncertainty regarding the corporate structure of the Tarter Companies.

Defendant Gregory proceeds to argue that the Plaintiffs lack derivative standing because the decisions of certain Tarter Family members to refuse to request or issue calls for a special meeting fell within the business judgment rule. Shareholders asserting a claim on behalf of a corporation are required to show either (1) a demand of the Directors to pursue the corporation's claim and a wrongful refusal of that demand, or (2) that making such a demand would have been futile in that the directors "are deemed incapable of making an impartial decision regarding the pursuit of the litigation." *Wood v. Baum*, 953 A.2d 136, 140 (Del. 2008). Because a decision by a board of directors to refrain from acting in accordance with the demand may be warranted, courts apply the business judgment rule in reviewing the board's refusal. *Allied Ready Mix Co. ex rel. Mattingly v. Allen*, 994 S.W.2d 4, 8 (Ky. Ct. App. 1998). "The business

judgment rule is a presumption that in making a business decision, not involving self-interest, the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *Spiegel v. Buntrock*, 571 A.2d 767, 774 (Del. 1990). The shareholders challenging the board's decision bears the burden of establishing facts that rebut this presumption. *Id.*

The Complaint alleges that demand letters were sent to the potential combinations of Directors and member/managers for each of the four Tarter Companies. According to the bylaws of Tarter Industries, in order to file litigation, there must first be a request to call a special meeting. This request can be made by the President or by the majority of Directors. [DE 1-1.] In accordance, David, in his alleged capacity as President, requested that Anna Lou, the Secretary, call a special meeting for the purpose of voting on whether to authorize litigation. [DE 1, at 21.] A special meeting was held, and the resolution passed. [DE 1, at 21.]

At the other Tarter entities, however, the demands for litigation were met with resistance. At Tarter Management, Anna Lou, in her alleged capacity as President, requested that the Secretary, Joy, issue notice of a special meeting. However, Joy refused to issue the notice, precluding the Directors from ever voting on the issue. The demand letters sent to the Tarter LLCs suffered a similar fate. Joshua Tarter, in his assumed capacity as President of the LLCs, never requested the Secretaries of the two entities to issue notices of a special meeting. As a result, the matter was never formally voted upon or even discussed.

These refusals to request and issue calls for special meetings amount to rejections of the Plaintiffs' litigation demands. And when a demand is rejected, courts evaluate the refusal under the business judgment rule. *Allied Ready Mix*, at 8. It is then up to the shareholders to overcome the accompanying presumption of correctness.

Defendant Thomas Gregory argues that it was within Joy, Joshua, Keith, and Nell's business judgment to determine that the litigation was not in the best interests of the Tarter

Companies. [DE 12, at 15.] The theory behind this argument appears to be that lawsuits, even if meritorious, can be costly, especially in terms of public perception. This may be true. However, there is nothing in the pleadings that suggest that the Boards of Tarter Management and the member/managers of the Tarter LLCs arrived at this conclusion following independent reviews of the demands. To the contrary, it appears that there was no investigation whatsoever.

In sum, the Court finds that adequate demand was made on the Boards of Tarter Management and the Tarter LLCs. The Court also determines that the refusals to request or issue calls for special meetings do not fall within the protections of the business judgment rule. As such, the Court finds that the Plaintiffs have derivative standing to sue on behalf of Tarter Management, Tarter Gate, and Tarter Tube. Because the Court finds that the Plaintiffs have sufficiently pleaded that adequate demand was made on the Boards of Tarter Management and the member/managers of Tarter LLCs, it does not need to address the futility arguments.

## II. Defendants' 12(b)(6) Claims

Plaintiffs bring a variety of claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), the Defend Trade Secrets Act ("DTSA"), the Kentucky Uniform Trade Secrets Act ("KUTSA"), and the Kentucky common law. Defendants Joshua Tarter and Thomas Gregory have moved to dismiss all of these claims pursuant to Fed. R. Civ. 12(b)(6). For reasons listed below, the Court will grant the motions as to Counts IV, V, VII, and XV of the Complaint. The rest of the Plaintiffs' claims, however, may proceed.

### A.

To survive a Rule 12(b)(6) motion to dismiss, a complaint must assert enough facts to provide the defendant with "fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 545 (2007) (internal quotation marks and citations omitted). A complaint "must also contain sufficient factual matter, accepted as true, to

'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 697 (2009) (quoting *Twombly*, 550 U.S. at 570).

A complaint should be dismissed pursuant to Rule 12(b)(6) if there is no law to support the claims, if the alleged facts are insufficient to state a claim, or if an insurmountable bar to relief exists on the face of the complaint. *See Browning v. Pennerton*, 633 F.Supp.2d 415, 429 (E.D. Ky. Jun. 22, 2009) (citing *Rauch v. Day & Night Mfg. Corp.*, 576 F.2d 697 (6th Cir. 1978)). "When considering a motion to dismiss pursuant to Rule 12(b)(6), the Court must accept as true all factual allegations in the complaint and must draw inferences in a light most favorable to the plaintiff." *Drain v. Nicholson*, No. 1:07-CV-690, 2008 WL 123881, at *1 (S.D. Ohio Jan. 10, 2008). However, the Court "need not accept as true legal conclusions cast in the form of factual allegations if those conclusions cannot be plausibly drawn from the facts, as alleged." *O'Hair v. Winchester Police Dep't*, No. CIV.A. 5:15-097-DCR, 2015 WL 4507181, at *2 (E.D. Ky. July 23, 2015).

## B.

As an initial matter, Defendant Thomas Gregory contends that the pending Rule 12(b)(6) motions should be granted because the Plaintiffs' "group allegations" violate the requirements of Fed. R. Civ. P. 8. [DE 12, at 19.] He challenges Plaintiffs' practice of grouping together the four Tarter entities under one umbrella—the Tarter Companies. Moreover, he submits that the Complaint impermissibly lumps him in with Joshua Tarter and Xiaofeng Chen when referring to the alleged pass-through scheme.

