# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF KENTUCKY
# CENTRAL DIVISION
# LEXINGTON

| | |
|---|---|
| **C-Ville Fabricating, Inc, d/b/a Tarter Industries, *et al.*,** | Civil No. 5:18-379-KKC |
| Plaintiffs, | |
| v. | **OPINION AND ORDER** |
| **Joshua Donald Tarter, *et al.*,** | |
| Defendants. | |

\*\* \*\* \*\* \*\* \*\*

This matter is before the Court on cross motions for summary judgment filed by the Plaintiffs (DE 91) and Defendants Joshua Tarter and Thomas Gregory (DE 93). Both sides have responded and replied to each motion, and the matter is ripe for the Court's review. For the reasons set forth below, Defendants' motion will be granted in part and denied in part, and Plaintiffs' motion will be denied as moot.

## BACKGROUND

This commercial action centers around four business entities that comprise the Tarter family business, which Plaintiffs allege is one of the largest suppliers of farm and ranch equipment in the United States, employing over 1,000 Kentuckians. (*See* DE 91 at 1.) Those four entities are C-Ville Fabricating, Inc. *d/b/a* Tarter Industries (Tarter Industries), Tarter Management Company, Inc. (Tarter Management), Tarter Gate Company, LLC (Tarter Gate), and Tarter Tube, LLC (Tarter Tube), which the Court will

collectively refer to as the Tarter Companies. (*Id.*) The Tarter Companies are part of a larger array of legal entities through which the Tarter family carry out their business, which while legally distinct, share some common ownership, resources, and employees. (*Id.* at 7.) For example, Tarter Industries is responsible for the manufacture and purchase of component parts, the hiring of new employees, and the research and development of new products. (*Id.* at 31.) Tarter Tube, on the other hand, specializes in the creation of tubing that assists in the manufacture of gates and other equipment. (*Id.*) It also sells hardware to the other Tarter Companies. Tarter Gate, presumably after buying components and parts from Tarter Industries and Tarter Tube, manufactures gates and other animal control equipment. These final products are then sold to two main distributors. (*Id.*) The final Tarter entity, Tarter Management, controls the compensation of the officers and executive employees of the Tarter Companies. (*Id.*) Though each entity is legally distinct and conducts separate operations, the owners, management, and even sometimes employees, including the parties to this action, often treated them aggregately as a sort of single integrated enterprise constituting the family business. Indeed, the failure to observe certain corporate and business formalities is partially what brings the parties before the Court in this action.

## I.    The Tarter Companies

Since its founding, the Tarter family business has always been owned by the family and passed down generation to generation. (DE 1 at 8.) At some point, the aggregate shares of the Tarter Companies were held by two brothers, David and Donald Tarter, along with their wives, Anna Lou Tarter

Smith and Joy Tarter.[1] (*Id.*) The Court will refer to these individuals as the "Third Generation" of the Tarter family. David and Anna Lou had two children, Douglas and LuAnn, and were eventually divorced. (*Id.*) Donald and Joy remain married and have three children: Keith, Joshua, and Nell. The Court will refer to the descendants of David and Donald (Douglas, LuAnn, Keith, Joshua, and Nell) as the "Fourth Generation" of the Tarter family.

Three of the four members of the Third Generation (David, Donald, and Joy) transferred their interests in the Tarter Companies to members of the Fourth Generation. (*Id.*) As with many family-held entities, this transition was far from seamless, and it has created a tangled web of ownership and responsibility that the Court must sift through to address the pending motions.

## II.     Changes in Ownership and Responsibility

### A.     Tarter Industries

When Tarter Industries was incorporated, the initial shares were divided among the Third Generation. (DE 1 at 8.) David, Anna Lou, Donald, and Joy each held 25% interests. (*Id.* at 9.) At the first annual shareholders meeting the Third Generation shareholders elected themselves as directors. and appointed themselves to various company positions. (*Id.*) David became the President, Donald became the Vice President, Joy became the Treasurer, and Anna Lou became the Secretary of the corporation. (*Id.* at 10.) Annual shareholders and board of directors' meetings were held from 1993 to 1997, but no such meetings occurred between 1997 and 2012. (*Id.*)

---

[1]  Given the presence of so many Tarter family members in these connected lawsuits, the first names of Tarters will be used to lessen any confusion.

On December 31, 2012, David, Donald, and Joy transferred their shares of Tarter Industries. (*Id.* at 11.) David transferred his shares to his and Anna Lou's two children, Douglas and LuAnn. Likewise, Donald and Joy passed along their interests in Tarter Industries to their three children, Keith, Joshua, and Nell. (*Id.*) In the aftermath of these transfers, Anna Lou, Douglas, and LuAnn held a collective 50% interest in Tarter Industries, while Keith, Joshua, and Nell together owned the other 50%. (*Id.*)

Amazingly enough, this new slate of shareholders did not elect a new board of directors or formally appoint officers. Instead, it they simply assumed the board seats and divvied up company responsibility in an informal manner. (*Id.*) From 2013 to 2017, Tarter Industries's annual filings with the Kentucky Secretary of State listed Joshua as President, Keith as Vice President, Nell as Treasurer, and Anna Lou as the Secretary. (DE 13-3.) These annual filings, however, did not state who the directors of the corporation were.

### B.    Tarter Management

Tarter Management shares a similar story. Incorporated pursuant to Kentucky law, the original shares of Tarter Management were issued to David's wife at the time, Anna Lou, and Donald's wife, Joy. (DE 1 at 12.) Each retained a 50% stake. At the first shareholders meeting, Anna Lou and Joy unanimously voted themselves to serve as the Directors. They then appointed themselves to the positions of President (Anna Lou) and Secretary-Treasurer (Joy). (*Id.*) The record reveals that annual shareholders and Board meetings were held until 1997. From 1997 to 2012, however, no such meetings took

place. (*Id.* at 13.) On July 28, 1998, Anna Lou divided her shares with David such that each held 25% interests in Tarter Management. (*Id.*)

On December 31, 2012, David split his interest in the corporation between himself and Anna Lou's two children, Douglas and LuAnn. (*Id.*) Similarly, Joy divided her interest in Tarter Management among herself and Donald's three children, Keith, Joshua, and Nell. (*Id.*) From that point on, Anna Lou, Douglas, and LuAnn together owned 50% of Tarter Management and Keith, Joshua, and Nell collectively owned the other 50%. (*Id.* at 14.) Like Tarter Industries, the newly minted shareholders of Tarter Management failed to vote on a new Board of Directors and to formally appoint Officers. Again, it appears that these positions, and their accompanying responsibilities, were implicitly assumed.

Because of the nature of the 2012 ownership transitions, the corporate structures of Tarter Industries and Tarter Management are severely muddled. David, Donald, and Joy transferred their ownership interests to members of the Fourth Generation, but there is no written record of their resignations as directors and officers. Moreover, while the Fourth-Generation shareholders have taken on a significant portion of the day-to-day operations of the corporations and list themselves as officers in the corporations' annual filings, they never voted themselves in as directors or officers.

## C.   Tarter Gate and Tarter Tube

The other two Tarter businesses, Tarter Gate and Tarter Tube, are limited liability companies created pursuant to the Kentucky Limited Liability Act. (DE 1 at 14–15.) On December 31, 2012 the Third-Generation member/managers of both LLCs approved resolutions that transferred their

ownership interests. (*Id.* at 15.) From that point on Anna Lou, Douglas, and LuAnn collectively owned 50% of Tarter Gate and Tarter Tube while Keith, Joshua, and Nell owned the other 50%. (*Id.*) In 2014, the member/managers of Tarter Gate formally elected Josh as President, LuAnn as Vice President, and Anna Lou as the Secretary/Treasurer. (*Id.*) Nothing in the record suggests that a similar vote was held for Tarter Tube.

## III.  Source of the Controversy

Plaintiffs contend that Joshua held himself out as a high-ranking executive of the Tarter Companies conglomerate, and in accordance with this assumed authority, that he oversaw the entire operation of the Tarter Companies. He negotiated and executed vendor and sales agreements, transacted business with valued customers, hired and fired key personnel, and developed company strategies. (DE 1 at 35.) Plaintiffs also maintain that in his implicit top brass position, Joshua had access to "confidential and proprietary information" of the Tarter Companies. This information included business strategies, order information, customer relationships, research and development, market analyses, and most importantly, information regarding component pricing and profit margins. (*Id.* at 34.)

