**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**CENTRAL DIVISION AT LEXINGTON**

| | |
|---|---|
| **C-VILLE FABRICATING, INC. d/b/a TARTER INDUSTRIES,** | **CIVIL ACTION NO. 5:18-cv-379-KKC** |
| **Plaintiff,** | |
| **V.** | **OPINION and ORDER** |
| **JOSHUA DONALD TARTER, et al.,** | |
| **Defendants.** | |

**\*\*\* \*\*\* \*\*\***

This matter is before the Court on the Defendants' Motion to Exclude (R. 136). Now that this matter is fully briefed, it is ready for review. For the following reasons, Defendants' Motion is denied.

## I.  FACTAL BACKGROUND

The facts of this case have been laid out numerous times in the record. (*See* R. 65, 106, 123.) The Court will briefly summarize the facts relevant to this motion.

Through various entities (hereinafter, the "Tarter Companies"), the Tarter family operates a large animal management and farm gate manufacturing business. Principally at issue in this case are the business transactions between Plaintiff C-Ville Fabricating, Inc. (doing business as Tarter Industries), and Defendant Hong Kong QMC Industry Company, LTD ("QMC"). (R. 65 at 1–2.)

Defendant Josh Tarter is a shareholder of Tarter Industries. Plaintiff contends that at all relevant times, Josh held himself out as a high-ranking executive of the Tarter Companies and oversaw their operation. Plaintiff also alleges that Josh's right-hand man was fellow Defendant Thomas Lewis Gregory. (*Id.* at 2.)

Plaintiff sued Josh Tarter, Thomas Gregory, and QMC because of their alleged undisclosed interest in QMC. (R. 136 at 1.) The scheme allegedly resulted in the Tarter Companies wiring approximately $74,857,122.80 to QMC and its affiliates. Plaintiff asserts that during this period, Josh and Thomas hid their interests in QMC – despite a duty to reveal that information – and that Josh affirmatively lied about such interests on two occasions. (*Id.* at 2–3.)

The Court has noted that the "thrust" of the Plaintiff's allegations is that Josh and Thomas "used their senior positions with the Tarter Companies to ensure that components and parts were sourced from QMC, while siphoning Tarter funds to themselves through inflated rates for the purchased components" from QMC. (R. 65 at 2.) Plaintiff alleges that they were damaged because they overpaid QMC for the components. (R. 136 at 1.)

On June 5, 2019, the Court ordered the Clerk of Court to enter default against QMC. (R. 52.) QMC has never participated in the litigation. (R. 97 at 2.) Despite Josh and Thomas' majority ownership interest in QMC, none of its financial records were disclosed during discovery. (*Id.*)

Because Plaintiff was unable to obtain any of QMC's financial records, they retained Dr. Christopher Clifford, who holds a Ph.D. in finance from Arizona State University and is the Department Chair of the University of Kentucky's Department of Business & Economics, to conduct a financial analysis of QMC's profits. (R. 97at 2.) The expert report ("Clifford Report") calculates the difference between the amount the Tarter Companies actually paid to QMC and price quotes of the same products from a Chinese business called LongLife. (*Id.* at 2.)

Clifford's calculations were derived from an Excel spreadsheet detailing 7,094 purchases made by Tarter Industries from QMC between 2010 and 2017 and an Excel spreadsheet detailing 5,885 price quotes from LongLife on parts previously purchased by

Tarter Industries from QMC. (R. 135-2 at 3.) Clifford then estimated the economic damages by calculating QMC's markup as the difference between the price charged by QMC and that quoted by LongLife. (*Id.* at 4.) The average markup of the 5,885 price quotes was 27.45%. Clifford then assumed an average markup of 27.45% for the 1,210 purchases that did not have a direct quote from LongLife. (*Id.*) Clifford aggregated the markups to determine the markup paid on an annual basis and compounded the result to present value at 7.05%. (*Id.*) The Clifford Report concludes that the total damages suffered by the Plaintiff was approximately $24,162,158. (*Id.* at 5.) The Defendants move to exclude the Clifford Report on numerous grounds. (R. 136.)

## II.  LEGAL STANDARD

Under Federal Rule of Evidence 702, expert testimony will be admitted where the proponent satisfies four requirements: (1) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (2) the testimony is based on sufficient facts or data; (3) the testimony is the product of reliable principles and methods; and (4) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case. Fed. R. Evid. 702(a)-(d). "The party proffering the expert has the burden of proving by a preponderance of the evidence that the expert satisfies Rule 702." *Sigler v. Am. Honda Motor Co.*, 532 F.3d 469, 478 (6th Cir. 2008).