Gregory overstates the prevalence and severity of the "groupings" in the Complaint. Despite his best efforts to frame it as such, this is not a situation where the Complaint blanketly asserts all claims against all Defendants. Instead, it spells out each Defendant's role in the purported pass-through scheme. Just because the Complaint alleges that, in certain instances,

the Defendants allegedly acted in concert does not mean Rule 8 has been violated. This holds especially true in fraud cases and where the Plaintiffs do not yet have the benefit of discovery.

**C.**

In Counts III, IV, V, VI, VII, and VIII, Plaintiffs allege trade secret misappropriation under the Defend Trade Secrets Act ("DTSA") and the Kentucky Uniform Trade Secrets Act ("KTSA").

### Count III, Violation of the DTSA – All Defendants

The DTSA provides a private cause of action for owners of misappropriated trade secrets "if the trade secret[s] [are] related to a product or service or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836. The DTSA became effective on May 11, 2016 and is not retroactive. *See* 18 U.S.C. § 1833; *Duro Corp. v. Canadian Standards Ass'n*, No. 1:17 CV 1127, 2017 WL 6326862, at *3 (N.D. Ohio Dec. 11, 2017). Under the DTSA, a trade secret is information for which: (1) the owner thereof has taken reasonable measures to keep such information secret; and (2) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information. 18 U.S.C. § 1839(3). To prove misappropriation of a trade secret, a plaintiff must assert facts "establishing an unconsented disclosure or use of a trade secret by one who used improper means to acquire the secret; or, at the time of the disclosure, knew or had reason to know that the trade secret was acquired through improper means, under circumstances giving rise to a duty to maintain the secrecy of the trade secret." *Ford Motor Co. v. Launch Tech Co.*, No. 17-12906, 2018 WL 1089276, at *16 (E.D. Mich. Feb. 26, 2018) (citing to 18 U.S.C. § 1839(5)).

Plaintiffs allege that each of the Defendants misappropriated the Tarter Companies' trade secrets, which included "costs and price lists, marketing and business strategies, inventory and pricing costs, and calculations related to profit margins." [DE 17, at 43.] In order

to proceed on this claim, the Plaintiffs must sufficiently allege that the documents and information at issue qualify as trade secrets and were somehow misappropriated. *Xoran Holdings LLC v. Luick*, No. 16-13703, 2017 WL 4039178, at *6 (E.D. Mich. Sept. 13, 2017).

Plaintiffs argue that the information at issue qualifies as a trade secret because the Tarter Companies took reasonable steps to protect it and because it derives independent value. Regarding the steps taken to maintain secrecy, Plaintiffs assert that at the time of the alleged misappropriation, the Tarter Companies utilized a network that was secure, and password protected. There was also a document management system that limited access to sensitive information to high-level employees. [DE 17, at 47.] As to independent worth, Plaintiffs submit that the information at issue derives value because it gave the Tarter Companies a competitive advantage over other market participants and was not easily ascertainable. [DE 17, at 43-44.]

Plaintiffs further assert that the actions taken by the Defendants constitute misappropriation. The Complaint alleges that Joshua Tarter and Thomas Gregory took the confidential information and disclosed it to QMC. This information was then purportedly used to the "Defendants' benefit and the Tarter Companies' detriment." [DE 1, at 59.]

Defendants Joshua Tarter and Thomas Gregory, on the other hand, argue that the information cited by the Plaintiffs does not qualify for protection under the DTSA. They first contend that the Plaintiffs have failed to adequately show that "costs and price lists, marketing and business strategies, inventory and pricing costs, and calculations related to profit margins" qualify as trade secrets. Next, they argue that the information was not misappropriated in contravention of the DTSA. Third and finally, Tarter and Gregory argue that Plaintiffs have not sufficiently alleged that any misappropriation occurred after May 11, 2016—the DTSA's effective date.

After a review of the pleadings, the Court concludes that the Plaintiffs have adequately asserted their federal misappropriation claims against Defendants Joshua Tarter, Thomas

Gregory, and QMC. To begin, the determination of whether certain information constitutes a trade secret is a fact-based inquiry. Here, the Complaint alleges that the Tarter Companies utilized a password protected network and restricted access to the documents and information at issue to high-level employees and executives. It also asserts that the information derived independent value because it was not widely known, and it gave the Tarter Companies a competitive advantage over other farm management equipment manufacturers. At this point in time, the Court is unwilling to say that (1) password protected networks and limited access to sensitive documents do not constitute "reasonable steps" under the DTSA, and (2) that the information at issue does not derive independent value in the manufacturing context. As such, the Plaintiffs, at this stage of the litigation, have sufficiently alleged the existence of trade secrets under the DTSA.

As to misappropriation, the Complaint asserts that Joshua Tarter and Thomas Gregory took the trade secrets of the Tarter Companies and disclosed them to QMC and its affiliates. The Complaint further indicates that the confidential information was disclosed and utilized in a manner that hurt the Tarter Companies and enriched all of the Defendants. It also alludes to specific acts of misappropriation occurring after May 11, 2016. For instance, in January of 2017, Defendant Gregory allegedly formed a company called Mighty Strong Products. Plaintiffs contend that he and Joshua Tarter misappropriated certain trade secrets to the benefit of this newly formed company and to the detriment of the Tarter Companies. [DE 1, at 62.]

In sum, the Court determines that the Plaintiffs have adequately pleaded their misappropriation claim under the DTSA.

### Count IV, Aiding and Abetting Defendant Joshua Tarter's Misappropriation of Trade Secrets Pursuant to the DTSA – Defendants Thomas Gregory and QMC

Plaintiffs' fourth claim of relief asserts that Defendants Thomas Gregory and QMC aided and abetted Defendant Joshua Tarter's violation of the DTSA. [DE 1, 80.] The Plaintiffs, however, do not cite any authority demonstrating that Congress has established civil aiding and

abetting liability under the DTSA. In *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, the Supreme Court held that there is no general presumption for aiding and abetting liability in federal statutes. 511 U.S. 164 (1994). Instead, Congress imposes this form of liability on a "statute-by-statute" basis. *Id.* at 182; *see Swartwout v. Edgewater Grill LLC*, No. 1:12-CV-130, 2013 WL 3655162 (W.D. Mich. July 12, 2013) ("Since the Supreme Court's decision in *Central Bank of Denver* almost twenty years ago, the federal courts have been loathe to extend liability beyond the clear text of a statute on theories of civil conspiracy or aiding and abetting.").