In 2009, the Tarter Companies, like many other American manufacturers, began to source components and parts from Chinese suppliers to achieve cost savings. (*Id.* at 38.) The Tarter Companies employed an individual named Xiaofeng Chen to facilitate these transactions. (*Id.*) Chen would negotiate with the Chinese suppliers, who would then ship the components directly from mainland China to the Tarter Companies. (*Id.*)

Much of the remaining factual background in this case is discussed in the Court's March 26, 2019, Order and Opinion (DE 31), and is only briefly summarized here. Plaintiffs allege that in 2010, Joshua, Thomas, and Chen concocted a scheme to divert the component cost savings to themselves. Prior to this litigation, in August of 2017, Anna Lou, LuAnn, and Douglas brought suit in both their individual capacities and derivative capacities on behalf of the Tarter Companies. The thrust of their allegations was that Josh, Thomas, and Chen incorporated QMC Industry Company, LTD (QMC) in Hong Kong, and that Josh and Thomas used their senior positions with the Tarter Companies to ensure that components and parts were sourced from QMC, while siphoning Tarter funds to themselves through inflated rates for the purchased components. The scheme allegedly resulted in the Tarter Companies wiring approximately $74,857,122.80 to QMC and its affiliates. Plaintiffs assert that during this period, Josh and Thomas hid their interests in QMC—despite a duty to reveal that information—and that Josh affirmatively lied about such interests on two occasions.

## IV.    The Initial Lawsuit

As a result of this alleged scheme, Plaintiffs Anna Lou Tarter Smith, Douglas Tarter, and LuAnn Coffee filed an initial lawsuit in this Court against Joshua, Thomas, and QMC. *Smith v. Tarter*, 305 F. Supp. 3d 733 (E.D. Ky. 2018). Joshua and Thomas moved to dismiss the action on Fed. R. Civ. P. 12(b)(1) and 12(b)(6) grounds. *Id*. As to their 12(b)(1) claims, Defendants argued that the Plaintiffs lacked standing to bring the suit in their individual capacities and lacked the standing to bring a derivative suit on behalf of any of the Tarter Companies. *Id*. at 738. Judge Reeves agreed,

– 7 –

concluding that an individual shareholder does not have standing to bring a direct cause of action when the only injury being asserted is diminution in the value of his corporate shares. *Id.* at 739. Judge Reeves further rejected the Plaintiffs' argument that they possessed individual standing by way of their statuses as member/managers of the two Tarter LLCs (Tarter Gate and Tarter Tube). *Id.* at 740. In total, Judge Reeves found that the Plaintiffs had failed to establish both individual and derivative standing. As such, he dismissed the action without prejudice on 12(b)(1) grounds and did not address the Defendants' Rule 12(b)(6) arguments.

## V.    Aftermath of the Initial Lawsuit

After the dismissal of the original complaint, two important things happened. First, in February of 2016, a new round of demand letters was sent to the potential combinations of Directors and member/managers for the four Tarter Companies. (DE 1 at 22.) And unlike the first alleged demands rejected by Judge Reeves, these demands explicitly requested that the boards and member/managers of the Tarter Companies vote on the specific issue of whether to sue the Defendants for their supposed misdeeds. (DE 30-1.)

Second, individuals purporting to be the board of Tarter Industries passed a resolution authorizing the corporation to file a lawsuit against the Defendants. On February 7, 2018, David, purporting to act as the corporation's president, requested that Anna Lou, in her capacity as Secretary of Tarter Industries, call for a special meeting to vote on whether to commence legal action against the Defendants, and Anna Lou obliged. (DE 1 at 21–22.)

In addition to sending notice of the meeting to David, Donald, and Joy, Anna Lou also sent notices to Keith, Joshua, and Nell. (DE 1 at 22.) Pursuant to the notice, David called the special meeting to order on February 22, 2018 at 10:00 a.m. A recording of this meeting has been submitted into the record. (DE 11-1.) The recording reveals that the meeting was called to order with David, Anna Lou, and Joy present and purporting to be directors. Anna Lou then moved to vote on the issue of whether to initiate a lawsuit against Joshua, Thomas, and QMC. At this point, Joy asked if Anna Lou could explain the motion to her in laymen's terms. Anna Lou refused. Instead, she read the motion out loud once more. David seconded the motion, and a vote was called. David and Anna Lou voted "yea" while Joy abstained. David announced that the motion had passed and adjourned the meeting. (DE 1 at 24.) After the meeting had closed, Donald arrived and demanded that the vote be taken again. David and Anna Lou refused, noting that the original vote had taken place on time. (DE 11-1.)

## VI.    The Present Litigation

Hoping the second bite at the apple proves more successful than the first, Anna Lou Tarter Smith, LuAnn Coffey, and Douglas Tarter filed this action in individual and derivative capacities on behalf of the four Tarter Companies. Tarter Industries has also been joined as a direct plaintiff in the action. As a collective, Plaintiffs argue that the standing deficiencies of their first complaint have been cured, pointing to the newly issued demand letters and the Tarter Industries Board resolution.

Defendants Joshua Tarter and Thomas Gregory moved to dismiss the complaint for lack of subject-matter jurisdiction and for failure to state a

claim. (DE 11; DE 12.) The Court granted the motions in part and denied them in part. Anna Lou, Douglas, and LuAnn's claims brought in their individual capacity were dismissed for lack of standing, and several counts of the complaint were dismissed for failure to state a claim. However, the Court did not dismiss Tarter Industries's direct claims or the derivative claims for lack of standing at that time, finding that at that stage of litigation, the Plaintiffs had sufficiently alleged facts to support standing.

The parties have now filed cross motions for summary judgment, raising an array of arguments on the merits of the claims, as well as the Plaintiffs' standing to bring those claims.

## STANDARD OF REVIEW

Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). A party seeking summary judgment bears the initial burden of informing the Court of the basis for its motion with particularity. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The party opposing the motion must then make an affirmative showing of a genuine dispute in order to defeat the motion. *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009). To do so, the non-moving party must direct the Court's attention "to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact." *In re Morris*, 260 F.3d 654, 655 (6th Cir. 2001).

"At the summary-judgment stage, we view the facts in the light most favorable to the nonmoving party (usually by adopting the plaintiff's version

of the facts) only if there is a genuine dispute as to those facts." *EEOC v. Ford Motor Co.*, 782 F.3d 753, 760 (6th Cir. 2015) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)) (cleaned up). "[N]ot every issue of fact or conflicting inference presents a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir. 1989). "Mere speculation will not suffice to defeat a motion for summary judgment: '[T]he mere existence of a colorable factual dispute will not defeat a properly supported motion for summary judgment. A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate.'" *Powell v. Cherokee Ins. Co.*, 919 F. Supp. 2d 873, 877 (W.D. Ky. 2013) (quoting *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1177 (6th Cir. 1996), *abrogated on other grounds by Lewis v. Humboldt Acquisition Corp., Inc.*, 681 F.3d 312 (6th Cir. 2012)). "A 'genuine' dispute exists when the plaintiff presents 'significant probative evidence' 'on which a reasonable jury could return a verdict for her.'" *Ford Motor Co.*, 782 F.3d at 760 (quoting *Chappell v. City of Cleveland*, 585 F.3d 901, 913 (6th Cir. 2009)).

## ANALYSIS

### I.   The Tarter Industries Board of Directors Did Not Authorize the Filing of This Litigation

Defendants argue that Tarter Industries is not a proper party to this lawsuit because a majority of the corporation's board of directors never approved it to engage in litigation, as required by Kentucky law. They argue that the meeting where the lawsuit was purportedly approved was not a valid meeting of the board of directors, and thus the action taken at the meeting is also invalid. Plaintiffs, on the other hand, contend that the meeting was

properly called and was a valid, legal meeting of the board of directors, and that the vote purporting to authorize this litigation was a valid act of the board, making Tarter Industries proper party to this suit.

As an initial matter, it should be noted that the parties' characterization on this issue as an issue of standing is a mischaracterization of the law. The issue of standing—constitutional or statutory—goes to whether a party has the right or ability to assert a given claim. The heart of "the question of [constitutional] standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." *Warth v. Seldin*, 422 U.S. 490, 498 (1975). Statutory standing, on the other hand, is something of a misnomer since it is really "not a standing issue" but rather a question of whether the plaintiff "has a cause of action under the statute." *Soehnlen v. Fleet Owners Ins. Fund*, 844 F.3d 576, 581 (6th Cir. 2016). Though distinct doctrines, both constitutional standing and "statutory standing" address whether a particular plaintiff could decide to assert a particular claim.