In *Daubert v. Merrell Dow Pharmaceuticals*, Inc., 509 U.S. 579 (1993), "the Court charged trial judges with the responsibility of acting as gatekeepers to exclude unreliable expert testimony." Fed. R. Evid. 702, advisory committee notes to 2000 amendment. Rule 702 provides "general standards to assess reliability: whether the testimony is based upon 'sufficient facts or data,' whether the testimony is the 'product of reliable principles and methods,' and whether the expert 'has applied the principles and methods reliably to the facts

of the case.'" *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 529 (6th Cir. 2008) (quoting Fed. R. Evid. 702).

A court's inquiry must focus "solely on principles and methodology, not on the conclusions they generate." *Daubert*, 509 U.S. at 595. "The task for the district court in deciding whether an expert's opinion is reliable is not to determine whether it is correct, but rather to determine whether it rests upon a reliable foundation, as opposed to, say, unsupported speculation." *In re Scrap Metal Antitrust Litig.*, 527 F.3d at 529–30. Courts should confirm that "the factual underpinnings of the expert's opinion [are] sound," *Greenwell v. Boatwright*, 184 F.3d 492, 498 (6th Cir. 1999), but generally "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

"Rule 702 should be broadly interpreted on the basis of whether the use of expert testimony will assist the trier of fact." *Morales v. Am. Honda Motor Co.*, 151 F.3d 500, 516 (6th Cir. 1998) (citation omitted). "Mere weaknesses in the factual basis of an expert witness's opinion . . . bear on the weight of the evidence rather than on its admissibility." *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 801 (6th Cir. 2000) (quotations and citation omitted); *United States v. Davis*, 103 F.3d 660, 674 (8th Cir. 1996) (noting defendant was "free to challenge the expert's conclusions and point out the weaknesses of the [expert's] analysis to the jury during cross-examination" but "[w]eight and credibility are the province of the jury.")

### III. ANALYSIS

Defendants make multiple arguments as to why the Clifford Report should be excluded under Federal Rule of Evidence 702 and Federal Rule of Civil Procedure 26(a)(2)(B). (R. 136 at 1.) The Court will address each argument in turn.

4

### A. The Clifford Report Relies on a Valid Comparison

Defendants argue that the Clifford Report should be excluded because it erroneously assumes that the QMC payments and the LongLife Quotes are comparable. (R. 136 at 5.) Defendants point out the fact that the QMC payments were "CIF Liberty," meaning that the cost of transport, insurance, duties, and risk were born by QMC. (*Id.*) On the other hand, the quotes from LongLife reflected "FOB Fuzhou, China." (*Id.*) This means that transport, insurance, duties, and risk would have to be borne by the Plaintiff. Defendants argue that this difference renders the Clifford Report inadmissible because it relies on an apples-to-oranges comparison and ignores the economic reality of the situation. (*Id.*)

In response, Plaintiffs point out the fact that they had to rely on the best available estimates, particularly because they are unable to obtain financial documents showing QMC's costs and profits. (R. 97 at 2.) They argue that had QMC participated in this litigation, they would know exactly what QMC's costs, sources of supply, and profits were. (*Id.* at 2.)

Because the Plaintiff is unable to view QMC's financial documents, some way of calculating its profits is necessary. Although Defendants assert that the payments were an apples-to-oranges comparison to the price quotes, the evidence shows otherwise. In fact, the comparisons, minus the obvious shipping costs discrepancy, are very similar. Most parts the Tarter Companies ordered from QMC had an exact comparison with LongLife. This is because LongLife is in the same industry as QMC, and, in fact, was QMC's supplier. (R. 97 at 2.) Contrary to Defendant's argument that the comparison is "unhelpful and misleading," it is a reliable way determine QMC's profits since its records are unavailable. (R. 136 at 6.)

Allowing this report will not confuse the jury, and any discrepancy in the Clifford Report is properly dealt with by vigorous cross examination. *Daubert*, 509 U.S. at 596. With the help of counsel, a juror will easily be able to differentiate a payment that put all transportation costs and risk on the seller, and a price quote that shifts costs and risk to the

buyer. Nor does admitting the Clifford Report ignore the economic reality. Plaintiff alleges it paid over $74,000,000 to QMC for parts. The economic reality is that shipping costs were but a small portion of the figure paid. Although QMC's profits may be less than reported after factoring in transport costs, "[t]he task for the district court in deciding whether an expert's opinion is reliable is not to determine whether it is correct, but rather to determine whether it rests upon a reliable foundation . . ." *In re Scrap Metal*, 527 F.3d at 529–30.