Because the Plaintiffs have not put forth—nor has the Court found—any statutory basis for aiding and abetting liability under the DTSA, the Court **dismisses** Count IV of the Plaintiffs' Complaint.

### Count V, Conspiracy to Commit the Misappropriation of Trade Secrets Pursuant to the DTSA – All Defendants

Count V of the Complaint alleges that each of the Defendants, Joshua Tarter, Thomas Gregory, and QMC, conspired to violate provisions of the DTSA. [DE 1, at 81.] The Court concludes, however, that the DTSA does not create a private right of action for conspiracy to engage in the theft of trade secrets. *See Steves & Sons, Inc. v. JELD-WEN, Inc.*, 271 F. Supp. 3d 835 (E.D. Va. 2017) (noting that "even after the enactment of the DTSA, plaintiffs who asserted claims for trade secrets misappropriation under the DTSA have relied on state law to present conspiracy claims"). Accordingly, the Court **dismisses** Count V of the Plaintiffs' Complaint.

### Count VI, Violation of Kentucky's Uniform Trade Secrets Act ("KUTSA"), KRS § 365.880 – All Defendants

Kentucky's trade secret protection statute is nearly identical to the DTSA. To establish a violation of the KUTSA, a plaintiff must allege that (1) the existence of a trade secret, and (2) the misappropriation of that trade secret. *KCH Servs., Inc. v. Vanaire, Inc.*, No. CIV.A. 05-777-C, 2008 WL 4401391, at *2 (W.D. Ky. Sept. 24, 2008). Similar to the DTSA, a trade secret under Kentucky law requires that the information at issue (1) have independent economic value, (2)

not be generally known or readily ascertainable by proper means, and (3) be the subject of reasonable efforts to maintain its secrecy. *BDT Products, Inc. v. Lexmark Int'l, Inc.*, 274 F.Supp.2d 880, 890 (E.D. Ky. 2003). Furthermore, to establish an act of misappropriation, the plaintiff must show that the information at issue was used without proper consent, disclosed improperly, or acquired through improper means. KRS § 365.880; *KCH Servs., Inc.*, 2008 WL 4401391, at *4; *In re Dippin' Dots Patent Litigation*, 249 F.Supp.2d 1346, 1375 (N.D. Ga. 2003) (applying Kentucky law).

For the same reasons listed in the Court's analysis under the DTSA, the Court determines that the Complaint sufficiently alleges a KUTSA claim against Defendants Joshua Tarter, Thomas Gregory, and QMC.

### Count VII, Aiding and Abetting Joshua Tarter's Misappropriation of Trade Secrets Under the KUTSA – Defendants Thomas Gregory and QMC

Plaintiffs' seventh claim of relief asserts that Defendants Thomas Gregory and QMC aided and abetted Defendant Joshua Tarter's violation of the KUTSA. [DE 1, 80.] However, the Plaintiffs have not pointed to, and the Court is unaware of, any authority indicating that aiding and abetting liability exists under the KUTSA. As such, the Court will **dismiss** Count VII of the Plaintiffs' Complaint.

### Count VIII, Conspiracy to Commit the Misappropriation of Trade Secrets Pursuant to the KUTSA – All Defendants

Count VIII of the Complaint alleges that all Defendants—Joshua Tarter, Thomas Gregory, and QMC—conspired to violate the KUTSA. Pursuant to the laws of Kentucky, a civil conspiracy claim is derivative of other causes of action. *Phoenix Process Equip. Co. v. Capital Equip. & Trading Corp.*, No. 3:16-CV-00024-JHM, 2017 WL 157834, at *10 (W.D. Ky. Jan. 13, 2017), *on reconsideration in part*, 250 F. Supp. 3d 296 (W.D. Ky. 2017). Moreover, to establish a civil conspiracy claim, the plaintiff must show "an unlawful/corrupt combination or agreement

between the alleged conspirators to do by some concerted action an unlawful act." *See Peoples Bank of N. Ky., Inc. v. Crowe Chizek and Co. LLC*, 277 S.W.3d 255, 261 (Ky. Ct. App. 2008).

As noted *supra*, the Plaintiffs have adequately pleaded their claim under the KUTSA. Thus, Plaintiffs need only show an illicit agreement to complete their civil conspiracy claim. Upon review, the Court concludes that the Plaintiffs have sufficiently alleged such an agreement. Specifically, the Complaint asserts that Defendants Joshua Tarter, Thomas Gregory and QMC, coordinated and engaged in a scheme to divert cost savings from the Tarter Companies' to themselves—utilizing a variety of trade secrets in the process. [DE 1, at 85.] It also notes certain communications between the Defendants and details how each contributed to the illicit arrangement. Accordingly, the Court will allow the Plaintiffs to proceed on Count VIII of the Complaint.

### D.

The Complaint asserts two claims under the Racketeer Influenced Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-1968. In Count I, Plaintiffs allege that all Defendants violated the federal RICO Statute, 18 U.S.C. § 1962(c) "by conducting the affairs of a criminal enterprise through a pattern of racketeering activity to the injury of Plaintiffs' business and property." [DE 1, at 67.] In Count II, Plaintiffs allege that Defendants Joshua Tarter and Thomas Gregory engaged in a RICO conspiracy in contravention of 18 U.S.C. § 1962(d).

### Count I, RICO Violations (18 U.S.C. § 1962(c)) – All Defendants

In Count I, Plaintiffs assert that each of the Defendants violated the RICO statute, which permits a civil cause of action for any person suffering an injury to his "business or property by reason of a violation of 18 U.S.C. § 1962." *Grange Mut. Cas. Co. v. Mack*, No. CIV.A. 6:06-555-DCR, 2009 WL 1036092, at *3 (E.D. Ky. Apr. 17, 2009). To establish a viable civil RICO claim, one must satisfy the following elements: "(1) conduct (2) of an enterprise (3) through a pattern

(4) of racketeering activity." *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 496 (1985). The Defendants attack the Plaintiffs' RICO claims on multiple fronts.