Here, Defendants' argument cannot be characterized as a constitutional or "statutory" standing argument. They do not argue that Tarter Industries could not meet the "Cases" and "Controversies" requirements of Article III, or that the corporation lacks a cause of action for any of the claims alleged. Rather, Defendants argue that Tarter Industries has not *asserted* any rights it may have to pursue those claims because as a corporation, it can only exercise its right to sue through action by its board of directors. Even though Defendants have labeled their argument as a

challenge to Tarter Industries standing, they are really challenging is whether Tarter Industries consented to suing in its name.

Kentucky law gives a corporation the right to sue and be sued in its own name, and it is a basic principle of corporate law that a corporation "enforces its own rights and files its own litigation." *Gross v. Adcomm, Inc.*, 478 S.W.3d 396, 400 (Ky. Ct. App. 2015) (citing KRS 271B.3-020(1)(a)). The corporation's decision to pursue or refrain from litigation is made by its board of directors, and the decision to file a lawsuit in the corporate name must be authorized by the affirmative vote of a majority of directors. *Gross v. Adcomm, Inc.*, 478 S.W.3d 396, 400 (Ky. Ct. App. 2015) (citing Ky. Rev. Stat. § 271B.8-240); *see also Ky. Bar Ass'n v. Hines*, 399 S.W.3d 750, 769 (Ky. 2013) ("[T]he decision whether to pursue litigation directly on behalf of the corporation is lodged solely with the board of directors."). Without authorization from its board of directors, a corporation cannot be a proper party to a lawsuit and its claims should be dismissed as a matter of law. *Gross v. Adcomm, Inc.,* 478 S.W.3d 396, 404 (Ky. Ct. App. 2015).

Generally, a corporation's board of directors can only act on behalf of the corporation at a legal meeting or by unanimous written consent. *Covington Hous. Dev. Corp. v. Covington*, 381 F. Supp. 427, 430 (E.D. Ky. 1974) ("[It is a] well settled doctrine that a corporation can act only through its directors at an official meeting regularly held, and that its acts can be proven only by the records of such meeting.") (collecting cases); 2 Fletcher Cyc. Corp. § 392. Actions taken by the board of directors outside of a formal, legal meeting are not considered acts of the corporation, and board action taken in contravention of a mandatory bylaw is typically treated as void. *See*

2 Fletcher Cyc. Corp. § 392 ("[I]f [the board] act[s] at a meeting that is not a legal meeting, their action is not that of the corporation, although all may consent, and the corporation is not bound . . . . It is fundamental that officers of boards can act as a board only when assembled as a board . . . and that they cannot act in an individual capacity outside of a formal meeting."); *see also Paducah Newspapers v. Goodman*, 251 Ky. 754 (1933); *Klaassen v. Allegro Dev. Corp.*, No. 8626-VCL, 2013 Del. Ch. LEXIS 247, at \*59 (Ch. Oct. 11, 2013) ("[T]raditionally, when a board took action in contravention of a mandatory bylaw, the board action was treated as void."); William J. Grange, *Corporate Law for Officers and Directors* 63 (1935) ("In the case of a mandatory by-law the non-observance of its instructions renders the act performed or the thing done void and of no effect.").

In sum, for a corporation to have standing to sue, a majority of its board of directors must vote to authorize the filing of a lawsuit and that vote must be made at a meeting noticed and conducted in accordance with the corporation's governing documents and any applicable law. Otherwise, the corporation is not proper party to the action and its claims must be dismissed.

Defendants argue that the vote taken to approve this litigation at the special meeting is void because the meeting was called in contravention of the corporation's bylaws. They claim that David, who purported to be the corporation's president and called the meeting, resigned as an officer and director when he transferred his shares and thus had no power to call the meeting. Plaintiffs argue that to be effective, a resignation must be submitted in writing, and since David never submitted a written resignation and no new formal elections were held, he remains the president and a director of Tarter

Industries. The issue of whether Tarter Industries was authorized to file this litigation therefore hinges upon whether David was required to resign in writing, and if not, whether he did, in fact, resign as an officer and director of Tarter Industries.

## A.     A Corporate Director or Officer Is Not Required to Resign in Writing

Kentucky law provides that a director "may resign at any time by delivering written notice to the board of directors, its chairman, or to the corporation." Ky. Rev. Stat. § 271B.8-070(1). The statute governing resignation of officers is virtually identical, stating that "[a]n officer may resign at any time by delivering notice to the corporation." Ky. Rev. Stat. § 271B.8-430(1). The Tarter Industries bylaw provision regarding resignation of directors closely follows the statutory language, providing that "[a] director may resign at any time by filing a written resignation with the secretary." (DE 29-2 at 7.) The bylaws do not speak to how a corporate officer may resign.

Plaintiffs argue that the statutes and bylaws require an officer or director to resign in writing, and that no other method of resignation can be effective. They ask the Court to hold that it is the exclusive method by which an officer or director may resign and claim that holding otherwise would amount to "judicially amend[ing]" the statute. (DE 96 at 10.). However, the Court disagrees.

The parties have not cited, and the Court has been unable to locate a Kentucky case interpreting Kentucky Revised Statute (KRS) 271B.8-070(1), KRS 271B.8-430(1), a case interpreting a bylaw provision regarding resignation of a corporate officer or director, or a case addressing the issue of

whether a director or officer must resign in writing. Therefore, the Court will interpret the statutory provisions and bylaw in accordance with Kentucky principles of construction.

In Kentucky, "[t]he cardinal rule of statutory construction is that the intention of the legislature should be ascertained and given effect." *Wade v. Poma Glass & Specialty Windows, Inc.*, 394 S.W.3d 886, 888 (Ky. 2012). "To determine legislative intent, [the court] look[s] first to the language of the statute, giving the words their plain and ordinary meaning," *id.*, because "we assume that the '[legislature] meant exactly what it said, and said exactly what it meant.'" *Univ. of Louisville v. Rothstein*, 532 S.W.3d 644, 648 (Ky. 2017) (quoting *Revenue Cabinet v. O'Daniel*, 153 S.W.3d 815, 819 (Ky. 2005)). The words of the text must be interpreted in their context, meaning a court must scrutinize not just the words of the statute at issue, but also other statutes that are relevant. *Jefferson Cnty. Bd. of Educ. v. Fell*, 391 S.W.3d 713, 721 (Ky. 2012). And unless that context mandates otherwise, words are presumed to be understood in their ordinary meanings. *Owen v. Univ. of Ky.*, 486 S.W.3d 266, 270 (Ky. 2016).

Similar principles apply to the interpretation of corporate bylaws. Because "[t]he relationship of a corporation and its shareholders is contractual and the articles and bylaws are part of the contract[,] [t]he articles and bylaws should be construed as any other contract." *Toler v. Clark Rural Elec. Coop. Corp.,* 512 S.W.2d 25, 26 (Ky. 1974) (citations omitted). And as is the case when construing a statute, "[i]n the absence of ambiguity . . . a court will interpret the contract's terms by assigning language its ordinary meaning . . . ." *Ky. Shakespeare Festival, Inc. v. Dunaway*, 490 S.W.3d 691,

694 (Ky. 2016) (quoting *Wehr Constructors, Inc. v. Assurance Company of America*, 384 S.W.3d 680, 687 (Ky. 2012)). To be considered ambiguous, a reasonable person must be able to find a contract is "susceptible to different or inconsistent interpretations." *Ky. Shakespeare Festival, Inc. v. Dunaway*, 490 S.W.3d 691, 694–95 (Ky. 2016) (quoting *Hazard Coal Corp. v. Knight*, 325 S.W.3d 290, 298 (Ky. 2010)).

With these principles in mind, the Court will address each of the relevant statutory and bylaw provisions regarding the resignation of corporate officers and directors and determine whether they require an officer or director of a corporation to resign in writing.