The Clifford Report reaches its conclusion based on Plaintiff's actual purchase history, and the cost of capital is based on data provided by experts in the financial industry: NYU Stern and Aswath Damodaran. Dr. Clifford has testified that his analysis is standard in the finance community and can be found in "every finance textbook, in any corporate finance or valuation-based textbook at the undergraduate or graduate level." (R. 136-2 at 4; R. 97-6 at 5.) Notably, the Defendants' motion does not attempt to undermine Dr. Clifford's credibility as an expert or the pricing models he uses. Because the Clifford Report has a sufficiently reliable foundation and will help assist the jury in understanding the financial aspects of Plaintiff's claims, it will not be excluded on these grounds.

## B. The Clifford Report has a Sufficient Basis for Determining the Plaintiff's Economic Damages

Next, Defendants take issue with the fact that the Clifford Report fails to allocate damages to Tarter Industries individually. (R. 136 at 7.) Defendants argue that the Clifford Report aggregates damages amongst all four Tarter Companies, which is irrelevant and entirely unhelpful, since the only remaining Plaintiff is Tarter Industries. (R. 142 at 10.) Plaintiff disagrees, stating that the Clifford Report clearly references Tarter Industries. (R. 141 at 3.)

Plaintiff is correct. While parts of the Clifford Report reference economic damages suffered by the "Plaintiffs," this is due to the fact that the report was created at the time

6

when the other three Tarter Companies were still members to the lawsuit. However, the Clifford Report bases its calculations "solely" on the sales between Tarter Industries and QMC. (R. 97-4 at 3, 4.) The total damages figure is based off 7,094 orders, all of which were purchased by Tarter Industries. This makes sense given that Tarter Industries "is responsible for the manufacture and purchase of component parts . . ." (R. 106 at 2.) The fact that the Clifford Report's conclusion says "Plaintiffs" instead of "Plaintiff" is immaterial, because the remaining Plaintiff is the entity whose purchases the calculations were based off. The Clifford Report will not be excluded on these grounds.

### C.  The Clifford Report Satisfies Rules 26(a)(2)(B) and 37(c)(1)

Defendants argue that the Clifford Report should be stricken because the Report did not include information about Dr. Clifford's testimonial experience over the last four years and on his compensation. (R. 90 at 8.) Each of those are required to be disclosed during discovery. Fed. R. Civ. P. 26(a)(2)(B)(v), (vii).

Federal Rule of Civil Procedure 37(c)(1) provides that if a party fails to provide information or identify a witness as required by Rule 26(a), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless.

The drastic sanction of striking the Clifford Report is not warranted because the nondisclosure was harmless. Plaintiff states that the Clifford Report did not mention Dr. Clifford's testimonial experience over the past four years because he has none. (R. 97 at 9.) Additionally, the Plaintiffs indicate that Dr. Clifford's rate is $400 per hour. (*Id.*) Because the error was harmless, the Court will not strike the Clifford Report on these grounds.

7

### D. Additional Arguments in Defendants' Supplemental Briefing

Defendants submitted five new arguments in their supplemental briefing.[1] The Court will address each in turn.

#### i. Damages and disgorgement

Defendants argue that Dr. Clifford's model of "economic damage" is not really a measure of damage to the plaintiff, but rather a measure of the amount Defendants profited from marking up QMC prices. (R. 142 at 3.) Defendants construe this as an attempt by Plaintiff to seek a double recovery for the same funds: one via disgorgement of profits, and another by way of "economic damages." (*Id.*)

Plaintiff has given no indication that it seeks to recover QMC's profits twice over, and any attempt to do so would not be permitted. Rather, the Clifford Report is merely a way to quantify the harm allegedly caused by Defendants. If Plaintiff was to prevail on the merits of its claims, it would be entitled to recover profits earned by QMC. In fact, the citation Defendants provided helps prove this: "if a plaintiff has obtained an award of the defendant's profits (which is a proxy for what the plaintiff would have earned on the sales), the plaintiff must tie separate damages to a distinct harm and cannot seek a double recovery.") *Max Rack, Inc. v. Core Health & Fitness*, LLC, 40 F.4th 454, 476 (6th Cir. 2022). Like *Max Rack,* Plaintiff's damages *are* the Defendants' profits, because the extra price paid to QMC would otherwise be money it saved.

---

[1] Defendants' original motion did not contain the following arguments. (*See generally* R. 90.) This is because the original motion was denied as moot after the Court granted summary judgment for defendants on all counts. (*See* R. 107 at 2.) After the Sixth Circuit reversed this Court's decision this case was once again set for trial. The Court ordered that the Clerk re-file this motion and allowed each party to submit a supplemental briefing. (R. 135.) The Court will therefore address Defendants' additional arguments.