First, Defendant Gregory argues that the Complaint does not sufficiently allege his "conduct" within the RICO enterprise. This argument is nonsensical. The Complaint is littered with allegations regarding Gregory's purported involvement in the pass-through scheme. As such, the Court rejects this argument.

Second, Defendant Gregory argues that the Plaintiffs have failed to allege the existence of an enterprise. [DE 12, at 33.] Pursuant to RICO, an enterprise is "any individual, partnership, corporation, association, or other legal entity and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4); *see Ouwinga v. Benistar 419 Plan Servs., Inc.*, 694 F.3d 783, 793 (6th Cir. 2012). To establish the existence of an enterprise in this Circuit, a plaintiff must show: (1) an ongoing organization with some sort of framework making and carrying out decisions; (2) that the members of the enterprise functioned as a continuing unit with established duties; and (3) that the enterprise was separate and distinct from the pattern of racketeering activity in which it engaged. *United States v. Chance*, 306 F.3d 356, 372 (6th Cir. 2002).

Defendant Gregory specifically asserts that the Plaintiffs have failed to satisfy the Sixth Circuit's third requirement, that the enterprise be separate and distinct from the pattern of racketeering activity in which it engaged. According to Gregory, the alleged association-in fact enterprise consisted solely of QMC and its agents. And because the QMC agents, Joshua Tarter and himself, were not distinct from the QMC corporation, Gregory contends that an enterprise, for the purposes of RICO, could not have existed.

Sixth Circuit precedent appears to negate Gregory's line of argument. In *In re ClassicStar Mare Lease Litig.*, the Sixth Circuit acknowledged two key principles in regards to the distinctness requirement: (1) individual defendants are always distinct from corporations

because they are legally distinct entities, even when the individuals own the corporations or act only on their behalf; and (2) corporate defendants are distinct from RICO enterprises when they are functionally separate, as when they perform different roles within the enterprise or use their separate legal incorporation to facilitate racketeering activity. 727 F.3d 473, 492 (6th Cir. 2013) (referring to *Cedric Kushner Promotions, Inc. v. King*, 533 U.S. 158 (2001)). In light of this precedent, the Court finds that Joshua Tarter and Thomas Gregory were indeed distinct from QMC. As such, despite Gregory's contentions, the Court finds that the Plaintiffs have sufficiently alleged an enterprise for the purposes of RICO.

Next, Defendants Joshua Tarter and Thomas Gregory both maintain that the Plaintiffs have failed to adequately assert a pattern of racketeering activity. To establish a RICO violation under § 1962(c), a plaintiff must allege that the enterprise engaged in a "pattern of racketeering activity" consisting of at least two predicate acts of racketeering activity occurring within a ten-year period. 18 U.S.C. § 1961(5). The alleged predicate acts may consist of offenses "which are indictable" under any of a number of federal statutes, including the wire fraud (18 U.S.C. § 1343) and money laundering statutes (18 U.S.C. § 1956). 18 U.S.C. § 1961(1); *Moon v. Harrison Piping Supply*, 465 F.3d 719, 723 (6th Cir. 2006). The pattern requirement is intended to prevent routine commercial disputes from turning into civil RICO claims. *Smith v. Nationstar Mortg.*, No. 1:17 CV 1483, 2017 WL 6594009, at *4 (N.D. Ohio Dec. 21, 2017), *aff'd sub nom. Smith v. Nationstar Mortg.*, LLC, No. 18-3081, 2018 WL 6131847 (6th Cir. Nov. 21, 2018).

Here, the Complaint asserts three predicate acts of unlawful racketeering activity: (1) wire fraud; (2) money laundering; and (3) violations of the DTSA. Defendants Joshua Tarter and Thomas Gregory argue that the Plaintiffs have failed to allege these predicate offenses with sufficient detail. They also argue that even if the Court determines that the predicate offenses have been adequately pleaded, they are still insufficient to establish the "pattern" required by

the RICO statute. Lastly, Gregory argues that the Plaintiffs have failed to establish proximate cause. The Court addresses each of these contentions in turn.

### *(1) Wire Fraud*

Wire fraud consists of (1) a scheme to defraud, and (2) use of the wires in furtherance of the scheme. *United States v. Jamieson*, 427 F.3d 394, 402 (6th Cir. 2005). "A scheme to defraud includes any plan or course of action by which someone uses false, deceptive, or fraudulent pretenses, representations, or promises to deprive someone else of money." *Id.* at 402. A plaintiff must also demonstrate scienter to establish a scheme to defraud. This requirement can be satisfied by a showing that the defendant "acted either with a specific intent to defraud or with recklessness with respect to potentially misleading information." *Heinrich v. Waiting Angels Adoption Servs., Inc.*, 668 F.3d 393, 404 (6th Cir. 2012) (citing *United States v. DeSantis*, 134 F.3d 760, 764 (6th Cir. 1998)).

When asserting wire fraud as a predicate RICO act, a plaintiff must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Frank v. Dana Corp.*, 547 F.3d 564, 570 (6th Cir. 2008) (quoting *Gupta v. Terra Nitrogen Corp.*, 10 F.Supp.2d 879, 883 (N.D. Ohio 1998)). "A RICO plaintiff is *not* required to plead or prove first-party reliance on an allegedly false statement." *Heinrich*, 668 F.3d 393 at 405. However, the plaintiff must show that the predicate act was a proximate cause of the plaintiff's injuries. *Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 268, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992). Put differently, a plaintiff must show "some direct relation between the injury asserted and the injurious conduct alleged." *Id.*

In seeking to establish wire fraud as a predicate act, the Complaint alleges various instances where the Tarter Companies wired money to QMC in "excess of the true cost of the products being purchased." [DE 1, at 70.] For example, the Complaint asserts that on July 5,

2015, the Tarter Companies received shaft exchanges from QMC, paying $142,848.00. The true cost of the product, however, was $98,764.80. [DE 1, at 73.] Moreover, during the six-year period in which these wire transfers were taking place, Plaintiffs assert that Defendants Joshua Tarter and Thomas Gregory misrepresented their interests in QMC. [DE 1, at 74.]. These purported misrepresentations came in the form of both omissions and affirmative dishonesties. First, Plaintiffs assert that during the relevant period, Defendants Joshua Tarter and Thomas Gregory both failed to disclose their interests in QMC, despite a legal duty to do so. Second, that Plaintiffs allege that Joshua Tarter, in addition to his omission, lied about his ownership interests in QMC in January of 2013 and on April 1, 2016 [DE 1, at 62.] These statements allegedly occurred at headquarters in Casey County, Kentucky.