### 1. *Resignation of Corporate Officers*

KRS 271B.8-430 says that "[a]n officer may resign at any time by delivering notice to the corporation." This statute, unlike KRS 271B.8-070(1) and the Tarter Industries bylaw regarding directors, does not mention written resignation. Rather, it merely codifies the right of an officer to resign and states the officer may do so by giving the corporation notice of their resignation. Nothing in the statute itself or its context suggests that an officer is required to resign in writing. Nor do Plaintiffs argue that it does. The text of KRS 271B.8-430 is unambiguous, and it plainly does not require an officer of a corporation to resign in writing. Because there is no provision in the Tarter Industries articles of incorporation or bylaws regarding resignation of officers, KRS 271B.8-430 controls, and the Court finds that Tarter Industries's officers were not required to resign in writing.

### 2.       *Resignation of a Member of the Board of Directors*

Next, the Court considers the resignation of directors. The text of KRS 271B.8-070(1) and the Tarter Industries bylaw provision are essentially the same, with the operative language in both providing that "[a] director may resign" by giving the corporation written notice of their resignation. *Compare* Ky. Rev. Stat. § 271B.8-070(1) ("A director may resign at any time by delivering written notice to the board of directors, its chairman, or to the corporation."), *with* (DE 1-1 at 7) ("A director may resign at any time by filing a written resignation with the secretary."). Though both provisions state a director "may" resign via written resignation, they do *not* say a director "must" or "may only" resign in writing. In its plain and ordinary meaning, the word "may" is permissive and allows for discretion. *See, e.g., May*, Merriam-Webster.com Dictionary, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/may (last visited March 14, 2022) ("used to indicate possibility or probability"). And in Kentucky, when used in the context of statutes and contracts, "may" is construed as permissive, not mandatory. Ky. Rev. Stat. § 446.010 ("As used in the statute laws of this state . . . '[m]ay' is permissive . . . ."); *Fox v. Grayson*, 317 S.W.3d 1, 13 (Ky. 2010) ("*[M]ay* generally signifies something as being permissive in nature in contrast to the word *shall*, which generally signifies something being mandatory."); *Graoch Assocs. #73 Ltd. P'ship v. Lakeview Estates Lake Ass'n, Inc.*, Nos. 2003-CA-001495-MR, 2003-CA-001793-MR, 2004 Ky. App. Unpub. LEXIS 994, at *12 n.20 (Ct. App. Dec. 10, 2004) (holding that unless the context requires otherwise, the term "may" is generally construed as permissive when used in a contract).

The texts of KRS 271B.8-070(1) and the Tarter Industries bylaw provision are unambiguous. As used in this context, the plain meaning of "may" is simply that a corporate director is permitted to resign by giving the corporation a written resignation. Nothing in the text of the statute or bylaw suggests that written resignation is the *only* way a director can resign. Rather, they merely provide that written notice is one possible method by which a director can give notice of their resignation. To interpret them otherwise would not be reasonable—it would strain credulity and "construe a meaning that the text of the statute cannot bear." *Owen*, 486 S.W.3d at 270. The plain text, understood in its ordinary meaning and in its context, permits, but does not require, a director to resign in writing. Nothing in the statute or bylaw forecloses other means of resignation, and the necessary implication is that a director may also resign in some other way.

Although Kentucky cases do not specifically address the question of how corporate officers and directors may resign, the Delaware Supreme Court answered that question when it considered a statute and bylaw provision similar to those at issue in the instant case. Kentucky courts have long recognized that Delaware is "a bastion for corporate law and its development" and its cases are often "the leading cases in this subject area," and therefore have consistently looked to Delaware cases when there is a dearth of corporate case law on a particular issue in Kentucky. *See, e.g., Bacigalupo v. Kohlhepp,* 240 S.W.3d 155, 157 (Ky. Ct. App. 2001) (following Delaware law regarding the requirement of continuous ownership in derivative actions and stating that "Delaware has long been a bastion for corporate law and its development" and that "this court has previously adopted Delaware case law

when examining corporate statutes"); *Allied Ready Mix Co. v. Allen*, 994 S.W.2d 4, 8 (Ky. Ct. App. 1998) (stating as to standard of review to apply to a corporate committee's decision regarding a derivative suit after a demand has been made, "Delaware cases are the leading cases in this subject area and have been followed by other courts. The Court finds them persuasive in the case at bar"); *see also Jefferson Cnty. Bd. of Educ. v. Fell*, 391 S.W.3d 713, 719 (Ky. 2012) (stating that "interpretations by other courts" are especially useful extrinsic aids when interpreting a model or uniform statute, such as the Kentucky Business Corporation Act).

In *Biolase, Inc. v. Oracle Partners, Ltd. P'ship*, the Delaware Supreme Court affirmed the Delaware Court of Chancery's determination that, as used in a statute governing resignation of directors, "the word 'may' does not mean 'may only.'" 97 A.3d 1029, 1034 (Del. 2014) (citing Del. Code Ann. tit. 8, § 141(b)). The statute at issue provided that "[a]ny director may resign at any time upon notice given in writing or by electronic transmission to the corporation." *Id.* at 1033–34 (quoting Del. Code. Ann. Tit. 8 § 141(b). The Delaware Supreme Court stated that it was "sensible and reasonable" to interpret the statute to authorize written resignation but not foreclose on the possibility of resignation by other means not specified. *Biolase, Inc. v. Oracle Partners, Ltd. P'ship*, 97 A.3d 1029, 1034 (Del. 2014). The court noted that this interpretation followed "an unbroken line of decisions dating to 1984," *Biolase, Inc.*, 97 A.3d at 1034, which have held that "whether a director has resigned is a question of fact to be determined from the circumstances of each case." *Oracle Partners, Ltd. P'ship v. Biolase, Inc.*, No. 9438-VCN, 2014 Del. Ch. LEXIS 85, at *49 (Ch. May 21, 2014).

The holding and reasoning of the *Biolase* court is consistent with the Court's analysis of the issues in the instant case. The fact that Delaware courts, "bastions for corporate law and its development," have consistently reached the same conclusion when construing a similar statute and bylaws provides strong support for the Court's interpretation here. The weight of authority and the plain meaning of the text at issue both make clear that the only reasonable interpretation of KRS 271B.8-070(1) and the Tarter Industries bylaws is that a director is permitted, but not required, to resign in writing.

Upon review of the relevant Kentucky statutes, the Tarter Industries bylaws, and Delaware case law, this Court finds that an officer or director of Tarter Industries need not provide written notice in order to resign their position, because Kentucky law and the company bylaws allow resignation in a manner other than in writing.

**B.    David Resigned as President and a Director When He Transferred His Shares to the Fourth Generation Owners**

Having determined written resignation is not required to effectuate an officer or director's resignation, the Court must now determine whether David actually resigned from his positions as an officer and director of Tarter Industries. Defendants do not allege that David affirmatively resigned, either in writing or orally. Rather, they contend that he resigned by conduct or implication, evidenced by the transfer of his shares in the corporation and subsequent conduct. The Defendants' argument is essentially that David intended to resign when he gave up ownership of the company, and that his and the family members' subsequent conduct show that intent. For their part,

– 21 –

Plaintiffs do not offer any arguments regarding resignation by conduct and subsequent conduct, and instead hold fast to their argument that David could not resign other than in writing. They do not point to any portion of the record that creates a genuine issue of material fact as to Defendants' assertion that David resigned as an officer and director by conduct, and simply assert that as a matter of law, he could not do so. As the Court has already found otherwise, the Court will consider whether David did, in fact, resign.

Here again, there is no guidance in Kentucky case law. The parties have not cited, and the Court has been unable to find, any Kentucky cases where a court has considered whether a corporate officer or director resigned by conduct. As has already been discussed, Kentucky courts frequently turn to Delaware when determining issues of corporate law, and the Court finds that they would do so in this instance as well.

To determine whether an officer or director has resigned, Delaware eschews a rigid test and instead holds that it "is a question of fact determined by the circumstances of each case." *Hockessin Cmty. Ctr., Inc. v. Swift*, 59 A.3d 437, 458 (Del. Ch. 2012). An officer or director can resign through a "sufficiently clear manifestation of his or her intent to resign," and "[a]lthough the magic words 'I resign' may not be necessary, there must nonetheless be some objective manifestation of words or actions to that effect." *Oracle Partners*, 2014 WL 2120348, at *16, *aff'd*, 97 A.3d 1029 (Del. 2014); *see also Villette v. MondoBrain, Inc.*, Civil Action No. 2020-0295-SG, 2020 Del. Ch. LEXIS 375, at *7 (Ch. Dec. 29, 2020) ("[A] resignation need be neither in writing, nor use the words 'I resign,' to be an effective resignation as a director. What an act of resignation must be, however, is an action that

clearly manifests that the director has resigned his fiduciary position."). And when assessing an individual's intent to resign, their "subsequent statements and conduct may also be relevant." *Oracle Partners*, *Inc.*, 2014 WL 2120348, at *16.