Even if this distinction mattered, the Plaintiff would still have to prove the amount of revenue the Defendants earned to be entitled to disgorgement. Because they do not have access to QMC's financial records, the Clifford Report helps fill in the missing pieces.

Further, for purposes of a motion to exclude, the Court's gatekeeping function is limited to the considerations in Rule 702. The Court has already determined that Dr. Clifford's report satisfies Rule 702 and that his testimony will help assist the jury. Defendants' attempt to distinguish the remedies of damages and disgorgement does not alter the Court's Rule 702 determination. The Clifford Report will not be excluded on these grounds.

### ii. The Clifford Report is not an adoption of Plaintiff's lay opinion, nor is it basic math

Defendants contend that the Clifford Report is not an expert report at all, but rather Plaintiff's own position clothed in expert garb. (R. 142 at 4.) Defendants argue that Dr. Clifford "blindly accepted that the LongLife quotes were comparable to the QMC prices" and that he conducted basic math to arrive at his opinion. (*Id.*) This, Defendants argue, amounts to a wholesale adoption of Plaintiff's position. (*Id.*)

Defendants' criticisms are off base. Defendant's attempt to construe Dr. Clifford's reliance on Plaintiff's purchase records as "adopt[ing] the analysis and calculation of his client," as if its actual financial records are some sort of opinion, analysis, or calculation. (*See id.*) This ignores the practical reality and purpose behind Dr. Clifford's Report. To determine QMC's profits, he necessarily had to reference the Plaintiff's purchase records. Using such records to calculate QMC's profits is not a wholesale adoption of Plaintiff's position.

Additionally, the Clifford Report is more than basic math. The Clifford Report analyzed 7,094 purchases over a seven-year span. It then aggregated QMC's markups on an annual basis and compounded the result to present value at a rate of 7.05%. (R. 97-4 at 4.)

While this may not be the most complex calculation, it is certainly beyond "basic math" that any lay person can do. Additionally, Dr. Clifford based his calculations off specific data that is best understood by a specialist in the finance industry. (*See id.*) Specifically, the present value calculation is especially helpful to the jury, as it allows them to better understand the impact of the purchases. The Clifford Report will not be excluded on these grounds.

### iii.  The Clifford Report based its calculation on gross profits

Defendants argue that Plaintiff's reliance on gross profits is improper; that the correct measure of damages should be net profits. (R. 142 at 9.) While "[t]he use of gross rather than net profits has also been found to be an inappropriate way of calculating lost profits," the cases Defendants cite relate to 42 U.S.C. § 1983 and breach of contract cases. *See Wineries of the Old Mission Peninsula Ass'n v. Peninsula Twp.,* No. 1:20-CV-1008, 2025 WL 1859905 (W.D. Mich. July 7, 2025) (citing *Cont. Design Grp., Inc. v. Wayne State Univ.*, 635 F. App'x 222, 235 (6th Cir. 2015)). Even if Defendants are correct, the Court can resolve this issue with specific jury instructions, avoiding the need to take the harsher path of excluding an expert.  Additionally, Dr. Clifford's figures will be subject to scrutiny on cross examination and defense counsel is free to question all aspects of his financial calculations. The Court will not exclude the Clifford Report on that basis alone.

### iv. Federal Rule of Evidence 403

Defendants' final argument is that the Clifford Report should be excluded because it will mislead the jury. (R. 142 at 11.) To support this claim, Defendants repeat its argument about economic damages and disgorgement. The Court has already resolved that argument and will not address it further. *Supra* § III.D.i. Because the probative value of the Clifford Report is not substantially outweighed by its likelihood of misleading the jury, it will not be excluded.

## IV.  CONCLUSION

The Clifford Report will help assist the jury in understanding the financial impact of the transactions between Plaintiff and QMC. Plaintiff has established that Dr. Clifford has specialized knowledge in the financial industry; based his Report on thousands of actual purchases over a seven year period; used principles taught in "every finance textbook, in any corporate finance or valuation-based textbook at the undergraduate or graduate level;" and applied present value calculations to all 7,094 purchases. Because Plaintiff has proven by a preponderance of evidence that the requirements of Fed. R. Evid. 702 have been met, the Clifford Report will not be excluded.

Accordingly, the Court hereby ORDERS that Defendants' Motion to Exclude (R. 136) is DENIED.

This 20th day of July, 2026.

**Signed By:**

*Karen K. Caldwell*

**United States District Judge**

11