Defendant Thomas Gregory attacks the Plaintiffs' fraud by omission theory, arguing that the Plaintiffs have not shown the existence of an independent duty to disclose his ownership interests in QMC. This argument is futile. The Complaint alleges that Defendants Joshua Tarter and Thomas Gregory's duty to disclose derived from the fact that the two occupied high-level positions within the Tarter Companies and were responsible for key decisions. Accordingly, Gregory's argument fails.

Defendant Gregory further asserts that Plaintiffs have failed to allege the details of the fraudulent omission with sufficient detail. According to him, "the broad allegation of an ongoing, six-year omission is not enough." [DE 12, 29.] This argument, however, misses the mark. Because of the inherent nature of omissions, plaintiffs are "less likely to uncover discrete evidence." *In re Duramax*, 298 F. Supp. 3d at 1083. And, the purpose of Rule 9(b) is simply to put Defendants on notice of the allegations so that they can prepare an adequate defense. *Id.* Here the Complaint alleges that Defendant Gregory actively participated in the creation of QMC. The Complaint further asserts that he was instrumental in the alleged pass-through scheme and failed to disclose his interests in QMC, despite his alleged status as an informal

Vice President, i.e., Joshua Tarter's right hand man. Plaintiffs' allegations, therefore, are "sufficient to apprise Defendants of the alleged fraudulent scheme." *Id.*

Next, Gregory contends that the Plaintiffs have failed to demonstrate scienter because there has been no allegation that he knew that the individual Plaintiffs were unaware of his ownership interests in QMC. [DE 12, at 31.] The scienter requirement can be satisfied by a showing that the defendant acted either with a specific intent to defraud or with recklessness with respect to potentially misleading information. *United States v. DeSantis*, 134 F.3d 760, 764 (6th Cir. 1998). The intent to deceive may be inferred from the totality of the circumstances and does not need to be proven by direct evidence. *United States v. O'Connell*, 172 F.3d 921 (D.C. Cir. 1998). In the instant case, the Complaint alleges that Gregory took steps to conceal his interests in QMC. The Complaint also asserts that Gregory diverted business opportunities, ordered employees to lie about the quality of QMC components, and sold defective QMC products, knowing that in the end the Tarter Companies would absorb the losses. [DE 48-51.] The Court finds that these allegations, taken together, establish the requisite intent for Plaintiffs' wire fraud claims against Gregory.

Lastly, Gregory submits that the Complaint fails to allege that the Plaintiffs relied on Gregory's non-disclosure of his QMC interests to their detriment. [DE 12, at 32.] The Court finds this argument unpersuasive. The Complaint indicates that because of Defendants Joshua Tarter and Thomas Gregory's omissions (and Joshua Tarter's affirmative misrepresentations) regarding their interests in QMC, the Plaintiffs did not intervene in the practice of sourcing components from QMC. And because the Plaintiffs did not intervene, the Complaint alleges that the Tarter Companies continued sourcing components from QMC, costing them millions of dollars in the process.

In total, the Court concludes that the Plaintiffs have sufficiently alleged the elements of wire fraud, qualifying it as a predicate act for the purposes of their civil RICO claims.

### (2) Money Laundering

To establish a claim for money laundering, a plaintiff must show that the defendants engaged in a financial transaction involving property that they knew to be criminally obtained, and which represented the proceeds of "specified unlawful activity" at the time the transaction occurred. *United States v. Santos*, 553 U.S. 507, 511 (2008). The term financial transaction includes deposits, withdrawals, transfers between accounts, stock purchases, and other actions. Further, the term "specified unlawful activity" is defined as any criminal offense listed under § 1956(c)(7), including most offenses which constitute "racketeering activity" under § 1961(1) of the federal RICO statute. 18 U.S.C. § 1956(c)(7)(A). *Arnold v. Alphatec Spine, Inc.*, No. 1:13-CV-714, 2014 WL 2896838, at *13 (S.D. Ohio June 26, 2014).

Plaintiffs maintain that Defendants Joshua Tarter and Thomas Gregory violated the federal money laundering statutes by causing the Tarter Companies to send funds to QMC and related entities in furtherance of their scheme to defraud. [DE 1, at 75.] Specifically, the funds flowed from QMC to Global Bright and then back into the domestic accounts of Defendants Joshua Tarter and Thomas Gregory. [DE 1, at 76.] Defendant Thomas Gregory, on the other hand, argues that Plaintiffs' allegations of money laundering are "entirely conclusory." [DE 12, at 28 n.16.] Moreover, he contends that the transactions occurred in the ordinary course of business and therefore, do not constitute money laundering in violation of the federal statutes.

After a review of the arguments, the Court concludes that the Plaintiffs have sufficiently alleged that the Defendants violated money laundering statutes in their supposed scheme to defraud the Tarter Companies. The Complaint details how the illicit scheme produced income for the Defendants and how offshore accounts were used to funnel the money back to the private accounts of the Joshua Tarter and Thomas Gregory.

Because the Court finds that the Plaintiffs have adequately pleaded the required elements of money laundering, the Court finds that it qualifies as a predicate offense for the purposes of their civil RICO claims.

### (3) Violations of the DTSA

Having already found that the Plaintiffs have adequately pleaded a violation of the DTSA, the Court determines that it qualifies as a predicate act under RICO.