Applying these principles to the instant case, it is clear that David resigned his positions as an officer and director of Tarter Industries when he transferred his ownership shares in 2012. When asked in his deposition if he thought he was to remain a director after transferring his shares in the company, David replied that he was "sure" he would not be. (DE 93-1 at 29.) As for his position as president, he did not dispute the legitimacy or accuracy of the corporation's public documents that listed Joshua as president, showing that he did consider himself to be in that role by 2013. (*Id.* at 36.) He also stated that he did not sign any documents nor attend any meetings as a director of Tarter Industries after transferring his shares. (*Id.* at 34.)

David's statements show a clear intent to resign, and the remaining evidence in the record shows that both he and the other family members unequivocally understood that he had resigned. None of the corporate documents made after he transferred his shares that list the corporation's officers or directors list David in either role. In its Annual Reports, which are official corporate documents publicly filed with the Kentucky Secretary of State each year, Joshua is listed as the president in each report from 2013 to 2017. And when Hilliard Lyons was consulting the family on the companies' governance structure, it created a draft amendment to the bylaws that identified LuAnn, Anna Lou, Keith, and Joshua as the directors as of the time it was drafted. Though this draft amendment was never formally adopted, it

was circulated among various family members, none of whom disputed the persons it listed as board members.

The evidence before the Court therefore shows David resigned from both his roles as president and director of Tarter Industries upon transferring his shares. All the subsequent conduct and statements in the record show that everyone involved considered David to have stepped down from those positions, and Plaintiffs have pointed to no portion of the record to contradict that fact. The facts underlying the relevant statements and conduct are not in dispute, and thus, the Court finds the circumstances of this case clearly show that David manifested his resignation by voluntarily relinquishing his roles as president and director, as evidenced by his and the other family member's subsequent conduct. Therefore, because all the evidence in the record shows that David resigned as both the president and a director of Tarter Industries upon transferring his ownership interest, no rational fact finder could find otherwise.

## C.   The Vote Purporting to Authorize the Instant Litigation Is Void

Because he was neither the Tarter Industries president nor a member of its board of directors, David had neither the power to call the special meeting nor vote on the resolution to approve this litigation. Article II § 4 of the Tarter Industries bylaws specifies how and when a special meeting of the board of directors can be called, and it provides that "[t]he secretary shall call a special meeting of the Board when directed by the president, or upon written request of a majority of the Board of Directors." (DE 29-1 at 7.) The president or a majority of the board must direct that a board meeting be

called, otherwise any purported meeting is not a valid, legal meeting of the board.

Anna Lou, as secretary, issued the notice of special meeting at David's direction, but because he had resigned his position as president, David did not have the authority to direct her to issue that notice. The bylaws only allow a special meeting to be called upon the direction of the president or a majority of directors, and no such direction was given. "The corporation, and its directors and officers, are bound by and must comply with [the bylaws]," 8 William Meade Fletcher et al., *Fletcher Cyclopedia of the Law of Corporations* § 4197, at 803-04 (perm. ed., rev. vol. 2010), and when notice of a board meeting is not given in the specific manner required by the bylaws, board action taken at that meeting is void. *Klaassen v. Allegro Dev. Corp.,* No. 8626-VCL, 2013 Del. Ch. LEXIS 247, at *59 (Ch. Oct. 11, 2013); *see also Hockessin Cmty. Ctr., Inc. v. Swift*, 59 A.3d 437, 461 (Del. Ch. 2012) ("Action taken at a board meeting that was not called in compliance with the bylaws may be deemed void."); *Fogel v. U.S. Energy Sys.,* Civil Action No. 3271-CC, 2007 Del. Ch. LEXIS 178, at *9 (Ch. Dec. 13, 2007) ("Before a corporation may hold a special meeting of its board of directors, each director must receive notice as prescribed by the bylaws; to the extent such a meeting is held without notice, the meeting and 'all acts done at such a meeting are void.'"). Because David had resigned his position as president, he was without power to direct Anna Lou to notice a special meeting and could not call one. Therefore, the vote on the resolution approving this litigation was taken at a meeting that was not called in compliance with the bylaws and is void.

Even if the Court were to assume the special board meeting had been properly called, there was not a quorum when the vote was taken and the resolution was only approved by, at most, one potential director. At the meeting, David, Anna Lou, and Joy were noted present as three of the four directors, and David and Anna Lou voted to approve the resolution authorizing this litigation. Assuming, but not deciding, that Anna Lou and Joy were members of the board of directors as Plaintiffs claim, David was not. As previously discussed, he had resigned from that role upon transferring his shares. And because he was not a director, his presence could not contribute to a quorum and his vote to approve the resolution was ineffective. Since David was not a director, under any combination of other possible directors the vote to authorize the litigation was still only approved by one director and not a majority. Therefore, whether anyone else was or was not a director is not important, because at most one director voted to approve the litigation, and both the Tarter Industries bylaws and Kentucky law require a majority of directors to approve the filing of a lawsuit in the corporate name.

In sum, the Court finds that David was neither the president of Tarter Industries nor a member of its board of directors. He was therefore without power to call the special meeting and without power to vote as a member of the board. Since the meeting was not called in accordance with the corporation's bylaws, any action taken at the meeting was contrary to the corporation's bylaws and void. Because there was no valid vote by its board of directors authorizing it to file this lawsuit, Tarter Industries is not a proper party to this lawsuit and the Court will dismiss its claims.

## II.   Anna Lou, LuAnn, and Douglas Lack Standing to Assert Derivative Claims on Behalf of Any Tarter Company

Plaintiffs Anna Lou, LuAnn, and Douglas have each asserted standing to bring this suit in a derivative capacity on behalf of each of the Tarter Companies: Tarter Industries, Tarter Management, Tarter Gate, and Tarter Tube. Defendants argue that Plaintiffs lack standing to assert derivative claims on behalf of any Tarter Company. The Defendants claim that the individual Plaintiffs did not make a proper demand upon any of the companies, but that even if proper demands had been made, the failure to act on the demands amounted to a rejection protected by the business judgment rule. Conversely, the Plaintiffs argue that they made a proper demand upon the directors and member/managers of each company, and that the business judgment rule does not apply to the rejection of the demands because the rejection was not made by independent directors or member/managers, was made in bad faith, and was made without proper investigation into its claims. The Court will address each of these arguments in turn.

A derivative action is "an exception to the normal rule that the proper party to bring a suit on behalf of a corporation is the corporation itself, acting through its directors or a majority of its shareholders." *Halebian v. Berv*, 590 F.3d 195, 205 n.6 (2d Cir. 2009) (cleaned up). Derivative actions in federal court are governed by Rule 23.1 of the Federal Rules of Civil Procedure, which states that a derivative plaintiff must be "a shareholder or member at the time of the transaction complained of, or that the plaintiff's share or membership later devolved on it by operation of law." Fed. R. Civ. P. 23.1(b)(1). This requirement is sometimes called the "contemporaneous ownership requirement." Although Rule 23.1 provides the pleading standard

for derivative actions in federal court, the substantive rules for determining whether a plaintiff has satisfied that standard is determined by state law. *Kamen v. Kemper Fin. Servs.*, 500 U.S. 90, 105 (1991).

## A. Douglas and LuAnn Satisfy the Contemporaneous Ownership Requirement

Under Kentucky law, the contemporaneous ownership requirement can be satisfied in one of two ways: (1) the person asserting derivative standing must have been a shareholder of the corporation or member of the LLC at the time of the alleged wrongdoing, or (2) they must have acquired status as a shareholder or member by operation of law from a person who was themselves a shareholder or member at the time of the alleged wrongdoing. Fed. R. Civ. P. 23.1(b)(1); Ky. Rev. Stat. § 271B.7-400(1); Ky. Rev. Stat. § 275.337(3).