### *(4) Plaintiffs Have Sufficiently Alleged a Pattern of Racketeering*

As defined by the RICO statutes, a "pattern of racketeering activity" requires "at least two acts of racketeering activity" in a ten-year period. And though two predicate acts are required to establish a pattern, they may not be sufficient. *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 237 (1989). Rather, Congress intended a more flexible approach, foreseeing that "a pattern might be demonstrated by reference to a range of different ordering principles or relationships between predicates, within the expansive bounds set." *Id.* at 238. Within the various kinds of relationships that can establish a pattern, two elements must be presented: "that the racketeering predicates are related, and that they amount to or pose a threat of continued criminal activity." *Brown v. Cassens Transp. Co.*, 546 F.3d 347, 354 (6th Cir. 2008). In order to prove a relationship between the predicate acts, plaintiff must show that the acts have "similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 230 (1989). The continuity requirement, on the other hand, looks to "[w]hether the predicates proved establish a threat of continued racketeering activity depends on the specific facts of each case." *Id.*

Defendant Joshua Tarter argues that a pattern of racketeering activity does not exist here because there was only one victim (the Tarter Companies), one scheme (the diversion of cost savings from the Tarter Companies to QMC), and one injury (lost of cost savings). [DE 11, at 29.] Further, Joshua Tarter alleges that there was only one omission here—the failure to reveal ownership interests in QMC. In response, Plaintiffs argue that a RICO enterprise does not require more than one victim. And in any event, they suggest that there were four victims, each of the Tarter four entities named in the Complaint. Plaintiffs further argue that there were multiple schemes. These include, amongst other things, the scheme to overcharge the Tarter Companies for substandard components, the scheme to shift the financial losses from QMC to

the Tarter Companies, the scheme to have the Tarter Companies pay for QMC employees and expenses, and the scheme to engage in money laundering. [DE 17, at 34.] Third and finally, Plaintiffs suggest that multiple injuries were suffered. These include not only loss of savings, but also reputational harm from the use of substandard components.

The Court, in sum, determines that the Complaint sufficiently alleges a pattern of racketeering. The Plaintiffs have adequately pleaded three predicate acts, all of which had a similar purpose—to defraud the Tarter Companies and enrich the Defendants. Moreover, given that the alleged fraud spanned a period of six years, the Plaintiffs have sufficiently alleged that the continuity requirement has been satisfied.

### (5) Proximate Cause

Defendant Thomas Gregory presents one last challenge to the Plaintiffs' RICO claims. He posits that the Plaintiffs have failed to establish that their damages were proximately caused by the alleged RICO violations. [DE 12, at 25.] His argument can be summarized as follows: (1) the crux of this action involves Defendants Joshua Tarter and Thomas Gregory's failure to disclose their ownership interests in QMC to the shareholders of the Tarter Companies; (2) the disclosure of this information, however, would not in and of itself have saved the Tarter Companies; (3) instead, once armed with the information regarding Joshua Tarter and Thomas Gregory's ownership interests, the Plaintiffs would have had to take affirmative steps to prevent further transactions with QMC; (4) this would have required the ability to control the Tarter Companies, something they likely did not have; and (5) thus, to link the alleged RICO violation to the injuries, the Court would have to undergo multiple assumptions and logical leaps, undermining a finding of proximate cause.

Despite Gregory's arguments, Plaintiffs have sufficiently pleaded that their injuries flowed directly from the alleged commission of the predicate acts of wire fraud, money laundering, and violations of the DTSA. *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 497 (1985)

(holding that, in a RICO action based on predicate acts of mail and wire fraud, a plaintiff's damages must "flow from the commission of the predicate acts"); *Kovach v. Access Midstream Partners, L.P.*, No. 5:15-CV-616, 2016 WL 1162061, at *10 (N.D. Ohio Mar. 23, 2016). Specifically, the Complaint alleges that as a result of the Defendants' failure to disclose the QMC shareholders, the Tarter Companies continued to source components from QMC, costing them millions of dollars. Lastly, Gregory's contention that the Plaintiffs did not have the power to intervene is contradicted by the Complaint's assertions that when members of the Tarter family confronted Joshua Tarter and Thomas Gregory, the scheme was halted and Gregory resigned.

### *(6) Conclusion*

Considering the above, the Court finds that the Plaintiffs have adequately pleaded three predicate RICO offenses. Moreover, the Court concludes that these offenses establish the pattern of racketeering activity required by the statute. As such, the Plaintiffs may proceed on their RICO claims against all Defendants.

### Count II, Conspiracy to Violate the RICO Statutes (18 U.S.C. § 1962(d)) – Defendants Joshua Tarter and Thomas Gregory

In Count II, Plaintiffs allege that Defendants Joshua Tarter and Thomas Gregory engaged in a conspiracy to violate the RICO statute. [DE 1, at 76-77.] To plausibly state a claim for a RICO conspiracy, plaintiffs must "successfully allege all the elements of a RICO violation, as well as alleging the existence of an illicit agreement to violate the substantive RICO provision." *United States v. Sinito*, 723 F.2d 1250, 1260 (6th Cir. 1983). The Court has already determined that Plaintiffs have adequately pleaded all the elements of a substantive RICO violation. As such, the only thing left to consider is whether the Plaintiffs have established the presence of an illicit agreement to violate the RICO provision.

"An agreement can be shown if the defendant objectively manifested an agreement to participate directly or indirectly in the affairs of an enterprise through the commission of two

or more predicate crimes." *Heinrich v. Waiting Angels Adoption Servs., Inc.*, 668 F.3d 393, 411 (6th Cir. 2012) (internal quotation and editing marks omitted). The Complaint alleges that Defendants Joshua Tarter and Thomas Gregory conspired to secretly profit from a pattern of racketeering activity involving QMC. The agreement can be inferred though the alleged involvement of Joshua Tarter and Thomas Gregory in the three predicate acts that the Court has recognized: wire fraud, money laundering, and violations of the DTSA. And since the Plaintiffs have sufficiently pleaded an underlying RICO violation and an agreement to participate in this violation, the Court concludes that Count II states a claim upon which relief can be granted.