The parties have not cited and the Court has been unable to locate any Kentucky cases interpreting these statutes and whether a person claiming derivative standing had an ownership interest at the time an alleged wrongdoing occurred, but Kentucky courts have previously found interpretations of FRCP 23.1 persuasive and instructive, specifically looking to Delaware cases for guidance when interpreting the ownership requirements of KRS 271B.7-400(1). *Bacigalupo v. Kohlhepp*, 240 S.W.3d 155, 156 (Ky. Ct. App. 2007) ("However, the language of KRS 271B.7-400 is substantially the same as that found in Federal Rules of Civil Procedure (FRCP) 23.1. As such, cases interpreting FRCP 23.1, while not binding on this Court, are both instructive and persuasive on this issue.") The Court finds they would do the same in this case.

Defendants contend that LuAnn and Douglas cannot assert derivative claims because of the contemporaneous ownership requirement, arguing that they were not shareholders or members of the Tarter Companies at the time of the alleged wrongdoing. On the other hand, Plaintiffs argue they meet the requirement under either of the two ways it can be satisfied. First, they argue that Defendants' wrongdoing continued after LuAnn and Douglas acquired ownership interest in the Tarter Companies in December 2012. Second, they argue that they received their ownership interest as a gift from their father, who had been an owner since the alleged wrongdoing began, and thus they claim to they received their interest by operation of law from a person who had an ownership interest when the alleged wrongdoing occurred. Because the Court concludes that LuAnn and Douglas were shareholders and members of the Tarter Companies at the time of the conduct giving rise to this action, we need not address whether they became owners by operation of law.

Defendants assert that the "transaction complained of" and "conduct giving rise" to this action was solely the single act of Joshua and Thomas taking ownership in QMC. (*See* DE 93 at 19.) But this is a mischaracterization of the claims alleged in the complaint. Plaintiffs allege an array of claims, including fraudulent misrepresentation, breach of fiduciary duty, and RICO violations. The acts giving rise to the claims in the complaint include a series of discrete transactions between QMC and the Tarter Companies, as well as multiple allegedly fraudulent misrepresentations, which continued after Douglas and LuAnn took ownership interest in the Tarter Companies. Contrary to the Defendants'

claim, the Plaintiffs do not merely allege continuing damage from the singular event of Joshua and Thomas acquiring ownership interest in QMC. Rather, Plaintiffs have alleged that specific acts of wrongdoing occurred beginning in 2010, when Defendants acquired ownership in QMC, and continuing "over the course of seven years." (DE 1 at 2.)

Defendants cite *Desimone v. Barrows*, 924 A.2d 908 (Del. Ch. 2007) in support of the proposition that "[w]here the alleged wrong occurs before the shareholder acquires his or her shares, the mere fact that 'damage' continues thereafter does not overcome the contemporaneous ownership rule." (DE 93 at 20.) The plaintiff in *Desimone* argued that he had standing to challenge allegedly improper stock grants, all but two of which occurred before he became a stockholder. *Desimone*, 924 A.2d at 924. Nevertheless, the plaintiff contended that he had standing to challenge all the stock grants, because the conduct alleged in the complaint involved a "pattern of continuing wrongs persisting into the time period where he was a stockholder." *Id*. Essentially, the plaintiff argued that he could challenge transactions that occurred prior to his ownership because they were so closely related to later transactions that occurred after he acquired ownership that they should be considered one continuous pattern of wrongdoing. The *Desimone* court rejected that argument, holding "[t]he fact that other wrongs have later occurred does not afford a plaintiff standing to challenge earlier wrongs that pre-date his stock ownership, even though they may be similar or related." *Id*. at 925.

The Plaintiffs' claims in this case are markedly different than those in *Desimone*. As previously discussed, the Plaintiffs' claims allege a series of wrongdoings that occurred after they acquired ownership of the Tarter

Companies. The complaint does not allege Joshua and Thomas acquiring ownership as the single, discrete transaction that caused harm to the Tarter Companies. Rather, the complaint alleges that distinct actions taken by Defendants, both before and after Plaintiffs became owners of the Tarter Companies, caused harm to the Companies.

"[D]ecisions [by Delaware courts] suggest that the [continuing wrong] doctrine is a narrow one that typically is applied only in unusual situations, such as where a plaintiff acquires his stock after a particular transaction has begun but before it is completed." *Desimone*, 924 A.2d at 924-25. But "in determining whether to grant derivative standing to a proposed plaintiff who acquired stock in the midst of the alleged wrongdoing, courts have . . . been particularly influenced by whether the proposed plaintiff knew of the wrongful conduct before purchasing his or her shares." *Denham v. Tramuto*, 414 F. Supp. 3d 1095, 1104 (M.D. Tenn. 2019) (quoting *In re Bank of New York Derivative Litig.*, 320 F.3d 291, 298 (2d Cir. 2003)).

"Narrow though the scope of the exception may be, Plaintiffs have sufficiently alleged that the various acts about which they complain are 'so inexorably intertwined that there is but one continuing wrong.'" *Id.* (quoting *Ewing v. Beck*, 520 A.2d 653, 662 (Del. 1987)). Specifically, Plaintiffs claim that, beginning when Defendants acquired ownership of QMC in 2010, Defendants repeatedly defrauded the Tarter Companies in a series of business transactions that continued until the filing of the complaint in 2018, and that the alleged fraud was wrongfully and actively concealed by the Defendants throughout that time period. Further, Defendants do not explain why Plaintiffs do not have standing to challenge the transactions that

occurred after they became owners of the Tarter Companies. The Complaint alleges that Defendants engaged in a series of fraudulent actions that continued after the change in ownership, and Defendants offer no reason why those later transactions would not satisfy the contemporaneous ownership requirement.

The Plaintiffs' claims arise from conduct and transactions that occurred after they took ownership of the Tarter Companies in 2013. To the extent that those claims derive from conduct and transactions that occurred prior to their ownership, those acts were so inexorably intertwined with later acts that they constitute one continuing wrong and Plaintiffs have satisfied the contemporaneous ownership requirement under KRS 271B.7-400(1) and 275.337(3)(a).

### B.   The Plaintiffs Made a Proper Demand Upon Each of the Tarter Companies

Kentucky law allows shareholders of a corporation and members of an LLC to bring derivative actions on behalf of their respective entity in if certain requirements are met. Ky. Rev. Stat. §§ 271B.7-400, 275.337. To maintain a derivative suit, the shareholder or member must meet the "demand requirement," which means "the shareholder [or member] must first make demand upon the directors [or managers] to obtain the desired action or plead with particularity why the demand was excused." *Allied Ready Mix Co. v. Allen*, 994 S.W.2d 4, 8 (Ky. Ct. App. 1998) (citing *Spiegel v. Buntrock*, 571 A.2d 767, 773 (Del. 1990)); Ky. Rev. Stat. §§ 271B.7-400, 275.337.

The Defendants claim that the Plaintiffs failed to make a proper demand, but they do not advance any argument or point to any evidence in

support of that claim other than the conclusory statement that the notices were "confusing." (DE 93 at 18.) The "[a]dequacy of demand is tied to its purpose," which is "to alert the Board of Directors [or Member/Managers] so that it can take corrective action, if any, as it feels is merited." *Allison ex rel Gen. Motors Corp. v. Gen. Motors Corp.*, 604 F. Supp. 1106, 1117 (D. Del. 1985) (citing *Daily Income Fund, Inc. v. Fox*, 464 U.S. 523 (1984)). There is no "all-inclusive legal formula" serving such a purpose, and the adequacy of demand is determined on a case-by-case basis. *Yaw v. Talley*, Civil Action No. 12882, 1994 Del. Ch. LEXIS 35, at *20–21 (Ch. Mar. 2, 1994). A pre-suit communication will be considered a demand if, at a minimum, it identifies (1) the alleged wrongdoers, (2) the alleged wrongdoing and resulting injury to the corporation, and (3) the legal action the shareholders or members want the board or managers to take on behalf of the company. *See Solak v. Welch*, No. 2018-0810-KSJM, 2019 Del. Ch. LEXIS 1338, at *9 (Ch. Oct. 30, 2019) (citing *Yaw v. Talley*, Civil Action No. 12882, 1994 Del. Ch. LEXIS 35, at *20–21 (Ch. Mar. 2, 1994)); *see also Allison ex rel Gen. Motors Corp. v. Gen. Motors Corp.*, 604 F. Supp. 1106, 1117 (D. Del. 1985) ("At a minimum, a demand must identify the alleged wrongdoers, describe the factual basis of the wrongful acts and the harm caused to the corporation, and request remedial relief.").