## E.

In Counts IX thru XV the Plaintiffs assert various claims under the Kentucky common law.

### Count IX, Breach of Fiduciary Duty – Defendants Joshua Tarter and Thomas Gregory

Defendant Thomas Gregory has moved to dismiss Count IX of the Complaint, arguing that the Plaintiffs have failed to demonstrate that Gregory owed a fiduciary duty to any of the Tarter Companies. [DE 12, at 34.] Gregory posits that as a "mere employee," a fiduciary duty cannot be imposed on him. [DE 12, at 35.] For the reasons set forth below, the Court rejects this argument.

The Kentucky Supreme Court has espoused the following definition of a fiduciary duty:

[A]s a general rule, we can conclude that such a relationship is one founded on trust or confidence reposed by one person in the integrity and fidelity of another and which also necessarily involves an undertaking in which a duty is created in one person to act primarily for another's benefit in matters connected with such undertaking. . . .

The relation[ship] may exist under a variety of circumstances; it exists in all cases where there has been a special confidence reposed in one who in equity and good conscience is bound to act in good faith and with due regard to the interests of the one reposing confidence.

*Giverny Gardens, Ltd. P'ship v. Columbia Hous. Partners Ltd. P'ship*, 147 F. App'x 443, 451 (6th Cir. 2005) (citing *Steelvest, Inc. v. Scansteel Serv. Ctr., Inc.*, 807 S.W.2d 476, 485 (Ky. 1991). The Complaint asserts that Defendants Joshua Tarter and Thomas Gregory owed fiduciary duties to the Tarter Companies by way of their senior positions within the family business. Gregory's attempts to downplay his clout within the Tarter Companies are unavailing. The Complaint asserts that during the relevant periods, Gregory and Joshua Tarter occupied crucial positions within the corporate structure and made key decisions. The Complaint also proclaims that at certain times, Gregory held himself out as Vice President of the Tarter Companies and executed documents in that capacity. Accordingly, the Court finds that the Complaint adequately asserts that because of the nature of their high-level positions, both Joshua Tarter and Thomas Gregory owed a fiduciary duty to the Tarter Companies.

Moreover, the Complaint sufficiently alleges that Defendants Joshua Tarter and Thomas Gregory breached these fiduciary duties through the operation of the pass-through scheme and through their failure to disclose their interests in QMC.

### Count X, Aiding and Abetting Joshua Tarter's Breach of Fiduciary Duty – Defendants Thomas Gregory and QMC.

Count X alleges that Defendants Thomas Gregory and QMC aided and abetted Defendant Joshua Tarter's breach of fiduciary duty. [DE 1, at 86.] As noted by the Sixth Circuit, Kentucky law "recognizes a claim for aiding and abetting tortious conduct, which covers fiduciary-breach claims." *Miles Farm Supply, LLC v. Helena Chem. Co.*, 595 F.3d 663, 666 (6th Cir. 2010) (citing *Steelvest, Inc. v. Scansteel Serv. Ctr., Inc.*, 807 S.W.2d 476, 485 (Ky. 1991)); *See also Anderson v. Pine S. Capital, LLC*, 177 F.Supp.2d 591, 604 (W.D. Ky. 2001) ("One may be held liable to an injured plaintiff for aiding and abetting a breach of a fiduciary duty.") (internal citations omitted). To prevail on this brand of claim, a plaintiff must show: (1) the existence and breach of a fiduciary duty; (2) that the defendant gave the breaching party "substantial assistance or encouragement" in effectuating the breach; and (3) the defendant

knew that the party's conduct breached that fiduciary duty. *Miles Farm Supply, LLC*, 595 F.3d at 666 (citations omitted).

Defendant Thomas Gregory argues that the claims are precluded because of the intracorporate conspiracy doctrine. This rule provides that "a corporation cannot conspire with its employees, and its employees, when acting within the scope of their employment, cannot conspire among themselves." *Cowing v. Commare,* 499 S.W.3d 291, 294 (Ky. App. 2016). And because the agents of QMC, Joshua Tarter and Thomas Gregory, were acting within the scope of their employment, Gregory argues that any aiding and abetting claim is precluded.

What Gregory fails to mention, however, is that the Complaint does not merely allege actions taken in the Defendants' employment capacities. Instead, it describes conduct motivated by self-interest independent of any of they hypothetical goals of QMC. As such, the Court rejects Defendant Gregory's argument and the Plaintiffs may proceed on Count X.

### Count XI, Fraudulent Misrepresentation – Defendant Joshua Tarter

In their eleventh request for relief, Plaintiffs allege that Joshua Tarter made fraudulent misrepresentations regarding his personal interests in QMC. Under Kentucky law, a fraudulent misrepresentation claim must establish by clear and convincing evidence: (1) that the declarant made a material representation to the plaintiff; (2) that this representation was false; (3) that the declarant knew the representation was false or made it recklessly; (4) that the declarant induced the plaintiff to act upon the misrepresentation; (5) that the plaintiff relied upon the misrepresentation; and (6) that the misrepresentation caused injury to the plaintiff. *RQSI Glob. Asset Allocation Master Fund, Ltd v. Apercu Int'l PR LLC*, 683 F. App'x 497, 503 (6th Cir. 2017) (citing *Flegles, Inc. v. TruServ Corp.*, 289 S.W.3d 544, 549 (Ky. 2009).

Defendant Joshua Tarter contends that the Plaintiffs have failed to plead any reasonable reliance on the misrepresentation and have failed to show how they were injured by the alleged

misrepresentation. He also maintains that the Plaintiffs' "bald assertions" regarding the fraudulent misrepresentation do not meet the requirements of Fed. R. Civ. P. 9(b).

These arguments are unpersuasive. As to reliance, the Complaint alleges that the Plaintiffs did rely on the misrepresentations, as shown by the fact that the Plaintiffs did not intervene, despite their suspicions regarding QMC. Moreover, the Complaint asserts that as a result, the pass-through scheme continued, costing the Tarter Companies millions of dollars. Lastly, as to the requirements of Fed. R. Civ. P 9(b), the Complaint describes two specific instances where Joshua Tarter allegedly lied about his interests in QMC.