Here, the Plaintiffs' pre-suit communications meet those requirements. Plaintiffs sent demand letters to the boards of directors and member/managers of each of the Tarter Companies. Aside from Tarter Industries, none of the Companies held a meeting to vote on the Plaintiffs' demand to sue, and none of the Companies acted based upon the Plaintiffs'

demands.[2] Each pre-suit communication identifies "Joshua Donald Tarter, Thomas Lewis Gregory, and Hong Kong QMC Industry Company, LTD" as the wrongdoers for "the claims previously incorporated" in the *Smith* lawsuit, and specifically requests a vote to "[a]pprov[e] the filing of litigation" against them for their alleged wrongdoing. (DE 30 at 16.) The Plaintiffs did not need to set forth each of the specific claims they wanted the entities to pursue—a pre-suit demand "need not specify [the shareholder's] legal theory" because "[d]ecisions as to how and on what theory the corporation will pursue wrongdoers are the proper province of the Board of Directors." *Allison ex rel Gen. Motors Corp. v. Gen. Motors Corp.*, 604 F. Supp. 1106, 1117 (D. Del. 1985). At that point, the family members were all too familiar with the claims and allegations of the previous lawsuit, so the reference in the pre-suit demand letters to those claims is sufficient to meet the purpose of the demand requirement, which is to alert the directors and member-managers of the alleged wrongdoing so that they can take appropriate action. *Allison ex rel Gen. Motors Corp.*, 604 F. Supp. At 1117.

The Defendants claim the demand letters were "confusing," and thus not legally effective demands. The Court finds otherwise. Plaintiffs signed and delivered separate demand letters for each of the Tarter Companies. Recognizing that who the actual directors, members, and officers of the entities were potentially in dispute, the Plaintiffs covered their bases and addressed each letter to every person who could possibly have authority to

---

[2] As discussed above, the purported special meeting of Tarter Industries' board of directors was not an official, legal meeting. Therefore, in effect, the Plaintiffs' demand was rejected by Tarter Industries the same as the other companies, because no valid action was taken in response to it.

call a special meeting to authorize litigation. Each of the letters clearly explained this. To the extent that the Defendants argue that addressing the letters to each person who might have had authority to call a meeting made the letters so confusing as to make them improper demands, that argument is rejected. The fact is that the status of the Tarter Companies boards, managers, and officers were in dispute, and Plaintiffs took the broadest possible approach to providing notice. The letters were clear as to why they were addressed to each person, and otherwise clearly stated the purpose of the demand.

The Court finds that the Plaintiffs made a proper pre-suit demand upon each of the Tarter Companies boards of directors and member/managers, and that each Company's failure to act upon that demand constituted a rejection.

### C. The Business Judgment Rule Applies to Each Company's Rejection of the Plaintiffs' Demand

Defendants argue that if the Plaintiffs did make an effective demand, that demand was rejected by each company's board of directors or member/managers, and rejection of the demand is protected by the business judgment rule. In response, Plaintiffs argue that the rejection of their demand is not protected by the business judgment rule because the decision was not made by independent directors and member/managers. They also contend that the directors and member/managers did not conduct a sufficient investigation into the Plaintiffs' claims, and their decision to reject the demand is not entitled to deference under the business judgment rule.

In Kentucky, "courts apply the business judgment rule in reviewing the board's refusal to act pursuant to a shareholder's demand to file a lawsuit." *Allied Ready Mix Co.*, 994 S.W.2d at 8. The business judgment rule provides "a presumption that in making a business decision, not involving self-interest, the [fiduciaries] of a [company] acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *Id.* at 8–9 (quoting *Spiegel v. Buntrock*, 571 A.2d 767, 774 (Del. 1990)). It is presumed that decisions made by corporate directors and LLC member/managers are not subject to judicial review, and to overcome that presumption, the party challenging such a decision bears the burden of establishing facts that rebut the presumption. *Id.* at 9. "The 'business judgment rule' is invoked by courts to avoid the difficult task of reviewing business decisions, and to avoid substituting the court's uninformed opinion for that of experienced management." *Daily v. Am. Founders Bank, Inc.*, 667 F. Supp. 2d 728, 736 (E.D. Ky. 2009) (citing *Brown v. Ferro Corp.*, 763 F.2d 798, FN2 (6th Cir. 1985)). "Courts should be extremely reluctant to condemn a business practice simply because they do not perceive a good rationale to support it." *Id.* (citing *Campbell v. Potash Corp. of Saskatchewan, Inc.*, 238 F.3d 792, 800 (6th Cir. 2001)).

### 1.   *The Boards of Directors and Member/Managers Were Not Self-Interested*

Plaintiffs argue that the decision to reject their demand was not entitled to deference under the business judgment rule because Nell and Keith were acting under threat or fear of Joshua and other family members. Under Kentucky law, "the business judgment rule only operates as a presumption in favor of the officers and directors where the decision in

question does not involve self interest." *Marrowbone Pharmacy, Inc. v. Johnson*, No. 2010-CA-000429-MR, 2011 Ky. App. Unpub. LEXIS 881, at *19–20 (Ct. App. Dec. 2, 2011). "If the board of directors is interested in the transaction . . . the burden shifts to them to show that their actions were fair, honest and reasonable in all respects." *Id.* at 20 (quoting 5A Fletcher Cyc. Corp. § 2181).

Plaintiffs do not argue that Keith or Nell were interested in the decision to reject the demand, and they plainly were not. Neither had any personal stake in whether the companies decided to file a lawsuit against Defendants. Because the directors and member/managers were not acting in self-interest when rejecting the Plaintiffs' demand, the business judgment rule applies and the decision is presumed to have been made "on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *Allied Ready Mix Co.*, 994 S.W.2d at 8) (quoting *Spiegel*, 571 A.2d at 774).

To the extent Plaintiffs argue that Keith and Nell were incapable of making an independent decision, that argument is rejected. "Where a shareholder makes a demand which is refused, the board's decision is subject to judicial review according to the traditional business judgment rule. By electing to make a demand, a plaintiff shareholder tacitly concedes the independence of a majority of the board to respond." *Id.* at 8–9 (cleaned up) (citing *Spiegel*, 571 A.2d at 775–76, 777). "[O]nce a demand has been made, absent a wrongful refusal, the stockholders' ability to initiate a derivative suit is terminated." *Spiegel*, 571 A.2d at 775 (Del. 1990). Thus, by making a

demand, Plaintiffs conceded independence and waived any futility arguments.

### 2. *Keith and Nell Acted in Good Faith*

However, "a board that appears independent *ex ante* may not necessarily act independently *ex post* in rejecting a demand." *Scattered Corp. v. Chicago Stock Exch., Inc.*, 701 A.2d 70, 75 (Del. 1997), *as modified on denial of reh'g* (Oct. 22, 1997), *and overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000). "Failure of an otherwise independent-appearing board or committee to act independently is a failure to carry out its fiduciary duties in good faith or to conduct a reasonable investigation," which could constitute a wrongful refusal. *Id.* Thus, even though the presumptions of the business judgment rule apply when a decision is made by an independent board, that presumption can be overcome if the party challenging the decision can show the board did not act in good faith or did not conduct a reasonable investigation.

Plaintiffs challenge whether Keith and Nell made their decisions in good faith, arguing that they may have acted "due to fear of violence or threat of exposure of improper activities." (DE 96 at 12–13.) In support of that argument, Plaintiffs allege that "Josh, Donald and Joy frightened Nell and Keith into rescinding their [earlier] decision to cut Josh's salary." (*Id.* at 12.) The essence of their argument appears to be that Nell and Keith had previously made a business decision (unrelated and completely distinct from the decision at issue now) under duress, and therefore it is *possible* that their decision to reject Plaintiffs demands was made under duress.

However, the only evidence in the record contradicts Plaintiffs' assertions and shows that no one felt threatened or in danger at any time, and that Keith and Nell did not act under fear or duress in making the earlier decision regarding Joshua's salary. (DE 100 at 2–3.) Even if the Court were to assume that Nell and Keith's previous decision regarding Joshua's salary was made because they were "frightened" by Joshua, the Plaintiffs' allegations that the decision to reject the demand was made due to "fear of violence or threat of exposure" is entirely conclusory and speculative—the two decisions were entirely separate. Plaintiffs point to no evidence of duress in Keith and Nell's decision to reject the demand, they merely speculate as to the possibility of it. Nothing in the record supports the assertion that Keith or Nell rejected the demand because they felt frightened or threatened. Those speculative, unsubstantiated allegations are insufficient to overcome the presumption that Keith and Nell acted in independently and in good faith.

### 3.   *The Investigation into the Claims in the Demand Was Reasonable*

Plaintiffs also challenge the reasonableness of the investigation into the claims in their demand, contending that there was no "discussion or investigation into the merits" of the demand, and no "attempt to consider . . . the cost of litigation and potential impact on business." (DE 96 at 12.) They claim that Keith and Nell's failure to explain their reasons when presented with the demand and "refusal to attend the special meetings" shows that they did not act on an informed basis or with a rational purpose. (*Id.* at 11–12.)

"When a board refuses a demand, the only issues examined by a Court are the good faith and reasonableness of the board's investigation." *Belendiuk*

*v. Carrión*, Civil Action No. 9026-ML, 2014 Del. Ch. LEXIS 126, at *15 (Ch. July 22, 2014). There is "no prescribed procedure that a board must follow" in considering and responding to a shareholder demand, and the board is not required to provide a "point-by-point response" to the demand. *Baron v. Siff*, C.A. No. 15152, 1997 Del. Ch. LEXIS 152, at *10–11 (Ch. Oct. 17, 1997). In most cases, a board should conduct a factual investigation so that it can be fully informed about the claims of wrongdoing alleged in a demand letter, but when directors "already have sufficient information regarding the subject of the demand to make a decision in response to it," a factual investigation is not required. *Rales v. Blasband*, 634 A.2d 927, 935 n.11 (Del. 1993) (citing *Levine v. Smith*, 591 A.2d 194, 214 (Del. 1991)).

Plaintiffs first object to the lack of explanation from each entity for rejecting their demand, arguing it is proof that there was no investigation into their claims. However, they point to no authority supporting the claim that the boards of directors and member/managers were required to explain their decision to reject the demand. On the contrary, a company's directors or managers are not required to explain their decision. 13 Fletcher Cyc. Corp. § 5969 ("The board of directors has no obligation to take any specific type of action to respond to a demand."); *Schick Inc. v. Amalgamated Clothing & Textile Workers Union*, 533 A.2d 1235, 1240 (Del. Ch. 1987) ("The board has no obligation to take any specific type of action [in response to] a demand . . . . The board may, for example, ignore the demand, or it may take other action it deems appropriate . . . .").

Plaintiffs also appear to allege that there was no investigation into their claims, arguing that "Keith and Nell declined to consider filing suit, as

evidenced by their refusal to attend the special meetings." (DE 96 at 11.) However, the record shows that Keith and Nell were fully informed about the allegations in the demand letter, and thus were not required to conduct a formal investigation. The Plaintiffs' demand letters sought approval to file litigation against Defendants for "the claims previously incorporated in the Complaint filed" in the *Smith* case. Keith and Nell, like all the other family members, were familiar with the allegations made in that case, which was part of a longstanding dispute and major concern within the Tarter Companies and the family. Indeed, in their deposition testimony, Keith and Nell both said they were aware of and familiar with the facts of the previous litigation. But even if they had not been familiar with the claims made in the demand, all they had to do was look to the filings in the previous litigation to inform themselves. Failure to attend formal meetings or discussions does not make their investigation unreasonable, because that sort of investigation was simply not necessary where the parties were already familiar with the facts and circumstances of the alleged wrongdoing.

If one were to view the lack of formal investigation and failure to hold a special meeting "in a vacuum" and ignore the fact that this was a longstanding dispute that had previously been the subject of a lawsuit, the lack of formal action *might* be cause for concern as to whether the directors and member/managers were informed. *See Kops v. Hassell*, No. 11982-VCG, 2016 Del. Ch. LEXIS 179, at *16 (Ch. Nov. 30, 2016). However, at the time the demand letter was sent, Keith and Nell were well aware of the previous litigation and the allegations made in the demands. Since they were already familiar with the wrongdoing alleged in the demand letter, they were not

required to conduct a formal investigation. *Rales*, 634 A.2d at 935 n.11 (citing *Levine*, 591 A.2d at 214) ("[A] formal investigation will not always be necessary because the directors may already have sufficient information regarding the subject of the demand to make a decision in response to it.").

### 4. *Rejection of the Demand Can Be Attributed to a Rational Business Purpose*

Unless the presumptions of good faith or reasonableness of the investigation are rebutted, "a court will not substitute its judgment for that of the board if the board's decision can be attributed to any rational business purpose." *Omnicare, Inc. v. NCS Healthcare, Inc.*, 818 A.2d 914, 928 (Del. 2003) (quoting *Unitrin, Inc. v. Am. Gen. Corp.*, 651 A.2d 1361, 1373 (Del. 1995)) (cleaned up). "[W]here business judgment presumptions are applicable, the board's decision will be upheld unless it cannot be 'attributed to any rational business purpose.'" *Brehm v. Eisner (In re Walt Disney Co. Derivative Litig.)*, 906 A.2d 27, 74 (Del. 2006) (quoting *Sinclair Oil Corp. v. Levien*, 280 A.2d 717, 720 (Del. 1971)).

The record shows that Keith and Nell's decisions were based on concerns regarding cost of litigation, risk to future business relationships, damage to the companies' reputation, and employee morale. (DE 93-40 at 3–4, 8–9, 12; DE 93-11 at 9–19.) Plaintiffs dispute the merits of these considerations, arguing that Anna Lou had been paying the legal expenses and "business ha[d] improved since Josh and Lew left management." (DE 96 at 12.)  However, it is a fundamental premise of the business judgment rule that courts should not evaluate the substance of a board's business decision if that decision "can be attributed to any rational purpose." *Omnicare, Inc.*, 818 A.2d at 927; *see also Pfeiffer v. Leedle*, No. 7831-VCP, 2013 Del. Ch.

LEXIS 272, at *14 (Ch. Nov. 8, 2013) ("Conspicuously absent from the business judgment rule's requirements is the need for corporate directors actually to make the 'correct' decision."). The reasons articulated by Keith and Nell are rational, common sense reasons any responsible fiduciary would consider when deciding whether to engage the company in litigation. The Court will therefore uphold the decision to reject Plaintiffs' demand.

In sum, neither Anna Lou, LuAnn, nor Douglas can maintain their derivative claims. The Plaintiffs do not allege that Keith or Nell were self-interested, and so the business judgment rule applies, creating a presumption that each company's decision not to sue was made in good faith and with the honest belief that it was in the company's best interest. Plaintiffs have failed to overcome that presumption because they have not shown that any director or member/manager acted in bad faith or that any director or member/manager's investigation was unreasonable. Because there is no evidence that the decision to refrain from litigation was an abuse of discretion, the refusal to act on Plaintiffs' demands will be respected by this Court. The Plaintiffs' derivative claims will therefore be dismissed.

## CONCLUSION

For the reasons stated in this opinion, the claims brought by Tarter Industries and the claims brought by Plaintiffs in a derivative capacity on behalf of the Tarter Companies will be dismissed. Because no claims will remain in this action, the Court need not address the remaining issues raised in the parties' motions for summary judgment.

Therefore, the Court hereby **ORDERS** as follows:

(1)  Defendants Joshua Donald Tarter and Thomas Lewis Gregory's motion for summary judgment (DE 93) is **GRANTED IN PART** and **DENIED IN PART**. The Court **GRANTS** the motion to the extent that it asks the Court to hold that Plaintiff C'Ville Fabricating, Inc. *d/b/a* Tarter Industries does not have standing to assert its claims. The Court also **GRANTS** the motion to the extent that it asks the Court to hold that Plaintiffs Anna Lou Tarter Smith, Luann Coffey, and Douglas Tarter do not have derivative standing. The motion is otherwise **DENIED AS MOOT**;

(2)  The claims brought by Plaintiff C'Ville Fabricating, Inc. *d/b/a* Tarter Industries are **DISMISSED WITHOUT PREJUDICE**;

(3)  The claims brought by Plaintiffs Anna Lou Tarter Smith, LuAnn Coffey, and Douglas Tarter in their derivative capacity are **DISMISSED WITHOUT PREJUDICE**;

(4)  Plaintiffs' motion for partial summary (DE 91) is **DENIED AS MOOT**.

Dated March 25, 2022.

KAREN K. CALDWELL
UNITED STATES DISTRICT JUDGE
EASTERN DISTRICT OF KENTUCKY

– 44 –