### Count XII, Fraudulent Concealment/Fraud by Omission -- All Defendants

In Count XII the Plaintiffs assert that all the Defendants committed fraud by omission in failing to disclose the details of QMC to the Tarter Companies. Under Kentucky law, to prevail on a claim of fraud by omission, a plaintiff must prove: (1) the defendant had a duty to disclose the material fact at issue; (2) the defendant failed to disclose the fact; (3) the defendant's failure to disclose the material fact induced the plaintiff to act; and (4) the plaintiff suffered actual damages as a consequence. *Giddings & Lewis, Inc. v. Indus. Risk* Insurers, 348 S.W.3d 729, 747 (Ky. 2011).

Defendant Gregory argues these claims are barred as to him because the Plaintiffs have failed to establish that he had an affirmative duty to disclose his interests in QMC. As discussed throughout this opinion, however, Gregory and Joshua Tarter's alleged statuses as senior executives at the Tarter Companies conferred on them a duty to disclose their interests in the offshore company. The Court thereby concludes that Plaintiffs have adequately pleaded the elements of a fraud by omission claim against all Defendants.

### Count XIII, Usurpation of Corporate Opportunity – Defendants Joshua Tarter and Thomas Gregory

Plaintiffs, via Count XIII, assert that Defendants Joshua Gregory and Thomas Gregory usurped corporate opportunities which, according to the Complaint, belonged to the Tarter

Companies. Under Kentucky Law, the test for whether a corporate opportunity has been improperly diverted is two pronged. The threshold question is whether the opportunity in question was closely related to an existing or prospective activity of the Company—i.e., the line of business test. *Patmon v. Hobbs*, 495 S.W.3d 722, 726 (Ky. Ct. App. 2016). The second question is whether the corporation has the practical or technical means to pursue the opportunity. If the answer to both questions is yes, then the Plaintiffs have sufficiently alleged the diversion of a corporate opportunity.

Defendant Gregory argues that the claim should fail because it requires the Plaintiffs to sufficiently allege that he had a duty to disclose the opportunity to the Tarter Companies—a feat which he says has not been accomplished. [DE 12, at 36.] The Court disagrees. As noted *supra*, the Plaintiffs have adequately asserted that Defendants Thomas Gregory and Joshua Tarter both owed the Tarter Companies fiduciary duties. And because the Plaintiffs have adequately pleaded all the elements of the claim, they may proceed on Count XIII.

### Count XIV, Unjust Enrichment – All Defendants

Count XIV alleges that Defendants Joshua Tarter, Thomas Gregory, and QMC were unjustly enriched by the purported pass-through scheme. To state a claim of unjust enrichment under Kentucky law, a party must establish: "(1) [a] benefit conferred upon defendant at plaintiff's expense; (2) a resulting appreciation of benefit by defendant; and (3) inequitable retention of benefit without payment for its value." *Christian Cty. Clerk ex rel. Kem v. Mortg. Elec. Registration Sys., Inc.*, 515 F. App'x 451, 459 (6th Cir. 2013) (citing Jones v. Sparks, 297 S.W.3d 73, 78 (Ky. Ct. App. 2009). The Court concludes that the Plaintiffs have adequately pleaded the elements of the claim.

### Count XV, Faithless Servant Doctrine – Defendants Joshua Tarter and Thomas Gregory

The Plaintiffs' last request for relief asserts that Defendants Joshua Tarter and Thomas Gregory violated the Faithless Servant Doctrine. In *USACO Coal Co. v. Carbomin Energy, Inc.*,

85 F.3d 630 (6th Cir. 1996), the Sixth Circuit upheld a district court's determination that the Kentucky Supreme Court would adopt the faithless servant doctrine. Defendant Joshua Tarter argues, however, that because the Sixth Circuit's opinion was unpublished and vague, it should not bind the Court. The Court tends to agree. The *USACO* decision was not a mandate for the recognition of the Faithless Servant Doctrine under Kentucky law. As such, Count XV of the Complaint is **dismissed**.

## CONLCUSION

The Court HERBEY ORDERS that Defendants Joshua Tarter and Thomas Gregory's motions to dismiss pursuant to Rules 12(b)(1) and 12(b)(6) [DE 11; DE 12] are **granted in part and denied in part** as follows:

(1) Defendants Joshua Tarter and Thomas Gregory's Rule 12(b)(1) motions to dismiss the claims brought in the Plaintiffs' individual capacities are **GRANTED**. As such, the claims brought by Plaintiffs Anna Lou Tarter Smith, Douglas Tarter, and LuAnn Coffee in their individual capacities are **DISMISSED without prejudice**.

(2) Defendants Joshua Tarter and Thomas Gregory's Rule 12(b)(1) motions to dismiss the claims brought directly by Tarter Industries are **DENIED**. As such, Tarter Industries may proceed on its claims against the Defendants.

(3) Defendants Joshua Tarter and Thomas Gregory's Rule 12(b)(1) motions to dismiss claims brought by the Plaintiffs in their derivative capacities are **DENIED**. Accordingly, Plaintiffs Anna Lou Tarter Smith, Douglas Tarter, and LuAnn Coffee may proceed on behalf of Tarter Management, Tarter Gate LLC, and Tarter Tube LLC.

(4) Defendants Joshua Tarter and Thomas Gregory's Rule 12(b)(6) motions to dismiss are **GRANTED** as to Counts IV, V, VII, and XV. These claims are **DISMISSED with prejudice**. The rest of the claims, however, may proceed.

As a result of this Opinion and Order, Tarter Industries, along with Plaintiffs Anna Lou Tarter Smith, Douglas Tarter, and LuAnn Coffey (in their derivative capacities on behalf of

Tarter Management, Tarter Gate LLC, and Tarter Tube), may proceed against the Defendants on Counts I, II, III, VI, VIII, IX, X, XI, XII, XIII, and XIV of the Complaint.

Dated March 26, 2019.

KAREN K. CALDWELL, CHIEF JUDGE
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY